USDC SCAN INDEX SHEET










ANDY   8/21/02   7:19
3:02-CR-00333   USA V. ESQUINO
*64*
*CRRESPM.*

PATRICK K. O'TOOLE
United States Attorney
TIMOTHY D. COUGHLIN
Assistant U.S. Attorney
California State Bar No. 144911
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7044

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 02cr0333-W |
| Plaintiff, | Date: August 26, 2002<br>Time: 2:00 p.m. |
| v. | GOVERNMENT'S RESPONSE AND |
| CHRISTIAN E. ESQUINO (1), | OPPOSITION TO DEFENDANT'S<br>MOTION IN LIMINE: |
| Defendant. | 1) TO COMPEL FURTHER DISCOVERY;<br>2) ADMISSION OF FOREIGN DOCUMENTS;<br>3) ADMISSION OF PRIOR CONVICTIONS, OR OUTSTANDING ARREST WARRANT;<br>4) ADMISSION OF EVIDENCE OF ADDITIONAL AIRCRAFT PURCHASES<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES AND GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Patrick K. O'Toole, United States Attorney, Timothy D. Coughlin, Assistant U.S. Attorney and hereby files its response and opposition to defendant's above-referenced motions. Said response is based upon the files and records of this case, together with the attached statement of facts, memorandum of points and authorities, and Government's renewed motion for reciprocal discovery.

I

STATEMENT OF THE CASE

The defendants are charged by indictment as follows: **Count 1** - Conspiracy to commit fraud involving an aircraft, in violation Title 18, United States Code, Sections 38(a)(3) and 38(a)(1)(C); **Counts 2 through 35** - False Statements or Writings, in violation of Title 18, United States Code, Section 1001 and Title 18,

FILED
AUG 19 2002
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States Code, Section 2; **Counts 36 and 37** - Fraud involving an aircraft, in violation of Title 18 United States Code, Section 38(a)(1)(C) and Title 18, United States Code, Section 2; **Count 38** - Fraudulent communications involving an aircraft, in violation of Title 18 United States Code, Section 32(a)(6) and Title 18, United States Code, Section 2.

II

STATEMENT OF FACTS

A. The Aircraft Purchase From Mexican Agricultural Department

In 1994, Christian Esquino, Mauricio Esquino and Luis Evia formed Argentum Air Corporation, to buy and sell aircraft. In late 1996, Christian Esquino and Jorge Sanchez-Pedraza struck a deal with the Mexican Agricultural Department "SAGAR" to trade thirteen of SAGAR's aircraft for a newer Jet Star aircraft. SAGAR's aircraft included a King Air, two helicopters, a number of Cessna 310s and 210s aircraft. Because Sanchez-Pedraza was not knowledgeable about aircraft, he relied on Esquino to conduct negotiations with SAGAR.

Prior to executing the transaction with SAGAR, Esquino directed Evia to ensure that Argentum Corporation was in good standing with the State of California by paying any outstanding fees. Esquino used the Argentum Corporation as the corporate entity in purchasing SAGAR's aircraft. In early 1997, Esquino directed Evia to provide Sanchez-Pedraza with the power of attorney for Argentum. Thereafter, Sanchez-Pedraza signed the agreement between SAGAR and Argentum, as Argentum's representative. FAA records document the 1997, purchase by Argentum of thirteen aircraft from SAGAR. Shortly after the contract was signed the Mexican aircraft began to arrive at Brown Field and were then transported to Esquino's company at Chino airport.

According to Evia, once the Mexican aircraft were present in the US, he was contacted by Esquino and asked to assist Lance Ricotta, an Esquino associate, in creating bogus logbooks or portions of logbooks, for some of the Mexican aircraft. At Esquino's direction Evia contacted Axel Ambrosius and asked him to assist them in creating bogus logbook entries for the recently arrived Mexican aircraft. According to Ambrosius, Ricotta and Evia provided him with the needed materials to create bogus log books including, blank logbooks pages, stamps and seals, the Mexican tail numbers of the purchased aircraft, Mexican airport codes,

information on an aircraft's flight range and fuel capacity, as well as the starting and ending time periods for which they needed logbook entries.

Ambrosius filled in blank pages with a pilot's name, license number, aircraft model, registration number, date, flight time, including departure time, arrival time and total time, as well as the total aircraft time. According to Evia and Ambrosius, Ricotta obtained and used stamps and seals which he placed into the logbooks regarding inspections and maintenance completed on the aircraft. Evia helped fill in the stamps by making up information and names regarding inspections to include information on the type of inspection, the date it occurred and the location, the name of the authority conducting the inspection and the total time hours on the aircraft. Both Evia and Ambrosius state that Ricotta put stamps and seals into the bogus log books and generally took steps to make the log books look older as well as authentic.

According to Ambrosius, he was paid twice for working on the Mexican logbooks. The first time, Ambrosius accompanied Esquino's wife, Bertha Cruz to an ATM at a Bank in Coronado. The second time, Ambrosius was paid directly by check presented to him by Esquino at Evia's office and Ricotta was also present. Bank records for Esquino's account corroborate a check in the amount of $2,500, was written to Ambroisius.

According to FAA safety inspector John Blanco, Federal Aviation Regulations require aircraft owners and operators to keep records of maintenance, preventive maintenance, alterations and inspections performed on each of their aircraft, aircraft engines, propellers and appliances. Many owners and operators maintain individual logbooks for the "aircraft" (airframe, appliances and avionics) and "engine" (basic engine and accessories). Records kept by owners and operators must include descriptions of the work performed, the date of completion of that work and the signature and certification number of the person approving the aircraft or engine for return to service. This information is vital when the owner of an aircraft is seeking to obtain an annual airworthiness inspection or the standard airworthiness certificate when an in imported aircraft is made ready to fly.

Typical maintenance records include entries describing the removal and replacement of tires, brakes, fuel pump, engine spark plugs, filters, annual inspections, engine or propeller overhauls. Aircraft owners and operators are further required to track and record the total time in service of each airframe, engine, propeller and rotor. Total time in service is used to schedule required maintenance, determine the inspection status of

those items required to be inspected at specific intervals, determine the retirement date/time of life limited parts, if installed, and gauge the resale value of the aircraft, engines and appliances. The logbooks provide a history of the aircraft including its major repairs/maintenance, disclose any major problems, such as, airframe damage caused by an accident, engine failure, engine overhauls and modifications. The logbooks also tract total time, which is the run time/flight time on the engine(s) and airframe from the date of manufacture and time since a major overhaul.

According to Inspector Blanco, the total time and time since a major overhaul are important to any buyer/owner because engines and airframe parts have different life spans set by manufacture specification which require inspection, repair, replacement or overhaul depending on the part. If the total time and or time since a major overhaul are fraudulently changed it has a direct impact on the condition and safety of the aircraft. A change of these times also has an economical impact on the aircraft, fraudulently showing the aircraft had an engine overhaul would increase the value of the plane because the perspective buyer is being told that the engine(s) have less hours than they actually do. According to Blanco and Evia, who are familiar with the small aircraft industry, an aircraft without logbooks and or incomplete logbooks could lose 30% to 40% of its value, consequently creating false logbooks or filling in logbook gaps with false entries could substantially increase the value of the aircraft.

Between March 1997 and early 1998, according to FAA records, all thirteen aircraft were sold by Esquino and Ricotta to U.S. buyers. Each aircraft was sold with the forged logbooks and FAA records show that the new US owners applied for FAA's standard airworthiness certificate using the bogus logbooks as evidence of the aircraft's maintenance and inspection record while in Mexico. The current US owners of six of the Mexican aircraft sold by Esquino and Ricotta in the US were given the bogus Mexican log books when they purchased the aircraft.

B. The Piper Cherokee Aircraft

On March 16, 1998, Craig Allen, who owned a 1969 Piper Cherokee PA-28 aircraft, sold the Piper Cherokee to Lance Ricotta, for $16,500. Escrow and bank records show that Christian Esquino financed the purchase of the aircraft. When Ricotta and Allen discussed the condition of the Piper aircraft, Allen informed Ricotta that the engine on the Piper had "run out", meaning that the flight hours on the engine were near the maximum allowable and that the engine needed to be overhauled. Allen believed the engine had a 2000-hour

maximum lifetime and recalled it was at approximately 1800 hours, when he purchased it in 1996. Allen stated that Ricotta was very familiar with this fact and used it when negotiating the purchase price for the Piper Cherokee. Allen also stated that personnel at the Faulkner Air Shop in Burnet, Texas were familiar with the Piper Cherokee aircraft and refused to issue Allen a ferry permit in March 1998, based on the overall condition of the Piper's engine.

On August 12, 1999, Max Lightsey purchased the Piper Cherokee through Carlsbad Aircraft Sales, located at Palomar Airport. Lightsey purchased the aircraft for $39,000.00 and knew the owner of the aircraft was Lance Ricotta, but dealt mainly with the broker. The Piper Cherokee aircraft was advertised as having 415 hours on the engine with a total tech time of 3525 hours. Lightsey was told and believed that the aircraft and engine were in good condition when he purchased it. On December 31, 1999, Mark Battle was flying the Piper Cherokee when the aircraft experienced engine failure. Battle made an emergency landing short of the airport, and narrowly avoiding traffic and electrical lines. Lightsey replaced the engine after he was told, the accident was caused by catastrophic engine failure. Followup interviews by IRS Special Agent Larry Kaiser revealed that the Piper Cherokee's logbooks had been changed. The current Piper logbooks show an engine overhaul on September 9, 1982, when in fact it was only an engine inspection and repair. The mechanic who performed this work was interviewed and unequivocally stated the logbook had been forged and he did do an engine overhaul on September 9, 1982.

C. The Jet Commander Aircraft

On May 23, 2000, Ron Hevele, doing business as: Wheeler Ridge Aviation, sold a 1966 Jet Commander aircraft, U.S. serial number N382AA to Lance Ricotta for $150,000.00. The money was wire transferred to Hevele from Insured Aircraft Escrow Company. Hevele recalled that Ricotta traveled to Bakersfield with a business partner (Esquino) to inspect the aircraft. He recalled that Ricotta spent little time inspecting the plane but spent substantial time reviewing the logbooks. Ricotta told him that he was the "leg man" and his partner (Esquino) was the "money man". Ricotta offered Hevele $150,000.00 for the aircraft which he thought was a good price because the engines had high time on them and one of the life-limited parts in the engine was near the end of it allowable cycles, which required replacement. At the time Ricotta purchased the aircraft, he (Ricotta) was well aware of the time on the engines because they discussed the matter.

On July 20, 2001, Robert Howell purchased the Jet Commander from Lance Ricotta, doing business as: Wright Brothers Aviation. Howell purchased the aircraft for $250,000.00 and took delivery of the plane at Executive Aviation Logistics (EAL) at Chino Airport, Chino, California. Christian Esquino purchased the stock in Executive Aviation Logistics (EAL) in early October 2000 for $1,450,000. The purchase price included cash and the trading of aircraft with the former owner of EAL. EAL was in Chapter 11 Bankruptcy at the time Esquino purchased the company. EAL is a fixed base operation located at Chino Airport.

Howell recalled that he initially contacted Ricotta based on an advertisement in an aircraft magazine. Howell stated that older Jets are worth the value of their engines. The engines on the jets have life-limited components, meaning that certain components such as the compressors must be replaced at 6000 cycles. The aircraft has two jet engines and each engine has 8 compressors. To replace all the compressors and parts could cost approximately $200,000.00 per engine. The aircraft was advertised as having new life-limited components when it was overhauled in 1978. The aircraft was advertised as the right engine having approximately 2000 hours and the left engine having 1861 hours and 1727 cycles. When Howell purchased the aircraft he believed he was purchasing an older Jet with newer engines. The logbooks that Howell purchased showed that their had been an engine overhaul for the right engine on May 16, 1978, and for the left engine, on May 18, 1978.

Shortly after purchasing the aircraft, Howell contacted Ron Hevele, the former owner who sold the Jet Commander to Ricotta. During the conversation, Hevele stated that it was a good plane except the engines had high time on them. Hevele said that when he sold the plane to Ricotta in 1999 the engines had approximately 3,255 hours on them and one of the engines had 5,975 cycles and it was only good for 6,000 cycles. Followup interviews by IRS Special Agent Larry Kaiser revealed that the logbooks had been changed and the entries on May 16 and 18, 1978, showing an engine overhaul had been forged. The mechanic who worked on the Jet Commander was interviewed and he stated that he had done a 150-hour inspection on the jet Commander's engines but not an overhaul. Copies of records kept by the mechanic's own company who performed the work corroborate that it was a 150-hour inspection and not an engine overhaul.

D. <u>Purchase of Four Additional Aircraft</u>

Between 1997 and July 20, 2001, paperwork shows that defendant Esquino purchased or arranged for the purchase of the following four aircraft: 1) a Rockwell Commander 690B, US tail number N25CE; 2)

a Cessna Conquest, US tail number N441CE; 3) a Merlin IIIB, US tail number N100CE; and 4) a Navajo Piper, US tail number 82PP. Each of these aircraft had portions of their log book entries created, altered or completely forged by defendants Ricotta or Esquino. Government agents confirmed this by providing copies of the log books to various companies that log book entries showed had worked on the aircraft. Representatives of these companies confirmed that the entries were false although the entries purported to be theirs. When Government agents contacted a rubber stamp company here in San Diego, they learned that Ricotta had purchased as many as 50 aircraft industry related stamps for various aircraft companies and repair stations. A comparison of these stamps and the forged stamps in the log books of the four aircraft show they were the identical stamps purchased by Ricotta.

## III
## POINTS AND AUTHORITIES

A.    DISCOVERY

This memorandum addresses two specific areas of discovery: (1) the Government's witness list for this case; and (2) Brady material, including the criminal records of Government witnesses.

    1.    Witness list

The Government will provide a witness list two weeks prior to the trial date set by this Court. While the Government may supply a tentative witness list two weeks in advance of trial, it vigorously objects to providing home addresses. See United States v. Sukumolachan, 610 F.2d 685, 688 (9th Cir. 1980), and United States v. Conder, 423 F.2d 904, 910 (9th Cir. 1970) (addressing defendant's request for the addresses of actual Government witnesses). A request for the home addresses and telephone numbers of Government witnesses is tantamount to a request for a witness list and, in a non-capital case, there is simply no legal requirement that the Government supply defendant with a list of the witnesses it expects to call at trial. United States v. Thompson, 493 F.2d 305, 309 (9th Cir.), cert. denied, 419 U.S. 835 (1974); United States v. Glass, 421 F.2d 832, 833 (9th Cir. 1969).

The Ninth Circuit addressed this issue in United States v. Jones, 612 F.2d 453 (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980). In Jones, the court made it clear that, absent a showing of necessity by the defense, there should be no pretrial disclosure of the identity of Government witnesses. Id. at 455. Several other Ninth Circuit cases have reached the same conclusion. See, e.g., United States v. Armstrong, 621 F.2d 951, 1954 (9th Cir. 1980); United States v. Sukumolachan, 610 F.2d at 687; United States v. Paseur, 501

F.2d 966, 972 (9th Cir. 1974) ("A defendant is not entitled as a matter of right to the name and address of any witness.").

2. Request for Brady Material

The Government in this case will comply with the Brady mandate and will abide by its Brady obligations concerning discovery. Furthermore, any uncharged prior misconduct attributable to Government witnesses, all promises made to and consideration given to witnesses by the Government, and all threats of prosecution made to witnesses by the Government will be disclosed if required by the doctrine of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 450 U.S. 150 (1972). As the Government becomes aware of other evidence that is favorable to the defense on the issue of guilt it will make it available to the defendant. This includes any benefits or lenient treatment provided to government witnesses. The Government will provide a rap sheet for all Government witnesses two weeks prior to trial.

B. GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR THE ADMISSION OF FOREIGN DOCUMENTS

The Government has no objection to allowing the foreign documents, purported to be court Mexican records, concerning the criminal case pending against defendant Esquino admitted into evidence pursuant Fed. R. Evid. 902(3). That is provided the foundational requirement for the document's admission as set forth in Fed. R. Evid. 901(b)(7), is satisfied by the testimony of defendant Esquino's Mexican attorney Ernesto Sorriano and the document's counsel intends to rely on are translated into English by a court certified interpreter. Pahl v. Commissioner, 150 F3d 1124, (9th Cir. 1998)(foreign document admissible where supported by witness testimony).

Conversely the Government requests that the certified foreign documents dated June 18 & 19, 2002, that it produced in discovery which were received from the Mexican Department of Communications and Transportation Civil Aviation General Administration (DGAC) department, also admitted as foreign documents provided the foundational requirement's of Fed. R. Evid. 901(b)(7) are satisfied by the testimony of a witness. A translation of the relevant DGAC' documents will be forth coming.

//

//

C.  IMPEACHMENT EVIDENCE SHOULD BE ADMITTED

If defendant chooses to testify, the Government intends to impeach him with evidence of his prior two felony convictions a 1993 tax conviction and a 1993 bank fraud conviction. Federal Rule of Evidence 609 provides:

(a) General Rule.

For the purpose of attacking the credibility of a witness, (1) evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

(b) Time Limit.

Evidence of a conviction under this Rule is not admissible if a period of ten years has elapsed since the date of the conviction or of the release of the witness from confinement, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial value.

In United States v. Jimenez, 214 F.3d 1095 (9th Cir. 2000), the Ninth Circuit reiterated the five factors that the district court should evaluate in making the balancing determination required by Rule 609(a)(1). Specifically, the court must consider: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. 214 F.3d at 1095.

It is anticipated that should the defendant testify he will claim that his co-defendant Lance Ricotta orchestrated all illegal activity involving aircraft log books. The Government should not be prevented from demonstrating defendant's lack of trustworthiness, based on his two prior felony convictions. See, United States v. Cook, 608 F.2d 1175, 1187 (9th Cir. 1979)(en banc) cert. denied, 444 U.S. 1034 (1980), overruled on other grounds, Luce v. United States, 469 U.S. 38 (1884). See also, United States v. Alexander, 48 F.3d 1477 (9th Cir.) cert. denied 116 S.Ct. 210 (1995) (Prior convictions for residential robbery and possession of rock cocaine for sale more probative of defendant's credibility than prejudicial to his defense in bank robbery trial); United States v. Caudle, 48 F.3d 433, 435 (9th Cir. 1995) (Regardless of whether theft

conviction considered a crime of dishonesty, theft conviction properly admitted as its probative value outweighed any unfair prejudice).

Rule 609(b) provides that a conviction is admissible under 609(a) if less than 10 years has elapsed since the release of the witness from the confinement imposed for that conviction. F.R.E. 609(b). More importantly, Rule 609, by its own terms, allows for the admission of a prior conviction even where the defendant has been released for ten years because a defendant should not be permitted to mislead the jury into believing that he had one aberrational episode. United States v. Alexander, 48 F.3d 1477 (9th Cir.) cert. denied, 116 S.Ct. 210 (1995). Taking all the factors into consideration, this court should allow the defendant to be impeached with his prior felony convictions which are clearly admissible for impeachment value. "When a defendant take the stand and denies having committed the charge offense, he places his credibility directly at issue." United States v. Alexander, 48 F.3d at 1489. In this case, knowledge will be the central issue. If Defendant takes the stand, his credibility will constitute the most important question of fact for the jury. Based on the foregoing, the United States should be allowed to impeach Defendant with his prior felony convictions.

1. Pending Mexican Charges Against Esquino

While the Government agrees that it would be improper to inquire of a defendant concerning pending criminal charges and will not do so in this case. While the Government agrees that it would be improper to inquire of the defendant concerning pending charges, there is no such admonition in a foreign deposition to inquire if such a charge was known and if it influenced a witnesses actions. If this court determines that foreign depositions will be taken, the Government will ask witnesses if they knew of the pending action by the Mexican Government. Contrary to defendant's claims this information is highly relevant and involves the same subject matter which forms the heart of this case. The foreign documents the defendant seeks to have the court admit into evidence are from this pending criminal case.

D. EVIDENCE OF THE PURCHASE AND SALE OF FOUR ADDITIONAL AIRCRAFT BY THE DEFENDANTS IS ADMISSIBLE AS PART OF THE CHARGED CONSPIRACY

The conspiracy charged in this case is a Conspiracy To Commit Fraud Involving AirCraft parts, in violation of Title 18 United States Code, Sections 38(a)(3) & 38(a)(1)(c). Section 38(a)(1)(c) provides, in relevant part:

>> Whoever, in or affecting interstate of foreign commerce, knowingly and with the intent to defraud –
>
> (c) makes or uses any materially false writing, entry, certification, document, record, data plate, label or electronic communication concerning any aircraft . . . part [shall be guilty of an offense].

Section 38(a)(3) makes it a crime to "attempt[ ] or conspire[ ]" to violate 38(a)(1)(c).

The indictment alleges that the conspiracy began at a date unknown to the grand jury and continued until July 20, 2001. The heart of the charge is that the defendants purchased aircraft, forged aircraft log books and maintenance records in order to increase the value of the aircraft, and then sold the aircraft to unsuspecting buyers. The buyers – based upon the phony logbooks – believed the planes were much more valuable and safe than they really were. As a result, buyers paid substantially more for the aircraft than they were really worth and air safety was adversely affected because the true condition of the aircraft was hidden. The indictment details the Manner and Means by which the conspiracy was executed.[1] In addition, 25 overt acts taken in furtherance of the conspiracy are set forth. Indictment pp. 6-11. The overt acts span from early 1997 through July of 2001. Id.

In the weeks leading up to the original trial date, the government discovered four additional aircraft that the defendants purchased, forged the logbooks, and then sold. This conduct took place during the conspiracy period alleged in the indictment and is precisely the conduct described in the conspiracy charge. Defendants were promptly provided discovery concerning these additional aircraft and were informed that the government intended to offer evidence about the aircraft on the conspiracy count.[2]

Defendant Esquino moves to exclude evidence concerning the four additional aircraft based

---

[1] In particular, defendants Esquino and Ricotta are alleged to have executed the conspiracy as follows: 1) They provided blank logbooks to create false and fraudulent logbooks for the Mexican aircraft purchased by Esquino's corporation "Argentum.," 2) They provided Mexican tail numbers, airport codes, aircraft fuel ranges and correct letters and numbers in Mexican pilots license to create false and fraudulent logbooks; 3) Ricotta and or Esquino obtained or were provided Mexican inspection stamps and Cessna repair station stamps; 4) Esquino paid at least one of the individuals for creating the false entries into the log books; 5) They thereafter caused the aircraft purchased from Mexican government to be sold by utilizing the fraudulent created logbooks; 6) The purchasers of the aircraft then applied for airworthiness certificates relying on information in fraudulent logbooks; 7) Defendants forged logbook entries reflecting engine overhaul and inspection records for an aircraft purchased by the defendants; 8) Defendants sold aircraft with forged logbooks and forged engine overhaul and inspection records.

[2] Defendants will have had the discovery concerning these aircraft for close to two months by the time these motions are scheduled to be heard on August 26, 2002.

11     02cr0333

on the claim that allowing the evidence will result in the constructive amendment of the indictment or a fatal variance. This simply is not so. The motion is meritless.

The entire motion is based upon a fundamental misapprehension of the distinction between a conspiracy charge and substantive offenses. Contrary to his claim that "in effect, four new charges... must be defended," Motion at p. 6, line 17, there are no new substantive charges. Rather, the government intends to offer proof on the aircraft precisely because they evidence the conspiracy charged.[3/] (Indictment, Count 1). Indeed, the evidence concerning the four additional planes lies at the heart of the conspiracy charged and, further, is the exact same type of conduct specifically set forth in the overt acts alleged. The law is clear – an indictment is not required to set forth every overt act and the government is not limited to proving up what is alleged in the overt acts. In fact, the particular conspiracy statute charged does not require even one overt act to be alleged.

An indictment is properly pleaded if it (1) contains the elements of the offense intended to be charged and sufficiently apprizes the defendant of what he must be prepared to meet; and (2) in case any other proceedings are taken against him for a similar offense, it must show with accuracy to what extent he may plead a former acquittal or conviction. Russell v. United States, 369 U.S. 749, 763 (1962). While a defendant has a right to be tried only on the charges returned by a grand jury in a proper indictment, the accused "is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." United States v. Giese, 597 F.2d 1170, 1181 (9th Cir. 1979). Moreover, it is well settled that the government is not limited in its proof to establishing the overt acts specified in the indictment, nor must the government prove every overt act alleged. United States v. Ruiz-Altschiller, 694 F.2d 1104, 1109 (8th Cir. 1982); Brulay v. United States, 383 F.2d 345, 350-51 (9th Cir. 1967). Where the indictment fairly specifies the offense charged and notifies the defendant of the particulars, the defendant has knowledge that other overt acts underlying the conspiracy might be pleaded at trial. United States v. Elliott, 571 F.2d 880, 911 (5th Cir. 1978).

Despite this very clear and long-established proposition, defendant Esquino argues that allowing proof about the four additional aircraft will somehow amend the indictment or result in a variance of proof. An amendment of the indictment occurs when the charging terms of the indictment are altered after the grand jury

---

[3/] Defendant Esquino's other arguments concerning the inextricably intertwined doctrine and other acts evidence are misplaced. Again, evidence concerning the four aircraft will be offered to prove up the conspiracy charged in the indictment.

has passed upon them. See United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993)("A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecution or court after the grand jury has last passed upon them.") A variance in proof occurs when the charging terms of the indictment are unchanged, but the evidence offered at trial proves facts materially different from those alleged in the indictment. United States v. Gil, 58 F.3d 1414, 1422 (9th Cir..1995).

In United States v. Atisha, 804 F.2d 920 (6th Cir. 1986), the court addressed and rejected a constructive amendment and variance claims similar to those being made here. In that case, evidence concerning a stolen truckload of beef was presented. The indictment alleged a conspiracy but did not identify the stolen beef. Nevertheless, the court concluded that the indictment encompassed the theft because, although the indictment had not specifically referred to the theft at issue, the "the time-frame, modus operandi, and characters were identical to those alleged in the indictment." Id. at 927. The court noted that there is no requirement in conspiracy cases that the government disclose all overt acts in furtherance of the conspiracy, id. (citing Giese, 597 F.2d at 1180), and concluded that the evidence was admissible against the defendant for, "by admitting evidence of another overt act, the theory of the case was not changed, the defendant was not charged with a different substantive crime, and the elements of the crime charged were not altered." Id. Therefore there was neither a constructive amendment to, or variance of, the indictment.

The Ninth Circuit has also rejected claim of prejudicial variance where, as here, the conduct falls within the conspiracy charged. United States v. Gil, 58 F.3d 1414. In that case, the indictment alleged a conspiracy to distribute cocaine extending from August 18 through September 23, 1992. The first overt act listed in the indictment involved the defendant meeting a woman in a supermarket parking lot. At trial, the government presented evidence of a cocaine delivery made by the defendant just prior to the parking lot meeting. The defendant argued that the evidence of the cocaine delivery – which was not listed in the indictment and was made prior to the first overt act alleged in the indictment - constituted a material variance. The Ninth Circuit found that "the evidence of the delivery did not subject the defendant to an offense not already covered by the indictment." Id. at 1422. The cocaine delivery occurred well within the time period of the conspiracy alleged in the indictment and such deliveries are a natural component to cocaine distribution conspiracies, and thus "the act in question was consistent with the nature of the conspiracy." Id. at 1423. The evidence was properly

13

02cr0333

allowed "because [the] act occurred during the time period that the conspiracy was alleged to exist, and because the act was consistent with the crime charged." Id.

In the present case, evidence about the four aircraft is similarly admissible. The evidence is consistent with the conspiracy charged. Indeed, it involves the same two parties (the defendants), precisely the same type of conduct (purchasing planes, forging log books and selling the planes), and occurred during the life of the charged conspiracy. By offering the evidence the theory of the case will not change, the defendants are not being charged with new or different crimes, and the elements of the crimes charged are not in any way changed. In short, the evidence about the four additional aircraft is admissible and relevant and there will be no prejudice to defendants in presenting the evidence.[4]

The Government hereby renews its request for reciprocal discovery from the defendant pursuant to Federal Rules of Criminal Procedure 16(b) and 26.

//

//

//

//

---

[4] Defendant Esquino makes much of the fact that the discovery of the evidence did not occur until just before the original trial date and therefore he will somehow be prejudiced by its late discovery. This claim too is infirm. In Atisha, 804 F.2d 920, the court considered the potential prejudice of evidence not discovered until just days before the trial and not disclosed to the defendant until after defense counsel's opening statement. The newly discovered evidence severely damaged the defendant's strategy, his opening statement, given prior to the government's disclosure, was directly contradicted by the evidence at issue. Although the court conceded that there clearly was reason to believe that the defendant's strategy was impaired by the evidence at issue, it found that "the mere fact that the defendant was surprised by the evidence does not mandate that the evidence be excluded." Id. at 925. In addition, the court noted that there is no rule that evidence must be excluded on the basis that a defendant had committed himself to a theory which was undermined by the newly discovered evidence. Id. Rather, "there is always a possibility that new evidence will be discovered, even if the defense was structured around assurances made by the government. This is particularly so when the indictment charges a conspiracy." Id.

# IV
# CONCLUSION

For the foregoing reasons, the Government requests that defendant's motions be denied where indicated and the Government's renewed request for reciprocal discovery be granted.

DATED: 8-19-02.

                                   Respectfully submitted,

                                   PATRICK K. O'TOOLE
                                   United States Attorney

                                   TIMOTHY D. COUGHLIN
                                   Assistant U.S. Attorney

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Criminal Case No. 02cr0333-W |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CERTIFICATE OF SERVICE BY MAIL |
| CHRISTIAN E. ESQUINO (1), | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Melissa D. Johnson, am a citizen of the United States over the age of eighteen years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and

On August 19, 2002, I deposited in the United States mail at San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of Government's Response and Opposition to Defendant's Motions In Limine

addressed to Marcus S. Topel, Esq., 832 Sansome St., 4th Flr., San Francisco, CA 94111

the last known address at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of August, 2002.

MELISSA D. JOHNSON