USDC SCAN INDEX SHEET

















JMJ    7/18/06    10:54

3:02-CR-00333    USA V. ESQUINO

*141*

*CRRESPM.*


ORIGINAL

1  CAROL C. LAM
   United States Attorney
2  TIMOTHY D. COUGHLIN
   Assistant United States Attorney
3  California State Bar No. 144911
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California 92101
5  Telephone: (619) 557-7044

6  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

7

8
                    UNITED STATES DISTRICT COURT
9
            FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10
   UNITED STATES OF AMERICA,          )  Civil Case No. 06cv0966-W
11                                     )  Crim. Case No. 02cr0333-W
                  Plaintiff-Respondent,)
12                                     )  GOVERNMENT'S RESPONSE AND
          v.                           )  OPPOSITION TO PETITION'S BRIEF FILED IN
13                                     )  SUPPORT OF HIS 28 U.S.C. 2255 MOTION TO
   CHRISTIAN ESQUINO,                  )  VACATE, SET ASIDE, OR CORRECT
14                                     )  SENTENCE; AND MEMORANDUM OF POINTS
                  Defendant-Petitioner.)  AND AUTHORITIES
15 _____)

16

17        COMES NOW the Plaintiff, United States of America, by and through its counsel, Carol C. Lam,

18 United States Attorney, and Timothy D. Coughlin, Assistant U.S. Attorney, and hereby files its response

19 and opposition to Petitioner Esquino's brief in support of his motion to vacate, set aside, or correct

20 sentence pursuant to 28 U.S.C. § 2255. This motion is based upon the attached memorandum of points

21 and authorities, the files and record of this case.

22

23

24

25

26

27

28
                              

I

## BACKGROUND INFORMATION

A. <u>INDICTMENTS</u>

On February 8, 2002, the grand jury sitting in the Southern District of California returned a thirty eight count indictment charging petitioner/defendant Esquino (hereinafter "Esquino") and his codefendant Lance Z. Ricotta with various violations involving an aircraft. The indictment contained extensive introductory allegations which detailed the subject matter of the indictment. In addition, the indictment contained nine paragraphs titled "manner and means of conspiracy" which detailed the method and pattern of criminal activity undertaken by Esquino and his codefendants to accomplish the charged criminal violations. Further, the indictment contained twenty five overt acts, which set forth the specific actions taken by Esquino and his codefendants beginning in mid February 1997 and continuing to July 21, 2001, in order to accomplish the agreed upon goal of the conspiracy which was to knowingly and intentionally make false and fraudlent entries in aircraft log books in order to enhance the sale value of aircraft Esquino and Ricotta were selling.

Count 1 of the indictment charged a conspiracy to commit fraud involving an aircraft, in violation of Title 18 United State Code, §§ 38(a)(3) and 38(a)(1)(c); Counts 2-35, charged making false, fictitious or fraudulent statements and representations of material fact, that is, fraudulent or false entries in aircraft log books, in violation of Title 18 United State Code, §§ 1001(a)(3) and 2; Counts 36-37, charged fraud involving an aircraft, in violation of Title 18 United State Code, §§ 38(a)(3)(C) and 2; and Count 38 charged Fraudulent communications involving aircraft, in violation of Title 18 United State Code, §§ 32(a)(6) and 2. A copy of the indictment is attached and marked as **Exhibit 1**. Recognizing that Title 18 United State Code, § 38 was not applicable to any criminal conduct charged as substantive counts occurring prior to September 30,1999, the indictment correctly charged Counts 2-35, with violations of Title 18 United State Code, §§ 1001(a)(3) and 2, the fraud and false statement statute provision of the federal code. Conversely Counts 36 and 37, which occurred after September 30, 1999, which charged the same kind of criminal conduct alleged in Counts 2-35, could and was correctly charged as a violation Title 18 United State Code, § 38.

06cv0966
02cr0333

On October 8, 2003, a forty-four count superseding indictment was filed in the Southern District of California charging Esquino and his codefendant with six additional felony violations involving an aircraft. Relevant to the instant matter, Count 1 of the superseding indictment[1] charged Esquino and his codefendant with "Conspiracy to Commit Fraud Involving an Aircraft," beginning at a date unknown and continuing up to and including October 2001, in violation of Title 18 United State Code, §§ 38(a)(3) and 38(a)(1)(C). The superseding indictment contained additional introductory allegations which detailed the subject matter of the indictment, in particular they identified Esquino's role in conducting business at "Aircraft R Us" Corporation and his role as the owner of EAL, Executive Aviation Logistics, where he employed his codefendant. In addition, the superseding indictment contained ten paragraphs titled "manner and means of conspiracy" which detailed the method and pattern of criminal activity undertaken by Esquino and his codefendants to accomplish the charged criminal violations. Similar to the underlying indictment, the superseding indictment contained nine additional overt acts, bringing the total to thirty four overt acts, which set forth the specific actions taken by Esquino and his codefendants beginning in mid February 1997 and continuing into August 2001, all undertaken in furtherance of the agreed upon goal of the charged conspiracy. As previously explained above, the government in presenting the superseding indictment, recognized that Title 18 United State Code, § 38 was not enacted until September 30, 1999, and charged substantive counts accordingly as false statements or fraud involving an aircraft in violation of Title 18 United State Code, §§ 1001(a)(3) and 2. A copy of the superseding indictment is attached and marked as **Exhibit 2**.

B.     GUILTY PLEA & TERMS OF THE PLEA AGREEMENT

On March 22, 2004, Petitioner Esquino pled guilty to Count 1of the superseding indictment charging him with Conspiracy to Commit Fraud Involving an Aircraft, in violation of Title 18 United State Code, §§ 38(a)(3) and 38(a)(1)(c). Esquino's guilty plea was entered pursuant to a written plea agreement, attached and marked as **Exhibit 3,** which included the following offense calculations: a) The base offense level of 6 as determined by USSG § 2F1.1 for fraud involving an aircraft; b) An increase

---

[1]     Count 1 of the indictment and superseding indictment both charged the same violation of federal law, that is, a conspiracy to commit fraud involving an aircraft.

06cv0966
02cr0333

1 of 8 levels pursuant to USSG § 2F1.1(b)(1)(I)[2/], when the loss is determined to be greater than $200,000

2 but less than $350,000;  c) An increase of 2 levels for more than minimal planning, as provided in USSG

3 § 2F1.1(b)(2);  d) An increase of 2 levels for conscious or reckless risk of serious bodily injury, as

4 provided in USSG § 2F1.1(b)(7);  e) An increase of 2 levels for Esquino's role in the charged offense,

5 as provided by USSG § 3B1.1(c);  f) A decrease of 3 levels for Esquino's acceptance of responsibility

6 in the charged conduct, as provided by USSG § 3E1.1(b);  and  g) a decrease of 2 levels pursuant to

7 USSG § 5K2.0 -Departures not ordinarily taken into consideration. ( **Exh. 3, pages 2-4**)

8         As part of the factual basis of the plea agreement Esquino admitted the following facts as

9 accurate and correct regarding Count 1's charged conspiracy:

10 1.     In early 1997, defendant CHRISTIAN E. ESQUINO arranged for the exchange of aircraft with
the Mexican Department of Agriculture (hereinafter "SAGAR"). Defendant ESQUINO used the
11 Argentum Air Corporation, a corporation in which he was an officer, to conduct the aircraft transaction
with SAGAR. Among those aircraft delivered by SAGAR to defendant ESQUINO as part of this
12 agreement were six Cessna aircraft identified with the following US Tail numbers: N310CL, N567D,
N310LH, N310LP, N38LH & N210JM..

13
2.     When these Cessna aircraft were imported into the United States, it was noted by both defendants
14 ESQUINO and LANCE Z. RICOTTA that the aircrafts' logbooks were incomplete, missing pages and
in some cases missing whole time periods.
15
3.     Beginning sometime in February or early March 1997, and continuing up to at least March 11,
16 1997, defendants ESQUINO and  RICOTTA and others working with them and at their direction,
created missing portions of the six Cessna logbooks. They accomplished this by using blank logbook
17 pages and making false and fraudulent entries therein, as well as using stamps purporting to be from the
Mexican Ministry of Communications and Transportation and a Cessna Repair Station to give an air of
18 authenticity to the logbooks.

19 4.     Defendants ESQUINO and RICOTTA, knowing that portions of the logbooks for these six
Cessna aircraft contained false and fraudulent entries, nonetheless sought and obtained standard
20 airworthiness certificates from FAA representatives, in order to sell the aircraft to U.S. customers.

21 5.     Defendants ESQUINO and RICOTTA undertook the creation of false and fraudulent portions
of the missing logbooks entries because they knew that the value of these six Cessna aircraft was
22 considerably diminished by missing or incomplete logbooks.

23 6.     Thereafter, defendant ESQUINO with the assistance of defendant RICOTTA, using the
Argentum Air Corporation, sold the following Cessna aircraft: N310CL, N567D, N310LH, N310LP,
24 N38LH & N210JM to U.S. buyers. All of these aircraft had logbooks which contained false or fraudulent
entries.
25
        (**Exh. 3, pages 2-4**)
26

27     [2/]     The parties agreed that for purposes of the guideline calculations the November 2000,

28 Guidelines would be utilized.

In addition, as part of the written plea and in exchange for the Government's concessions in this plea agreement, Esquino waived, to the full extent of the law, any right to appeal or to collaterally attack the conviction and sentence. (**Exh. 3, pages 10-11**)

During the plea colloquy the Court addressed Esquino, "How do you plead to the charge that *beginning on a date unknown to the grand jury and continuing up to and including October 2001, within* the Southern District of California, and elsewhere, in a matter with the jurisdiction of the Federal Aviation Administration, an agency of the United States, the defendant Christian Esquino and his codefendant, in or affecting interstate and foreign commerce did knowingly an intentionally chronologically together, and with each other, and other persons known and unknown to the grand jury to commit offenses against the United States. That is, knowingly and with the intent to defraud, make or use any material, false writing, false entry, false certification and false records concerning aircraft, all in violation of Title 18, United States Code, Sections 38(a)(3) and 38(a)(1)(C). Attorney Marcus Topel, appearing as attorney of record for Esquino, responded, "Your honor, with the limitations on the date as set out in the plea agreement, that is until August 1997." A copy of the transcript of Esquino's guilty plea is attached and marked as Exhibit 4. Defendant Esquino, then responded, "Guilty." (**Exh. 4, pages 8-9**) At no time during the plea colloquy did Esquino argue that the charged conspiracy had ended or that he had withdrawn from the conspiracy.

C.    PSR & SENTENCING

The Presentence report (PSR) was dictated by US Probation on June 10, 2004, and distributed to the parties shortly thereafter. A copy of the relevant portions of the PSR is attached as **Exhibit 5**. "The Offense Conduct" of the PSR offered an explained the importance of federal aviation log books. (**Exh. 5, pages 1-2**) In the "Offense" section the PSR detailed Esquino's criminal activities that formed the basis for the charges, in particular the offense section identified criminal conduct that began in 1994 and continued through February 27, 2002. The Offense section chronologically set forth various aircraft for which Esquino and Ricotta had altered or created false and bogus federal aviation log books. (**Exh. 5, pages 2-10**) Esquino also made a statement concerning the offense, which is contained in the "Defendant's Statement of the Offense." According to the probation officer present, upon the advice of counsel Esquino limited his comments to affirming the factual basis set forth in the written plea

06cv0966
02cr0333

agreement. **(Exh. 5, pages 11-12)** In calculating the guidelines the US Probation officer who prepared the PSR explained that he used the 2000 Guidelines Manuel, which became effective in November 2001, because the last date of the offense was in July 2001. **(Exh. 5, page 25)**

On December 9, 2004, Esquino's counsel filed his sentencing memorandum. A copy of the sentencing memorandum is attached and marked as **Exhibit 6**. In that memorandum Esquino's attorney made three points. First Esquino's attorney argued that the factual basis admitted to by Esquino did not include any facts underlying the enhancements recommended by the parties in paragraph X of the plea agreement. Second, based on Blakely v. Washington, enhancements not found by a jury or proved beyond a resonable doubt violated Esquino's 5th and 6h Amendment Constitutional rights. And third, the enhancements for loss, more than minimal planning, aggravating role etc. cannot be Constitutionally imposed based on the Blakely decision. Further, Esquino's counsel argued he ws not attempting to have Esquino withdraw his guilty plea, but simply, post Blakely persuade the Court that it could not Constitutionally impose the upward adjustments. Nowhere in Esquino's sentencing memorandum did he contest the PSR's finding that the charged offense ran from 1997 to 2001. Nor when making his own statement of the offense conduct did Esquino explain or contend that he was not involved in any of the charged criminal conduct, as set forth in the charged conspiracy after September 30, 1999.

On January 12, 2005, Esquino's counsel filed objections to the PSR. The sole objection noted by Esquino's attorney was that his criminal history "over-repesents" the seriousness of his criminal history and the likelihood that he will commit further crimes. Esquino's objections do not contend that the conspiracy ended or that he withdrew, rather his objections focus on his argument that his criminal history category should be reduced from a level III to a II. A copy of the objections to the PSR are attached and marked as **Exhibit 7.**

On January 24, 2005, Esquino and his attorney Joe Milchen appeared for sentencing. Esquino's counsel again focused on the effect Blakely had on Esquino's sentencing and reiterated his argument concerning over-representaion regarding Esquino's criminal history. The confirmed that the guidelines post Blakely were advisory nonetheless he rejected Esquino's over-representation argument and followed the terms agreed to by the parties and sentenced Esquino to twenty four months in custody, to be followed by three years of supervised release, restitution in the amount of $435,000, fine to be waived

06cv0966
02cr0333

1    and a $100 penalty assessment.  A copy of the Sentencing Transcript and the Judgement of conviction

2    are attached as **Exhibits 8 and 9** respectively.

3         D.    ESQUINO'S 2255 MOTION

4         On April 22, 2006, Esquino filed his motion to vacate, set aside, or correct a sentence pursuant

5    to 28 U.S.C. § 2255.  Therein Esquino claimed that his counsel was ineffective for allowing him to plead

6    guilty to a fatally defective indictment.  According to Esquino, the defect lies in Count 1 of the

7    superseding indictment in that it fails to allege a federal offense for the offense of conviction.  In

8    particular, Esquino complains that the offense of conviction, a conspiracy to commit fraud involving an

9    aircraft, in violation of Title 18 United State Code, §§ 38(a)(3) and 38(a)(1)(c), did not become a federal

10   law until September 30, 1999.  Esquino contends, that Count 1, the count of conviction failed to place

11   the charged conspiracy -to which Esquino plead guilty, within an operative time frame and deprived the

12   Court of "subject matter jurisdiction" when it failed to allege a "beginning date" for the conspiracy.

13        On May 8, 2006, Esquino filed  a motion to permit him to amend his § 2255 claim, pursuant

14   to Rule 15(a)(c) of the Fed. R. Civ. P..  Esquino contends that his attorney was ineffective when he

15   failed to object to the "fatally defective indictment." Further, Esquino argued that Count 1 of indictment

16   "serves to effectively divest..." the district court of subject matter jurisdiction to either try, convict or

17   to sentence the defendant under Title 18 U.S.C., §§ 38(a)(3) and 38(a)(1)(c).  As a consequence,

18   according to Esquino, the indictment should be dismissed without prejudice.  In addition, Esquino

19   complains that the open ended language of Count 1 of the indictment  fails to inform Esquino of the

20   charge he must defend against. According to Esquino, had he known that the indictment failed to state

21   a federal offense he would have never plead guilty.  Esquino also alleges that the district court never

22   made any specific findings of fact or any findings beyond a reasonable doubt that the conspiracy

23   extended into the effective date of Title 18 U.S.C., §§ 38(a)(3) and 38(a)(1)(c). According to Esquino,

24   the representation he received from his counsel, fell well below an objective standard of reasonableness

25   and undermined the proper function of the adversarial process, Strickland v. Washington, 466 U.S. 668

26   at 694,  (1984).  Esquino argued that but for his counsel's unprofessional errors, and his otherwise,

27   deficient performance, the results would have been different.

28

7

E.   COURT'S ORDER TO SHOW CAUSE

On June 21, 2006, this Court filed an order requiring the respondent to file and serve a responsive pleading to the Esquino's petition no later than July 17, 2006. Thereafter pursuant to Rule 15(a)(c) of the Fed. R. Civ. P. petitioner Esquino filed a motion to amend his § 2255 pleading. On June 29, 2006, this Court granted Esquino motion to amend his § 2255 claim provided it was filed no later than July 14, 2006.

III

MEMORANDUM OF POINTS AND AUTHORITIES

A.   COUNT 1 OF THE SUPERSEDING INDICTMENT WAS NOT DEFECTIVE

1.   The Claim

Esquino's amended § 2255 motion alleges two grounds as a basis for this Court to grant his motion to vacate, set aside, or correct his conviction. A copy of the amended § 2255 is attached as **Exhibit 10**. In ground one, Esquino claims that Count 1 of the superseding indictment, the Count to which Esquino pled guilty, is "fatally defective," in that it failed to allege a federal offense. Esquino argues that the overt acts allege a beginning date for the conspiracy of mid-February 1997, but on that date, "there was no such statutory charge under Title 18 U.S.C., §§ 38(a)(3) and/or 38(a)(1)(C)." Esquino contends that because no such federal charge existed in February 1997, his counsel was "Constitutionally ineffective" in advising Esquino to plead guilty. Further, Esquino argues that because of this defect this Court is divested of "subject matter jurisdiction to either try, convict or to sentence" Esquino under Title 18 U.S.C., §§ 38(a)(3) and/or 38(a)(1)(C). **(Exh. 10, pages 2-3)** Esquino's claim is without merit.

2.   The Law

The Supreme Court has repeatedly said that the essence of a conspiracy conviction is an agreement to commit an unlawful act. United States v. Jimenez-Recio, 357 U.S. 270, 274-75 (2003). Conspiracy is a continuing offense, which is charged and punished as one crime from beginning to end. United States v. Calabrese, 825 F.2d 1342, 1346 (9th Cir. 1987). The crime of conspiracy is entirely separate from the completed substantive offenses committed pursuant to the conspiracy, and it is appropriately punished as a separate offense. Id.   The Constitution's Ex Post Facto Clause prohibits, inter alia, Congress from enacting a statute that "makes an act a crime that was legal when committed."

06cv0966
02cr0333

1  United States v. Harris, 79 F.3d 223, 228 (2d Cir.1996). "It is well-settled that when a statute is

2  concerned with a continuing offense, the Ex Post Facto clause is not violated by application of a statute

3  to an enterprise that began prior to, but continued after, the effective date of the statute." Id. at 229;

4  United States v. Campanale, 518 F.2d 352, 365 (9th Cir.1975). When it is shown that a conspiracy

5  straddled the enactment of a statute, the government may introduce pre-enactment evidence to

6  demonstrate the conspiracy's genesis, its purpose, and its operation over time. See United States v.

7  Flores, 538 F.2d 939, 943-44 (2d Cir.1976); United States v. Smith, 464 F.2d 1129, 1132-33 (2d

8  Cir.1972). A conviction for a continuing offense straddling enactment of a statute will not run afoul of

9  the Ex Post Facto clause. Harris, 79 F.3d at 229.  One may be a member of a conspiracy without

10  knowing the identities of, nor the precise number of, all of the other members, nor the entire scope of

11  the conspiracy, nor all of the details of the conspiracy, nor the means by which the object or the purpose

12  of the conspiracy was to be accomplished. Blumenthal v. United States, 332 U.S. 539, 557 (1947). In

13  the Ninth Circuit, evidence of a slight connection is sufficient to prove guilt beyond a reasonable doubt,

14  United States v. Mares, 940 F.2d 455( 9th Cir. 1991).  Withdrawal from a conspiracy after the

15  commission of an overt act terminates a conspirator's liability only as to substantive offenses committed

16  after the effective date of  withdrawal and does not absolve a defendant of responsibility for the

17  conspiracy. United States v. Marolla, 766 F.2d 457, 461 (11th Cir. 1985).

18          3.    Discussion

19          Count 1 of the superseding indictment charged Esquino with a conspiracy to commit fraud in

20  connection with an aircraft, in violation of Title 18 U.S.C., § 38. Title 18 U.S.C., § 38  became a

21  violation of federal law on September 30, 1999.  The Constitution's Ex Post Facto Clause prohibits

22  making a crime out of conduct which was legal when committed unless the crime is part of a conspiracy

23  which continues past the enactment date of a law. In the present case, Count 1 of the superseding

24  indictment charges a conspiracy that commenced before the enactment of Title 18 U.S.C., § 38, but also

25  alleges that the criminal conduct of the conspiracy continued after its enactment.  Because conspiracy

26  is a continuing offense, the conspiracy charged in Esquino's case does not violate the Ex Post Facto

27  Clause.  Esquino's focus on the beginning date of the conspiracy is misplaced.  Count 1 is not fatally

28  flawed or defective as Esquino' alleges.

06cv0966
02cr0333

1    Esquino does not dispute that beginning in February 1997, he conspired with codefendant Ricotta

2    to create bogus and fraudulent aircraft log books. This makes Esquino a member of the charged

3    conspiracy and because the language and overt acts alleged in the conspiracy count continued beyond

4    the enactment date of Title 18 U.S.C., § 38, Count 1 of the superseding indictment is not defective as

5    claimed by Esquino. Further, as stated above to be a member of a conspiracy does not require

6    knowledge of all other members, nor the entire scope of the conspiracy, nor all of the details of the

7    conspiracy, nor to have participated in all the acts of the conspiracy by which the object or the purpose

8    of the conspiracy was to be accomplished. The fact that Esquino's factual basis for his plea places him

9    within the charged conspiracy and his admitted actions do not extend beyond the enactment date of Title

10   18 U.S.C., § 38, does not negate the charged conspiracy. A defendant cannot withdraw from a

11   conspiracy once an overt has been completed, because by then the crime is complete. On its face Count

12   1 of the superseding indictment withstands legal scrutiny. As such this Court retains subject matter

13   jurisdiction and legally retained jurisdiction over the conspiracy charge in order to accept Esquino's

14   guilty plea. Because the charged conspiracy was not fatally defective Esquino's counsel was not

15   ineffective for failing to challenge its legality.

16

17   B.    COUNT 1 IS NOT DEFECTIVELY DRAFTED AND SUFFICIENTLY
            INFORMS ESQUINO OF THE CHARGE AGAINST HIM

18

            1.    The Claim

19   In ground two, Esquino claims that the superseding indictment, "failed to place the conspiracy

20   within an operative time-frame." Specifically, Esquino complains that the conspiracy count is "open-

21   ended" in that it failed to allege a beginning date and as a consequence "fails to inform the Defendant

22   of the charge that he must defendant against." According to Esquino it "hampered the Defendant's

23   ability to prepare a defense." Further, Esquino contends that by merely alleging an "unknown start date

24   for the term of the conspiracy" it prevent the defendant from pleading "double jeopardy" in future

25   prosecutions. Esquino claims his attorney was "Constitutionally ineffective" when he failed to challenge

26   the "open-ended" conspiracy charge. Esquino argues that this Court failed to make specific findings that

27   the conspiracy extended into the effective date of, Title 18 U.S.C., §§ 38(a)(3) and/or 38(a)(1)(C) as

28

06cv0966
02cr0333

required under United States v. Torres, 901 F.2d 205, at 224-226 (2nd Cir. 1990). Finally, Esquino unequivocally states had he "been aware of the fatally defective indictment in the case at bar, he would not have pleaded guilty, but instead would have insisted upon going to trial." As such, Esquino argues he has established ineffective assistance of counsel. **(Exh. 10, pages 4-7)**

## 2. The Law and Discussion

An indictment must sufficiently notify the defendant of the charges against him and enable him to prepare a defense. "[A]n indictment must furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defenses, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." United States v. Cecil, 608 F.2d 1294, 1296-97 (9th Cir.1979). Esquino is correct in noting that the beginning date in the conspiracy count of the superseding indictment does not provide an adequate basis for ascertaining the charges against him. However, the overt acts alleged in the conspiracy count provide a narrowing focus. Count 1 of the superseding indictment contains introductory allegations, which provide background concerning federal aviation log regulations, Esquino's various businesses, and his employees, etc. The manner and means section of the indictment details the steps taken by Esquino and his codefendants engaged in the alleged conspiracy and a list of 34 overt acts serves as a basis for limiting the time frame covered by the conspiracy charge. These give Esquino the necessary notice of the scope of the charges against them. Further, the alleged overt acts occurred in a discrete time period between February 1997 and August 2001, and provided sufficient information for Esquino and his counsel to prepare an adequate defense. Further, Esquino's double jeopardy claim is without merit based on the specificity of the overt acts. The Ninth Circuit in United States v. Laykin, 866 F.3d 1534 (9th Cir. 1989) concluded that the uncertainty regarding beginning and ending dates does not render an indictment fatally defective. Drafting problems are cured by pleading specific overt acts which cure any time problems, Laykin, 866 F.3d at 1542. In the present case the overt acts cure a perceived notice or time problems. Finally, because the indictment's lack of a start date does render the indictment defective and because the indictment provides sufficient notice of the charges against Esquino his claim that his counsel was ineffective is without merit.

06cv0966
02cr0333

C. THIS PETITION SHOULD BE DENIED
   WITHOUT AN EVIDENTIARY HEARING

An evidentiary hearing on a § 2255 petition is not required where "the motions and the files and records of the case conclusively show that the . . . [petitioner] is entitled to no relief." United States v. Blaylock, 20 F.3d 1458, 1465 (9th Cir. 1994). An evidentiary hearing also is not required where the petition is "patently incredible," United States v. Grewal, 825 F.2d 220, 222 (9th Cir. 1987), "frivolous," Abatino v. United States, 750 F.2d 1442, 1444 (9th Cir. 1985), or "conclusory and wholly devoid of specifics," Bashor v. Rishley, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (citations omitted). Mere "bald assertions" of ineffective assistance do not require an evidentiary hearing. Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995). The facts in record as it presently exists are sufficient and complete for this Court to make its findings. Therefore, this petition should be denied without an evidentiary hearing.

IV

CONCLUSION

For the reasons stated in this memorandum, the Government requests that the Court deny Petitioner Esquino's motion for relief under 28 U.S.C. § 2255 on the basis that Esquino's basis to argue ineffective assistance of counsel have not merit.

DATED: July 17, 2006.

Respectfully submitted,

CAROL C. LAM
United States Attorney

TIMOTHY D. COUGHLIN
Assistant United States Attorney

06cv0966
02cr0333

**<u>EXHIBIT LIST</u>**

|  | Exhibit <u>No.</u> |
|---|---|
| Indictment, dated February 8, 2002 | 1 |
| Superseding Indictment, dated October 8, 2003 | 2 |
| Esquino's Plea Agreement, dated March 22, 2004 | 3 |
| Transcript of Esquino's Disposition, dated March 22, 2004 | 4 |
| Esquino's Presentence Report | 5 |
| Esquino's Sentencing Memorandum, dated December 9, 2004 | 6 |
| Esquino's Objections to Presentence Report, dated January 12, 2005 | 7 |
| Transcript of Esquino Sentencing, dated January 24, 2005 | 8 |
| Judgement in a Criminal Case, dated January 24, 2005 | 9 |
| Esquino's Memorandum of Law with Additional Facts | 10 |

02cr0333

# EXHIBIT 1

FILED

02 FEB -8 PM 4: 25

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

August 2001 Grand Jury **02 CR 0333**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CHRISTIAN E. ESQUINO (1),<br>LANCE Z. RICOTTA (2),<br><br>    Defendants. | Criminal Case No. _____<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Secs. 38(a)(3)<br>and 38(a)(1)(C) - Conspiracy to<br>Commit Fraud Involving an<br>Aircraft; Title 18, U.S.C.,<br>Sec. 1001(a)(3) - False Statements<br>or Writing; Title 18, U.S.C.,<br>Secs. 38(a)(1)(C) - Fraud Involving<br>an Aircraft; Title 18, U.S.C.,<br>Sec. 32(a)(6)-Fraudulent<br>Communications Involving an<br>Aircraft; Title 18, U.S.C.,<br>Sec. 2 - Aiding and Abetting |

The grand jury charges:

INTRODUCTORY ALLEGATIONS

1.   At various times material to this Indictment, the Federal Aviation Administration (FAA), was an agency of the United States, and did have jurisdiction to ensure the safety and airworthiness of domestic aircraft and those who flew on them, the FAA met this responsibility in part through the issuance of regulations regarding all aircraft within the United States.

//

2.    At various times material to this Indictment, Federal
Aviation Regulations require aircraft owners and operators to keep
records of maintenance, preventive maintenance, alterations and
inspections performed on each of their aircraft, total time in service
of aircraft engines, propellers and appliances related to the
aircraft.

3.    At various times material to this Indictment, Federal
Aviation Regulations require aircraft owners and pilots operating an
aircraft to have an appropriate and current airworthiness certificate,
which may only be obtained by application to a Federal Aviation
Administration Flight Standards District Office.

4..   At various times material to this Indictment, Federal
Aviation Regulations require aircraft owners and operators to track
and record the total time in service of each airframe, engine,
propeller and rotor.

5.    At various times material to this Indictment, total time in
service by an aircraft is used to schedule required maintenance,
determine inspection status of those items required to be inspected
at specific intervals, determine retirement date/time of life limited
parts, if installed, and gauge the resale value of an aircraft,
engines and appliances related to the aircraft.

6.    At various times material to this Indictment, an aircraft's
logbook provides a history of an aircraft including its major repairs
and maintenance, disclose any major problems, such as, airframe damage
from accident, engine failure, engine overhauls and modifications. The
logbooks also track total time, which is the run time/flight time on
the engine(s) and airframe from the date of manufacture and time since
a major overhaul.

7. At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO was the vice president and part owner of Argentum Air Corporation, which was incorporated in the State of California on March 17, 1994.

8. At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO made the business and financial decisions for Argentum Air Corporation's purchase of various aircraft from the Mexican Government.

9. At various times material to this Indictment, defendant LANCE Z. RICOTTA, was doing business as, LANCE Z. RICOTTA Aircraft Sales and Wright Brothers Aviation.

10. At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO conducted business including the purchase and sale of aircraft through the Aircraft R US Corporation, a Delaware Corporation, incorporated on August 9, 1999, and in which CHRISTIAN E. ESQUINO is the sole proprietor.

11. At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO was an owner and stockholder in Executive Aviation Logistics (EAL), a fixed base operation, located at the Chino Airport, in Chino California.

12. At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO employed defendant LANCE Z. RICOTTA as a pilot, as well as conducting business with defendant LANCE Z. RICOTTA as an associate.

//

//

//

//

3

Beginning at a date unknown to the grand jury and continuing up to and including July 20, 2001, within the Southern District of California, and elsewhere, in a matter within the jurisdiction of the Federal Aviation Administration, an agency of the United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, in or affecting interstate or foreign commerce, did knowingly and intentionally conspire together and with each other and with other persons known and unknown to the grand jury to commit offenses against the United States, that is, knowingly and with intent to defraud make or uses any materially false writings, false entries, false certifications, and false records concerning aircraft.

## MANNER AND MEANS OF THE CONSPIRACY

1. It was part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA provided an unidentified individual with blank logbooks for the purpose of creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

2. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA provided an unidentified individual with Mexican aircraft tail numbers, Mexican airport codes, fuel range for particular aircraft and the correct number of letters and numbers contained in a standard Mexican pilot license, all for the purpose of creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

3. It was further part of the conspiracy that defendant LANCE Z. RICOTTA obtained a counterfeit Mexican inspection stamp, which was used to make entries in the fraudulently created logbooks, concerning

4

the airworthiness for aircraft engines, propellers and airframes, as well as, certify completed 25, 50 and 100 hour aircraft inspections.

4. It was further part of the conspiracy that defendant CHRISTIAN E. ESQUINO provided an unidentified individual with payment for creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

5. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold aircraft purchased from the Mexican government by Argentum Air Corporation using the fraudulently created logbooks as an accurate record of an aircraft's total operating hours, of flights between Mexican airports by particular pilots, as well as, a history of maintenance and inspection records.

6. It was further part of the conspiracy that the new owners of aircraft previously purchased from the Mexican government made application to the Federal Aviation Administration for airworthiness certificates relying on information taken from logbooks fraudulently created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA.

7. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA changed and forged or caused others to change and forge aircraft logbook entries, concerning an aircraft's engine overhaul and inspection records, for aircraft purchased by the defendants.

8. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold aircraft containing changed and forged engine overhaul and inspection records in an aircraft's logbook.

//

## OVERT ACTS

In furtherance of said conspiracy and to effect the objects thereof, the following Overt Acts, among others were committed within the Southern District of California and elsewhere:

1.  Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 2138, Mexican Tail Number XC-GAV and United States Tail Number N310CL.

2.  Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna P210 aircraft, Serial Number 665, Mexican Tail Number XC-FUU and US Tail Number N567D.

3.  Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 1680, Mexican Tail Number XC-DAW and US Tail Number N310LH.

4.  Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 1656, Mexican Tail Number XC-FAP and US Tail Number N310LP.

6

5. Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 1886, Mexican Tail Number XC-FAR and US Tail Number N38LH.

6. Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 210 aircraft, Serial Number 64159, Mexican Tail Number XC-GEB and US Tail Number N210JM.

7. On or about February 24, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 210 aircraft, Serial Number 64159, US Tail Number N210JM, as part of that sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 210 aircraft.

8. On or about November 20, 1998, the new owner for a Cessna 210 aircraft, Serial Number 64159, US Tail Number N210JM, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, applied for an airworthiness certificate from the Federal Aviation Administration

9. On or about March 12, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 1886, and US Tail Number N38LH, as part of the sale, the defendants delivered the false and

7

1  fraudulently created logbooks to the new owner of the
2  Cessna 310 aircraft.

3  10.  On or about May 1, 1997, the new owner for a Cessna 210
4      aircraft, Serial Number 1886, and US Tail Number N38LH,
5      using information contained in the phoney logbooks created
6      by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA
7      applied for an airworthiness certificate from the Federal
8      Aviation Administration.

9  11.  On or about May 16, 1997, defendants CHRISTIAN E. ESQUINO
10     and LANCE Z. RICOTTA sold a Cessna 310 aircraft,
11     Serial Number 1680, and US Tail Number N310LH, as part of
12     the sale, the defendants delivered the false and
13     fraudulently created logbooks to the new owner of the
14     Cessna 310 aircraft.

15 12.  On or about August 7, 1997, the new owner for a Cessna 310
16     aircraft, Serial Number 1680, and US Tail Number N310LH,
17     using information contained in the phoney logbooks created
18     by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA
19     applied for an airworthiness certificate from the Federal
20     Aviation Administration

21 13.  On or about May 12, 1997, defendants CHRISTIAN E. ESQUINO
22     and LANCE Z. RICOTTA sold a Cessna 310 aircraft,
23     Serial Number 1656, and US Tail Number N310LP, as part of
24     the sale, the defendants delivered the false and
25     fraudulently created logbooks to the new owner of the
26     Cessna 310 aircraft.

27 14.  On or about November 3,1997, the new owner for a Cessna 210
28     aircraft, Serial Number 1656, and US Tail Number

N310LP, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

15. On or about March 31, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna P210 aircraft, Serial Number 665, and US Tail Number N567D, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna P210 aircraft.

16. On or about April 9, 1997, the new owner a Cessna 210 aircraft, Serial Number 665, and US Tail Number N567D, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

17. On or about October 31, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 2138, and United States Tail Number N310CL, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 310 aircraft.

18. On or about April 9, 1997, the new owner of a Cessna 310 aircraft, Serial Number 2138, and United States Tail Number N310CL, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

19. On or about March 16, 1998, in San Diego California, defendant CHRISTIAN E. ESQUINO caused a check in the amount of $19,000, to be delivered to defendant LANCE Z. RICOTTA, for the purchase of an aircraft.

20. On or about March 16, 1998, in San Diego County, defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO purchased a 1969 Piper Cherokee aircraft, US Tail Number N7933N, for $16,500. 21. Sometime after March 16, 1998, but before August 12, 1999, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA entered, or caused others to enter false and fraudulent information into the Piper Cherokee's logbook, that is, that an engine overhaul had been completed on September 9, 1982, and that an airworthiness inspection had been completed on August 5, 1998, for the aircraft.

21. On or about August 12, 1999, in San Diego County, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold the Piper Cherokee aircraft for $39,000, knowing that at least two of the aircraft's logbook entries were false.

22. On or about May 6, 2000, in San Diego, California, defendant CHRISTIAN E. ESQUINO delivered or had others deliver a check, in the amount of $150,000 to defendant LANCE Z. RICOTTA, for the purchase of an aircraft.

23. On or about May 23, 2000, defendant LANCE Z. RICOTTA wire transferred $150,000 to an escrow company for the purchase of a 1966 Jet Commander aircraft, US Tail Number N382AA.

24. Sometime after May 23, 2000, but before August 20, 2001, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA entered, or caused others to enter false and fraudulent

1　information into the Jet Commander's logbook, that is, that

2　an engine overhaul was completed on both engines of the

3　aircraft in May 1978.

4　25.　On or about July 21, 2001, in San Diego County, defendants

5　CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold the Jet

6　Commander aircraft for $250,000, knowing that false and

7　fraudulent entries were made into the aircraft's logbook

8　concerning its engines.

9　All in violation of Title 18, United States Code, Sections 38(a)(3)

10　and 38(a)(1)(C).

11　Counts 2 - 32

12　FALSE STATEMENT OR WRITING AND AIDING AND ABETTING

13　1.　Paragraphs 1 through 8 of the introductory allegations and

14　paragraphs 1 and 8 of the Manner and Means in Count 1 of this

15　Indictment are realleged and hereby incorporated by reference in

16　Counts 2-32 as though fully set forth herein.

17　2.　Between mid-February 1997 and March 11, 1997, within the

18　Southern District of California and elsewhere, in a matter within the

19　jurisdiction of the Federal Aviation Administration, an agency of the

20　United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA

21　did knowingly and willfully make or cause others to make false,

22　fictitious and fraudulent statements and representations of material

23　fact, that is, by creating false logbooks for aircraft purchased from

24　the Mexican government, as set forth below, making false and

25　fraudulent statements in the aircraft's logbook entries, including

26　inserting false and fraudulent airworthiness stamps, for an aircraft's

27　engine, propeller and airframe, inserting false and fraudulent

28　inspection dates, inserting false flight log times and engine time for

11

the Mexican aircraft, as set forth below, knowing that such entries were false, fraudulent and fictitious statements.

| Count | Mexican Tail # | Date & Logbook Entry | False Statement |
|---|---|---|---|
| 2 | XC-GAV | 03/19/91-Inspection Stamp | Fraudulent Stamp |
| 3 | XC-GAV | 11/12/90-Inspection Stamp | Fraudulent Stamp |
| 4 | XC-GAV | 07/28/90-Inspection Stamp | Fraudulent Stamp |
| 5 | XC-GAV | 03/19/91-Inspection Stamp | Fraudulent Stamp |
| 6 | XC-GAV | 02/24/94-Inspection Stamp | Fraudulent Stamp |
| 7 | XC-FUU | 01/17/90-Flight Log and Engine Time | False Entry |
| 8 | XC-FUU | 02/06/91-Flight Log and Engine Time | False Entry |
| 9 | XC-FUU | 01/04/92-Flight Log and Engine Time | False Entry |
| 10 | XC-FUU | 04/03/94-Flight Log and Engine Time | False Entry |
| 11 | XC-DAW | 06/12/87-Inspection Stamp | Fraudulent Stamp |
| 12 | XC-DAW | 01/03/88-Inspection Stamp | Fraudulent Stamp |
| 13 | XC-DAW | 05/19/84-Inspection Stamp | Fraudulent Stamp |
| 14 | XC-DAW | 03/03/83-Inspection Stamp | Fraudulent Stamp |
| 15 | XC-DAW | 12/27/80-Flight Log and Engine Time | False Entry |
| 16 | XC-DAW | 09/25/81-Flight Log and Engine Time | False Entry |
| 17 | XC-DAW | 05/22/82-Flight Log and Engine Time | False Entry |
| 18 | XC-DAW | 05/06/92-Flight Log and Engine Time | False Entry |
| 19 | XC-FAP | 01/07/93-Inspection Stamp | Fraudulent Stamp |
| 20 | XC-FAP | 06/04/93-Inspection Stamp | Fraudulent Stamp |
| 21 | XC-FAP | 03/02/93-Inspection Stamp | Fraudulent Stamp |
| 22 | XC-FAP | 10/10/93-Inspection Stamp | Fraudulent Stamp |
| 23 | XC-FAR | 10/10/95-Inspection Stamp | Fraudulent Stamp |
| 24 | XC-FAR | 04/03/95-Inspection Stamp | Fraudulent Stamp |
| 25 | XC-GEB | 05/22/95-Inspection Stamp | Fraudulent Stamp |
| 26 | XC-GEB | 12/20/81-Inspection Stamp | Fraudulent Stamp |

| 27 | XC-GEB | 05/25/82-Inspection Stamp | Fraudulent Stamp |
| 28 | XC-GEB | 11/10/82-Inspection Stamp | Fraudulent Stamp |
| 29 | XC-GEB | 12/20/81-Flight Log and Engine Time | False Entry |
| 30 | XC-GEB | 05/25/82-Flight Log and Engine Time | False Entry |
| 31 | XC-GEB | 01/19/83-Flight Log and Engine Time | False Entry |
| 32 | XC-GEB | 08/28/83-Flight Log and Engine Time | False Entry |

All in violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

### Counts 33 - 35

FALSE STATEMENT OR WRITING AND AIDING AND ABETTING

1.    Paragraphs 1 through 5 and 8 through 11 of the introductory allegations and paragraphs 7 and 8 of the Manner and Means in Count 1 of this Indictment are realleged and hereby incorporated by reference in Counts 33 through 35, as though fully set forth herein.

2.    Between March 16, 1998 and August 12, 1999, in Counts 33 and 34, within the Southern District of California and elsewhere, in a matter within the jurisdiction of the Federal Aviation Administration, an agency of the United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA did knowingly and willfully make or cause others to make false, fictitious and fraudulent statements and representations of material fact, that is, by making fraudulent and false entries in the logbook of 1969 Piper Cherokee, United States Serial Number N7933N, as set forth below, knowing that such entries were false, fraudulent and fictitious statements.

//
//
//
//

| Count | US Tail # | Date & Logbook Entry | False Statement |
|---|---|---|---|
| 33 | N7933N | 9/9/82-Engine overhaul | False Entry |
| 34 | N7933N | 8/5/98-Airworthiness Inspection | False Entry |
| 35 | N7933N | 8/8/98-Re-certification of Transponder | False Entry |

All in violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

### Counts 36-37

FRAUD INVOLVING AIRCRAFT AND AIDING AND ABETTING

1.    Paragraphs 1 through 5 and 8 through 11 of the introductory allegations and paragraphs 7 and 8 of the Manner and Means in Count 1 of this Indictment are realleged and hereby incorporated by reference in Counts 36 and 37 as though fully set forth herein.

2.    Between March 16, 1998 and July 20, 2001, within the Southern District of California and elsewhere, in a matter within the jurisdiction of the Federal Aviation Administration, an agency of the United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, in or affecting interstate or foreign commerce, did knowingly and with intent to defraud make or use a materially false writing, entry or certification concerning a 1966 Jet Commander aircraft, United States Tail Number N382AA, as set forth below.

| Count | US Tail # | Date & Logbook Entry | False Statement |
|---|---|---|---|
| 36 | N382AA | 5/16/78-Left Engine Overhaul | False Entry |
| 37 | N382AA | 5/18/78- Right Engine Overhaul | False Entry |

All in violation of Title 18, United States Code, Sections 38(a)(1)(C) and 2.

//

//

## FRAUDULENT COMMUNICATIONS INVOLVING
## AIRCRAFT AND AIDING AND ABETTING

1. Paragraphs 1 through 5 and 8 through 12 of the introductory allegations and paragraphs 7 and 8 of the Manner and Means in Count 1 of this Indictment are realleged and hereby incorporated by reference in Count 38 as though fully set forth herein.

2. Between March 16, 1998 and August 12, 1999, within the Southern District of California and elsewhere, in a matter within the jurisdiction of the Federal Aviation Administration, an agency of the United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA did knowingly and willfully communicate information regarding a 1969 Piper Cherokee PA-28 aircraft, US Tail Number N7933N, that is, as set forth in the logbook of the Piper Cherokee, that on September 9, 1982, a complete overhaul of the aircraft's engine had been completed and that on August 5, 1998, an airworthiness inspection was completed on the aircraft, knowing the information to be false and under circumstances in which such information may reasonably be believed, thereby endangering the safety of the Piper Cherokee aircraft in flight; in violation of Title 18, United States Code, Sections 32(a)(6) and 2.

DATED: February 8, 2002.

A TRUE BILL:

_____
Foreperson

PATRICK K. O'TOOLE
United States Attorney

By: _____
    TIMOTHY D. COUGHLIN
    Assistant U.S. Attorney

# EXHIBIT 2

FILED

03 OCT -8 PM 2:54

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

July 2002 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN E. ESQUINO (1),<br>LANCE Z. RICOTTA (2),<br><br>Defendants. | Criminal Case No. <u>02CR0333W</u><br><br>I N D I C T M E N T<br>**(Superseding)**<br><br>Title 18, U.S.C., Secs. 38(a)(3)<br>and 38(a)(1)(C) - Conspiracy to<br>Commit Fraud Involving an<br>Aircraft; Title 18, U.S.C.,<br>Sec. 1001(a)(3) - False Statements<br>or Writing; Title 18, U.S.C.,<br>Sec. 38(a)(1)(C) - Fraud Involving<br>an Aircraft; Title 18, U.S.C.,<br>Sec. 32(a)(6) - Fraudulent<br>Communications Involving an<br>Aircraft; Title 18, U.S.C.,<br>Sec 2 - Aiding and Abetting |

The grand jury charges:

INTRODUCTORY ALLEGATIONS

1.     At various times material to this Indictment; the Federal Aviation Administration (FAA), was an agency of the United States, and did have jurisdiction to ensure the safety and airworthiness of domestic aircraft and those who flew on them, the FAA met this responsibility in part through the issuance of regulations regarding all aircraft within the United States.

//

TDC:nlv:San Diego
10/7/03

2. At various times material to this Indictment, Federal Aviation Regulations require aircraft owners and operators to keep records of maintenance, preventive maintenance, alterations and inspections performed on each of their aircraft, total time in service of aircraft engines, propellers and appliances related to the aircraft.

3. At various times material to this Indictment, Federal Aviation Regulations require aircraft owners and pilots operating an aircraft to have an appropriate and current airworthiness certificate, which may only be obtained by application to a Federal Aviation Administration Flight Standards District Office.

4. At various times material to this Indictment, Federal Aviation Regulations require aircraft owners and operators to track and record the total time in service of each airframe, engine, propeller and rotor.

5. At various times material to this Indictment, total time in service by an aircraft is used to schedule required maintenance, determine inspection status of those items required to be inspected at specific intervals, determine retirement date/time of life limited parts, if installed, and gauge the resale value of an aircraft, engines and appliances related to the aircraft.

6. At various times material to this Indictment, an aircraft's logbook provides a history of an aircraft including its major repairs and maintenance, disclose any major problems, such as, airframe damage from accident, engine failure, engine overhauls and modifications. The logbooks also track total time, which is the run time/flight time on the engine(s) and airframe from the date of manufacture and time since a major overhaul.

2

7.   At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO was the vice president and part owner of Argentum Air Corporation, which was incorporated in the State of California on March 17, 1994.

8.   At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO made the business and financial decisions for Argentum Air Corporation's purchase of various aircraft from the Mexican Government.

9.   At various times material to this Indictment, defendant LANCE Z. RICOTTA, was doing business as, LANCE Z. RICOTTA Aircraft Sales and Wright Brothers Aviation.

10.   At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO conducted business including the purchase and sale of aircraft through the Aircraft R US Corporation, a Delaware Corporation, incorporated on August 9, 1999, and in which CHRISTIAN E. ESQUINO is the sole proprietor.

11.   At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO was an owner and stockholder in Executive Aviation Logistics (EAL), a fixed base operation, located at the Chino Airport, in Chino California.

12.   At various times material to this Indictment, defendant CHRISTIAN E. ESQUINO employed defendant LANCE Z. RICOTTA as a pilot, as well as conducting business with defendant LANCE Z. RICOTTA as an associate.

//
//
//
//

3

## Count 1

### CONSPIRACY TO COMMIT FRAUD INVOLVING AIRCRAFT

Beginning at a date unknown to the grand jury and continuing up to and including October 2001, within the Southern District of California, and elsewhere, in a matter within the jurisdiction of the Federal Aviation Administration, an agency of the United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, in or affecting interstate or foreign commerce, did knowingly and intentionally conspire together and with each other and with other persons known and unknown to the grand jury to commit offenses against the United States, that is, knowingly and with intent to defraud make or uses any materially false writings, false entries, false certifications, and false records concerning aircraft.

### MANNER AND MEANS OF THE CONSPIRACY

1. It was part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA provided an unidentified individual with blank logbooks for the purpose of creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

2. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA provided an unidentified individual with Mexican aircraft tail numbers, Mexican airport codes, fuel range for particular aircraft and the correct number of letters and numbers contained in a standard Mexican pilot license, all for the purpose of creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

3. It was further part of the conspiracy that defendant LANCE Z. RICOTTA obtained a counterfeit Mexican inspection stamp, which was

used to make entries in the fraudulently created logbooks, concerning the airworthiness for aircraft engines, propellers and airframes, as well as, certify completed 25, 50 and 100 hour aircraft inspections.

4. It was further part of the conspiracy that defendant CHRISTIAN E. ESQUINO provided an unidentified individual with payment for creating false and fictitious logbooks for aircraft purchased from the Mexican government by Argentum Air Corporation.

5. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold aircraft purchased from the Mexican government by Argentum Air Corporation using the fraudulently created logbooks as an accurate record of an aircraft's total operating hours, of flights between Mexican airports by particular pilots, as well as, a history of maintenance and inspection records.

6. It was further part of the conspiracy that the new owners of aircraft previously purchased from the Mexican government made application to the Federal Aviation Administration for airworthiness certificates relying on information taken from logbooks fraudulently created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA.

7. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA changed and forged or caused others to change and forge aircraft logbook entries, concerning an aircraft's engine overhaul and inspection records, for aircraft purchased by the defendants.

8. It was further part of the conspiracy that defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold aircraft containing changed and forged engine overhaul and inspection records in an aircraft's logbook.

9.    It was further part of the conspiracy that defendant LANCE Z. RICOTTA purchased or caused others to purchase rubber stamps for FAA repair stations located throughout the United States and in foreign countries which were used to create false and fraudulent entries in aircraft logbooks.

10.    It was further part of the conspiracy that defendant LANCE Z. RICOTTA purchased blank logbooks from a printing company which were used to create false and fraudulent aircraft logbooks.

## OVERT ACTS

In furtherance of said conspiracy and to effect the objects thereof, the following Overt Acts, among others were committed within the Southern District of California and elsewhere:

1.    Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 2138, Mexican Tail Number XC-GAV and United States Tail Number N310CL.

2.    Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna P210 aircraft, Serial Number 665, Mexican Tail Number XC-FUU and US Tail Number N567D.

3.    Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310

aircraft, Serial Number 1680, Mexican Tail Number XC-DAW and US Tail Number N310LH.

4. Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 1656, Mexican Tail Number XC-FAP and US Tail Number N310LP.

5. Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 310 aircraft, Serial Number 1886, Mexican Tail Number XC-FAR and US Tail Number N38LH.

6. Between mid-February 1997 and up to and including March 11, 1997, in San Diego, California, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA caused false and fraudulent logbooks to be created with false entries for a Cessna 210 aircraft, Serial Number 64159, Mexican Tail Number XC-GEB and US Tail Number N210JM.

7. On or about February 24, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 210 aircraft, Serial Number 64159, US Tail Number N210JM, as part of that sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 210 aircraft.

8. On or about November 20, 1998, the new owner for a Cessna 210 aircraft, Serial Number 64159, US Tail Number N210JM,

7

using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, applied for an airworthiness certificate from the Federal Aviation Administration

9. On or about March 12, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 1886, and US Tail Number N38LH, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 310 aircraft.

10. On or about May 1, 1997, the new owner for a Cessna 210 aircraft, Serial Number 1886, and US Tail Number N38LH, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration.

11. On or about May 16, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 1680, and US Tail Number N310LH, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 310 aircraft.

12. On or about August 7, 1997, the new owner for a Cessna 310 aircraft, Serial Number 1680, and US Tail Number N310LH, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

//

8

13. On or about May 12, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 1656, and US Tail Number N310LP, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna 310 aircraft.

14. On or about November 3, 1997, the new owner for a Cessna 210 aircraft, Serial Number 1656, and US Tail Number N310LP, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

15. On or about March 31, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna P210 aircraft, Serial Number 665, and US Tail Number N567D, as part of the sale, the defendants delivered the false and fraudulently created logbooks to the new owner of the Cessna P210 aircraft.

16. On or about April 9, 1997, the new owner a Cessna 210 aircraft, Serial Number 665, and US Tail Number N567D, using information contained in the phoney logbooks created by defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA applied for an airworthiness certificate from the Federal Aviation Administration

17. On or about October 31, 1997, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold a Cessna 310 aircraft, Serial Number 2138, and United States Tail Number N310CL, as part of the sale, the defendants delivered the false and

//

9

1          fraudulently created logbooks to the new owner of the

2          Cessna 310 aircraft.

3 18.   On or about April 9, 1997, the new owner of a Cessna 310

4          aircraft, Serial Number 2138, and United States Tail Number

5          N310CL, using information contained in the phoney logbooks

6          created by defendants CHRISTIAN E. ESQUINO and LANCE Z.

7          RICOTTA applied for an airworthiness certificate from the

8          Federal Aviation Administration.

9 19.   On or about May 19, 1997, in San Diego County, defendant

10         CHRISTIAN E. ESQUINO d.b.a., Argentum Air Corporation

11         purchased a Merlin IIIB aircraft from a seller in Ecuador,

12         and thereafter the aircraft was registered in the United

13         States under U.S. tail number N100CE and later changed to

14         N117CC.

15 20.   Sometime after May 1997, but before March 2000, defendants

16         LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO entered or caused

17         others to enter false and fraudulent information into the

18         Merlin IIIB (N117CC) logbooks which were then delivered to

19         the new owner in or about March 2000.

20 21.   Sometime in March 1998, in San Diego County, defendant

21         CHRISTIAN E. ESQUINO d.b.a., Argentum Air- Corporation

22         purchased a Cessna Conquest aircraft from a seller in

23         Mexico, and thereafter the aircraft was registered in the

24         United States under U.S. tail number N441CE and later

25         changed to N24PT.

26 22.   Sometime after March 1998, but before January 12, 2000,

27         defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO

28         entered or caused others to enter false and fraudulent

information into the Cessna Conquest (N24PT) logbooks which were then delivered to the new owner in or about January, 2000.

23. On or about March 16, 1998, in San Diego California, defendant CHRISTIAN E. ESQUINO caused a check in the amount of $19,000, to be delivered to defendant LANCE Z. RICOTTA, for the purchase of an aircraft.

24. On or about March 16, 1998, in San Diego County, defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO purchased a 1969 Piper Cherokee aircraft, US Tail Number N7933N, for $16,500.

25. Sometime after March 16, 1998, but before August 12, 1999, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA entered, or caused others to enter false and fraudulent information into the Piper Cherokee's logbook, that is, that an engine overhaul had been completed on September 9, 1982, and that an airworthiness inspection had been completed on August 5, 1998, for the aircraft.

26. On or about August 12, 1999, in San Diego County, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold the Piper Cherokee aircraft for $39,000, knowing that at least two of the aircraft's logbook entries were false.

27. On or about March 16, 1998, in San Diego County, defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO purchased a Rockwell Commander 690B aircraft, US Tail Number N25CE, for $350,000.

//
//

11

28. Sometime after March 16, 1999, but before June 2001, defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO entered or caused others to enter false and fraudulent information into the Rockwell Commander's (N25CE) logbooks which were then delivered to the new owner in or about June 2001.

29. On or about May 6, 2000, in San Diego, California, defendant CHRISTIAN E. ESQUINO delivered or had others deliver a check, in the amount of $150,000 to defendant LANCE Z. RICOTTA, for the purchase of an aircraft.

30. On or about May 23, 2000, defendant LANCE Z. RICOTTA wire transferred $150,000 to an escrow company for the purchase of a 1966 Jet Commander aircraft, US Tail Number N382AA.

31. Sometime after May 23, 2000, but before August 20, 2001, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA entered, or caused others to enter false and fraudulent information into the Jet Commander's logbook, that is, that an engine overhaul was completed on both engines of the aircraft in May 1978.

32. On or about July 21, 2001, in San Diego County, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA sold the Jet Commander aircraft for $250,000, knowing that false and fraudulent entries were made into the aircraft's logbook concerning its engines.

33. Sometime in August 2001, in San Diego County, defendant CHRISTIAN E. ESQUINO d.b.a., Aircraft R US Corporation and utilizing Pan Pacific Jets, a corporation owned by his brother, purchased a 1982 Piper Navajo aircraft from a

12

1  seller in Mexico, and thereafter the aircraft was
2  registered in the United States under U.S. tail number
3  N82PP.

4  34. Sometime after August 2001, but before October 2001,
5       defendants LANCE Z. RICOTTA and CHRISTIAN E. ESQUINO
6       entered or caused others to enter false and fraudulent
7       information into the Piper Navajo's logbooks, that is
8       information identifying it as a 1982 model aircraft when in
9       fact it was a 1976 Piper Navajo model.

10 All in violation of Title 18, United States Code, Sections 38(a)(3)
11 and 38(a)(1)(C).

12                          Counts 2-22 & 25-32

13        FALSE STATEMENT OR WRITING AND AIDING AND ABETTING

14     1.   Paragraphs 1 through 8 of the introductory allegations and
15 paragraphs 1 and 8 of the Manner and Means in Count 1 of this
16 Indictment are realleged and hereby incorporated by reference in
17 Counts 2-22 and 25-32 as though fully set forth herein.

18     2.   Between mid-February 1997 and March 11, 1997, within the
19 Southern District of California and elsewhere, in a matter within the
20 jurisdiction of the Federal Aviation Administration, an agency of the
21 United States, defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA
22 did knowingly and willfully make or cause others to make false,
23 fictitious and fraudulent statements and representations of material
24 fact, that is, by creating false logbooks for aircraft purchased from
25 the Mexican government, as set forth below, making false and
26 fraudulent statements in the aircraft's logbook entries, including
27 inserting false and fraudulent airworthiness stamps, for an aircraft's
28 engine, propeller and airframe, inserting false and fraudulent

                                    13

# EXHIBIT 3

1  CAROL C. LAM
   United States Attorney
2  TIMOTHY D. COUGHLIN
   Assistant U.S. Attorney
3  California State Bar # 144911
   Federal Office Building
4  880 Front Street
   San Diego, California 92101
5  Telephone: (619) 557-7044

6  Attorneys for Plaintiff
   United States of America

FILED

2004 MAR 22 PH 3: 39

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

7

8                UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA.

   UNITED STATES OF AMERICA,        )    Criminal Case No. 02cr0333-W
10                                   )
                    Plaintiff,       )
11                                   )    PLEA AGREEMENT
          v.                         )
12                                   )
   CHRISTIAN E. ESQUINO (1),         )
13                                   )
                                     )
14                  Defendant.       )
   _____  )



GOVERNMENT
EXHIBIT
1

15      IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF

16  AMERICA, through its counsel, Carol C. Lam, United States Attorney,

17  and Timothy D. Coughlin, Assistant United States Attorney, and

18  defendant, CHRISTIAN E. ESQUINO,(hereinafter "Esquino"), with the

19  advice and consent of Marcus S. Topel, Esq. and or Eugene G. Iredale,

20  counsel for defendant, as follows:

21                               I.

22                            **THE PLEA**

23      Defendant agrees to plead guilty to Count 1 of the superseding

24  indictment in criminal case 02cr0333-W, which charges him as follows:

25      Beginning at a date unknown to the grand jury and continuing up

26  to and including July 20, 2001, within the Southern District of
    California, and elsewhere, in a matter within the jurisdiction of the
27  Federal Aviation Administration, an agency of the United States,
    defendants CHRISTIAN E. ESQUINO and LANCE Z. RICOTTA, in or affecting
28  interstate or foreign commerce, did knowingly and intentionally
    conspire together and with each other and with other persons known and
    unknown to the grand jury to commit offenses against the United
    States, that is, knowingly and with intent to defraud, make or use any

materially false writings, false entries, false certifications, and false records concerning aircraft. All in violation of Title 18, United States Code, Sections 38(a)(3) and 38(a)(1)(C).

II

**NATURE OF THE OFFENSE**

A.   ELEMENTS EXPLAINED

Defendant understands that the offense to which he is pleading guilty has the following elements:

1.   That the defendant knowingly and intentionally conspired (that is agreed) with at least one other person;

2.   To make or aid and assist others or direct others to make or use a materially false writing or entry, certification, document, or record, concerning any aircraft;

3.   That the defendant undertook this action or assisted others in undertaking this action, with intent to defraud;

4.   That the defendant's actions as described above affected interstate or foreign commerce;

5.   The defendant or another member of the conspiracy took a substantial step towards committing the fraud.

B.   ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime, and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed:

1.   In early 1997, defendant CHRISTIAN E. ESQUINO arranged for the exchange of aircraft with the Mexican Department of Agriculture (hereinafter "SAGAR"). Defendant ESQUINO used the Argentum Air Corporation, a corporation in which he was an officer, to conduct the aircraft transaction with SAGAR. Among those aircraft delivered by

2

1  SAGAR to defendant ESQUINO as part of this agreement were six Cessna
2  aircraft identified with the following US Tail numbers: N310CL, N567D,
3  N310LH, N310LP, N38LH & N210JM.

4  2.  When these Cessna aircraft were imported into the United
5  States, it was noted by both defendants ESQUINO and LANCE Z. RICOTTA
6  that the aircrafts' logbooks were incomplete, missing pages and in
7  some cases missing whole time periods.

8  3.  Beginning sometime in February or early March 1997, and
9  continuing up to at least August 11, 1997, defendants ESQUINO and
10  RICOTTA and others working with them and at their direction, created
11  missing portions of the six Cessna logbooks. They accomplished this
12  by using blank logbook pages and making false and fraudulent entries
13  therein, as well as using stamps purporting to be from the Mexican
14  Ministry of Communications and Transportation and a Cessna Repair
15  Station to give an air of authenticity to the logbooks.

16  4.  Defendants ESQUINO and RICOTTA, knowing that portions of the
17  logbooks for these six Cessna aircraft contained false and fraudulent
18  entries, nonetheless sought and obtained standard airworthiness
19  certificates from FAA representatives, in order to sell the aircraft
20  to U.S. customers.

21  5.  Defendants ESQUINO and RICOTTA undertook the creation of
22  false and fraudulent portions of the missing logbooks entries because
23  they knew that the value of these six Cessna aircraft was considerably
24  diminished by missing or incomplete logbooks.

25  6.  Thereafter, defendant ESQUINO with the assistance of
26  defendant RICOTTA, using the Argentum Air Corporation, sold the
27  following Cessna aircraft: N310CL, N567D, N310LH, N310LP, N38LH &
28  N210JM to U.S. buyers. All of these aircraft had logbooks which

contained false or fraudulent entries.

III

**PENALTIES**

Defendant understands that the crime to which he is pleading guilty carries the following penalties:

A.  **Count 1**

Conspiracy to Commit Fraud Involving an
Aircraft, 18 U.S.C. Section 38(a)(3) & 38(a)(1)(C)

   1.  a maximum of 10 years in prison;

   2.  a maximum fine of $500,000;

   3.  a mandatory special assessment of $100.00 on each
       count; and

   4.  a term of supervised release of three years.

Defendant understands that failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring defendant to serve in prison all or part of the term of supervised release.

IV

**DEFENDANT'S WAIVER OF TRIAL RIGHTS**

Defendant understands that this guilty plea waives the right to:

A.  continue to plead not guilty and require the Government to
    prove the elements of the crime beyond a reasonable doubt;

B.  a speedy and public trial by jury;

C.  the assistance of counsel at all stages of trial;

D.  confront and cross-examine adverse witnesses;

E.  present evidence and to have witnesses testify on behalf of
    defendant; and

F.  not testify or have any adverse inferences drawn from the

4

failure to testify.

V

**DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE
PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION**

The Government represents that any information establishing the factual innocence of defendant known to the undersigned prosecutor in this case has been turned over to defendant. The Government will continue to provide such information establishing the factual innocence of defendant.

Defendant understands that if this case proceeded to trial, the Government would be required to provide impeachment information relating to any informants or other witnesses. In addition, if defendant raised an affirmative defense, the Government would be required to provide information in its possession that supports such a defense. Defendant acknowledges, however, that by pleading guilty defendant will not be provided this information, if any, and Defendant also waives the right to this information. Finally, defendant agrees not to attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

VI

**DEFENDANT'S REPRESENTATION THAT GUILTY
PLEA IS KNOWING AND VOLUNTARY**

Defendant represents that:

A.   Defendant has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel, and has a clear understanding of the charges and the consequences of this plea;

B.   No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in

5

1    this plea agreement or otherwise disclosed to the court;

2    C.    No one has threatened defendant or defendant's family to

3          induce this guilty plea; and

4    D.    Defendant is pleading guilty because in truth and in fact

5          defendant is guilty and for no other reason.

6                              VII

7    **AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE**
     **SOUTHERN DISTRICT OF CALIFORNIA**

8    This plea agreement is limited to the United States Attorney's

9    Office for the Southern District of California, and cannot bind any

10   other  federal,  state  or  local  prosecuting,  administrative,  or

11   regulatory authorities, although the Government will bring this plea

12   agreement  to  the  attention  of  other  authorities  if  requested  by

13   defendant.

14

15                             VIII

16                    **SENTENCING GUIDELINES**

17   Defendant understands the sentence will be governed by the United

18   States Sentencing Guidelines (Guidelines).  Defendant has discussed

19   the Guidelines with defense counsel, and understands that the sentence

20   cannot be determined until a presentence report has been prepared by

21   the U.S. Probation Office and defense counsel and the Government have

22   had an opportunity to review and challenge the presentence report.

23   Defendant understands that, under some circumstances, the court may

24   "depart" from the Guidelines and impose a sentence more severe or less

25   severe  than  the  Guidelines,  up  to  the  maximum  in  the  statute  of

26   conviction.

27                              IX

28                    **SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE**

     This plea agreement is made pursuant to Federal Rule of Criminal



6

Procedure 11(e)(1)(B). Defendant understands that the sentence is within the sole discretion of the sentencing judge. The Government has not made and will not make any representation as to what sentence defendant will receive. Defendant understands that the sentencing judge may impose the maximum sentence provided by statute, and is also aware that any estimate of the probable sentence by defense counsel is a prediction, not a promise, and is **not binding on the court**. Likewise, the recommendation made by the Government is not binding on the court, and it is uncertain at this time what defendant's sentence will be.

Defendant also has been advised and understands that if the sentencing judge does not follow any of the parties' sentencing recommendations, defendant nevertheless has no right to withdraw the plea.

X

## PARTIES' SENTENCING RECOMMENDATIONS

A. **BASE OFFENSE LEVEL AND ADJUSTMENTS**

The parties will jointly recommend the following Base Offense Level and Adjustments under the Guidelines:

    1.   Offense Level USSG § 2F1.1 (Nov 2000)        6

            The parties agree that for purposes of guideline calculations § 2F1.1 of the sentencing edition effective November 1, 2000, is the applicable guideline section, in November 2001 § 2F1.1 was deleted and replaced by § 2B1.1, which mirrors § 2F1.1.

    2.   Specific Offense Characteristics

        (1)   2F1.1(b)(1)(I), increase by 8 levels where loss exceeded $200,000     +8

        (2)   2F1.1(b)(2), increase by 2 levels where more than minimal planning and scheme involved more than one victim     +2



c.  2F1.1(b)(7), increase by 2 levels
    where the offense involved the conscious
    or reckless risk of serious bodily
    injury                                              +2

3.  Role (Aggravating Role) USSG § 3B1.1(c)              +2

4.  Acceptance of Responsibility USSG § 3E1.1           -3

5.  Departure for Package Offer § 5K2.0                 -2

    This departure is contingent upon co-defendant Ricotta
    also entering his guilty plea within one week of
    defendant Esquino's guilty plea.

B.  **ACCEPTANCE OF RESPONSIBILITY**

Notwithstanding paragraph A.3 above, the Government will <u>not</u>
recommend any adjustment for <u>Acceptance of Responsibility</u> if
defendant:

1.  Fails to admit a complete factual basis for the plea
    at the time it is entered, or

2.  Denies involvement in the offense, gives conflicting
    statements about that involvement, or is untruthful
    with the Government, the court or probation officer,
    or

3.  Fails to appear in court, or

4.  Engages in additional criminal conduct, or

5.  Attempts to withdraw the plea, or

6.  Refuses to abide by any lawful court order, or

7.  Assists any third party in contesting the forfeiture
    of properties seized in connection with this case.

C.  **NO OTHER ADJUSTMENTS ARE RECOMMENDED**

The parties agree not to recommend any upward or downward
adjustments other than those listed above.

D. **NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY**

There is **no** agreement as to defendant's Criminal History Category.

E. **DEPARTURES**

The parties agree that defendant Esquino reserves the right pursuant to USSG § 4A1.3, to argue for a downward departure based on a claim that his criminal history category over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. The Government reserves the right to oppose a motion for departure.

F. **"RELEVANT CONDUCT" INFORMATION**

Defendant agrees that the facts in the "factual basis" paragraph of this plea agreement are true, and may be considered as "relevant conduct" under § 1B1.3.

G. **GOVERNMENT'S RECOMMENDATION REGARDING CUSTODY**

The Government will recommend that defendant be sentenced to the low of the guideline range found by the court. However, if the court adopts an offense level or downward adjustment or departure below the Government's recommendations in this plea agreement, the Government will recommend a sentence as near as possible to what the sentence would have been if the Government's recommendations had been followed. The Government has no objection to a self surrender by defendant Esquino. The Government will submit to the Court's determination of an appropriate self surrender date.

H. **SPECIAL ASSESSMENT/FINE/RESTITUTION**

Special Assessment. The parties will jointly recommend that defendant pay a special assessment in the amount of $100.00 for each count to be paid forthwith at time of sentencing. The special

assessment shall be paid through the office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

Fine.   The parties will jointly recommend that defendant pay a fine in the amount as determined by the U.S. Probation Department. This fine is to be paid forthwith at the time of sentencing.  The fine shall be paid through the Office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

The parties will jointly recommend that as a condition of probation or supervised release, defendant will notify the Collections Unit, United States Attorney's Office, of any interest in property obtained, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation after the execution of this plea agreement until the fine or restitution is paid in full.

The parties will also jointly recommend that as a condition of probation or supervised release, defendant will notify the Collections Unit, United States Attorney's Office, before defendant transfers any interest in property owned directly or indirectly by defendant, including any interest held or owned under any other name or entity, including trusts, partnerships and/or corporations.

XI

**DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK**

In exchange for the Government's concessions in this plea agreement, defendant waives, to the full extent of the law, any right to appeal or to collaterally attack the conviction and sentence, including any restitution order, unless the court imposes a custodial

sentence greater than the high end of the guideline range recommended by the Government pursuant to this plea agreement at the time of sentencing. If the custodial sentence is greater than the high end of that range, defendant may appeal, but the Government will be free to support on appeal the sentence actually imposed. If defendant believes the Government's recommendation is not in accord with this plea agreement, defendant will object at the time of sentencing; otherwise the objection will be deemed waived.

<div align="center">XII</div>

**CRIMES AFTER ARREST OR BREACH OF THE AGREEMENT WILL PERMIT THE GOVERNMENT TO RECOMMEND A HIGHER SENTENCE OR SET ASIDE THE PLEA**

This plea agreement is based on the understanding that, prior to defendant's sentencing in this case, defendant has not committed or been arrested for any offense not known to the Government prior to defendant's sentencing. This plea agreement is further based on the understanding that defendant has committed no criminal conduct since defendant's arrest on the present charges, and that defendant will commit no additional criminal conduct before sentencing. If defendant has engaged in or engages in additional criminal conduct during this period, or breaches any of the terms of any agreement with the Government, the Government will not be bound by the recommendations in this plea agreement, and may recommend any lawful sentence. In addition, at its option, the Government may move to set aside the plea.

<div align="center">XIII</div>

<div align="center">**ENTIRE AGREEMENT**</div>

This plea agreement embodies the entire plea agreement between the parties and supersedes any other plea agreement, written or oral.

## XIV

### MODIFICATION OF AGREEMENT MUST BE IN WRITING

No modification of this plea agreement shall be effective unless in writing signed by all parties.

## XV

### DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

By signing this plea agreement, defendant certifies that defendant has read it. Defendant has discussed the terms of this plea agreement with defense counsel and fully understands its meaning and effect.

///

///

///

///

///

///

///

///

///

XVI

## DEFENDANT SATISFIED WITH COUNSEL

Defendant has consulted with counsel and is satisfied with counsel's representation.

CAROL C. LAM
United States Attorney

3-22-04
_____
DATED

_____
TIMOTHY D. COUGHLIN
Assistant U.S. Attorney

B.22.04
_____
DATED

_____
MARCUS S. TOPEL, ESQ.
EUGENE G. IREDALE, ESQ.
Counsel for Defendant

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE.

3/22/04
_____
DATED

_____
CHRISTIAN E. ESQUINO
Defendant

13

# EXHIBIT 4

```
1              IN THE UNITED STATES DISTRICT COURT   -
          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
2


3    UNITED STATES OF AMERICA,          )
                                        )NO. 02CR0333-W
4              PLAINTIFF,               )
          VS.                       .   )SAN DIEGO, CALIFORNIA
5                                       )MARCH 22, 2004
     CHRISTIAN E. ESQUINO,             )2:00 P.M.
6                                       )
               DEFENDANT.               )
7    *  *  *  *  *  *  *  *  *  *  *  *

8

9                  TRANSCRIPT OF DISPOSITION
          BEFORE THE HONORABLE THOMAS J. WHELAN
10               UNITED STATES DISTRICT JUDGE


11

     APPEARANCES:
12

     FOR THE GOVERNMENT:        CAROL LAM, U.S. ATTORNEY
13                              BY:  MR. TIMOTHY D. COUGHLIN,
                                ESQ.
14                              880 FRONT STREET
                                5TH FLOOR
15                              SAN DIEGO, CALIFORNIA 92101


16   FOR THE DEFENDANT:         MR. EUGENE G. IREDALE, ESQ.
                                105 WEST "F" STREET
17                              4TH FLOOR
                                SAN DIEGO, CALIFORNIA 92101
18                              (619) 233-1525


19   FOR THE DEFENDANT:         TOPEL AND GOODMAN
                                MR. MARCUS S. TOPEL, ESQ.
20                              832 SANSOME STREET
                                4TH FLOOR
21                              SAN FRANCISCO, CALIFORNIA 94111
                                (415) 421-6140
22

     OFFICIAL REPORTER:         MELISSA A. PIERSON, CSR, RPR
23                              940 FRONT STREET, BOX 18
                                SAN DIEGO, CALIFORNIA 92101
24                              (619) 702-7508
                                IL CSR NO. 084-003138
25                              CA CSR NO. 12499
```

ORIGINAL

1           MR. TOPEL:  GOOD AFTERNOON, YOUR HONOR.--

2    MARCUS TOPEL FOR MR. ESQUINO WHO IS PRESENT.

3           MADAM CLERK:  CASE NO. 02CR0333, UNITED STATES

4    OF AMERICA VERSUS CHRISTIAN E. ESQUINO.

5           MR. COUGHLIN:  YOUR HONOR, WE DID HAVE A

6    CHANGE IN CONNECTION WITH THE -- COULD YOU PASS THAT

7    MATTER FOR ABOUT FIVE MINUTES.  THERE IS ONE SMALL

8    THING WE ARE DISCUSSING.

9           THE COURT:  CERTAINLY.  WE WILL TRAIL IT.

10                (BRIEF RECESS TAKEN.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  MR. CHRISTIAN ESQUINO IS PRESENT.

2          MADAM CLERK:  CASE NO. 02CR0333, UNITED STATES

3    OF AMERICA VERSUS CHRISTIAN E. ESQUINO.

4          THE COURT:  GOOD AFTERNOON, MR. TOPEL.  YOU

5    ARE VERY PATIENT THERE.

6          MR. TOPEL:  WELL, WE ARE PREPARING THIS AS

7    QUICKLY AS WE CAN.

8          MR. COUGHLIN:  YOUR HONOR, WE DID HAVE A

9    CHANGE IN CONNECTION WITH WHAT WE THOUGHT WAS GOING TO

10   BE A PLEA TO AN INFORMATION.  WE ARE NOW GOING TO PLEAD

11   TO COUNT 1 OF THE CONSPIRACY CHARGED IN THE SUPERSEDING

12   INDICTMENT.

13         THE COURT:  SO, YOU WANT TO JUST WITHDRAW THE

14   SUPERSEDING INFORMATION THEN?  IT HADN'T BEEN FILED,

15   SO, I WILL GIVE THE COPY BACK.

16         MR. COUGHLIN:  THE SUPERSEDING INFORMATION WAS

17   FILED, YOUR HONOR.  I AM SORRY, THE SUPERSEDING

18   INDICTMENT.  THE INFORMATION IS GOING TO BE FILED.  WE

19   ARE GOING BACK TO THE INDICTMENT, SUPERSEDING

20   INDICTMENT.  I AM SORRY.  IT'S A CONSPIRACY COUNT,

21   COUNT 1.

22         THE COURT:  THE SUPERSEDING INFORMATION, THEN,

23   THAT I HAVE BEEN PROVIDED A COPY OF IT HAS NOT BEEN

24   FILED.

25         MR. COUGHLIN:  HAS NOT BEEN FILED, AND BASED

1   ON CONVERSATIONS THIS AFTERNOON, WE ARE NOT GOING

2   FORWARD THERE.  WE ARE GOING FORWARD WITH COUNT 1 OF

3   THE SUPERSEDING INDICTMENT.

4         MR. TOPEL:  YOUR HONOR, JUST FOR CLARITY, IN

5   THE PLEA AGREEMENT, WE SPELL OUT THE PLEA IS AS TO

6   COUNT 1.  IT'S TO THE OVERT ACTS THAT ARE WITHIN COUNT

7   1 THROUGH NUMBER SIX, AND THAT'S SET FORTH JUST SO THAT

8   THE FACTUAL BASIS WILL BE ACCURATE.

9         THE COURT:  ALL RIGHT.  ALL RIGHT.

10  MR. ESQUINO, WOULD YOU RAISE YOUR RIGHT HAND TO BE

11  SWORN, PLEASE, SIR.

12               (DEFENDANT SWORN.)

13               CHRISTIAN E. ESQUINO

14  CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY

15  SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

16                    EXAMINATION

17                    BY THE COURT

18     Q    MR. ESQUINO, HAVE YOU TAKEN ANY DRUGS OR

19  ALCOHOLIC BEVERAGES IN THE PAST 24-HOURS?

20     A    NO, YOUR HONOR.

21     Q    YOUR ATTORNEY HAS TOLD ME YOU WANT TO PLEAD

22  GUILTY, THIS AFTERNOON, TO THE OFFENSE OF CONSPIRING

23  WITH OTHERS TO COMMIT FRAUD INVOLVING AIRCRAFT.  IS

24  THAT WHAT YOU WANT TO DO?

25     A    YES, YOUR HONOR.

1          Q     IN EXCHANGE FOR YOUR GUILTY PLEA YOU AND THE

2    UNITED STATES GOVERNMENT HAVE ENTERED INTO A PLEA

3    AGREEMENT.  YOUR PLEA AGREEMENT IS CONTAINED IN A

4    13-PAGE DOCUMENT.  IN ABOUT THE MIDDLE OF THE LAST PAGE

5    THERE APPEARS TO BE YOUR SIGNATURE.  IS THIS YOUR

6    SIGNATURE, SIR?

7          A     YES, YOUR HONOR.

8          Q     DID YOU READ AND UNDERSTAND EVERYTHING IN THE

9    PLEA AGREEMENT?

10         A     YES, YOUR HONOR.

11         Q     HAVE YOU HAD ENOUGH TIME TO TALK TO YOUR

12   ATTORNEY, MR. TOPEL, BOTH ABOUT THE PLEA AGREEMENT AND

13   ABOUT THE FACTS OF YOUR CASE?

14         A     YES, YOUR HONOR.

15         Q     HAS ANYBODY THREATENED YOU OR ANYBODY NEAR OR

16   DEAR TO YOU IN ORDER TO GET YOU TO CHANGE YOUR PLEA

17   THIS AFTERNOON?

18         A     NO, YOUR HONOR.

19         Q     DO YOU UNDERSTAND THAT WHEN YOU PLEAD GUILTY,

20   YOU GIVE UP YOUR CONSTITUTIONAL RIGHTS?

21         A     I DO, YOUR HONOR.

22         Q     THOSE RIGHTS INCLUDE YOUR RIGHT TO A TRIAL BY

23   JURY, YOUR RIGHT TO CONFRONT AND CROSS-EXAMINE

24   WITNESSES AGAINST YOU AND YOUR RIGHT AGAINST

25   SELF-INCRIMINATION.  DO YOU UNDERSTAND YOUR RIGHTS?

1      A    YES, SIR.

2      Q    DO YOU GIVE THEM UP?

3      A    YES, YOUR HONOR.

4          THE COURT:  MR. TOPEL, DO YOU JOIN IN THE

5   WAIVER?

6          MR. TOPEL:  I DO.

7   BY THE COURT:

8      Q    DO YOU UNDERSTAND, SIR, THE MAXIMUM PUNISHMENT

9   FOR THIS OFFENSE IS UP TO TEN YEARS IN JAIL.  THERE IS

10  A FINE OF UP TO $500,000.  A MANDATORY SPECIAL

11  ASSESSMENT OF $100, AND FOLLOWING YOUR RELEASE FROM

12  CUSTODY, YOU WOULD BE ON SUPERVISED RELEASE FOR THREE

13  YEARS.  ARE YOU AWARE OF THE MAXIMUM PUNISHMENT YOU

14  WOULD BE FACING, SIR?

15     A    YES, YOUR HONOR.

16     Q    AS A FACTUAL BASIS FOR YOUR PLEA, THE PLEA

17  AGREEMENT SAYS THAT IN EARLY 1997, YOU ARRANGED FOR THE

18  EXCHANGE OF AIRCRAFT WITH THE MEXICO DEPARTMENT OF

19  AGRICULTURE, HEREINAFTER IN THIS PLEA AGREEMENT

20  REFERRED TO AS SAGAR, S-A-G-A-R.

21       YOU USED THE ARGENTUM, A-R-G-E-N-T-U-M, AIR

22  CORPORATION, A CORPORATION OF WHICH YOU WERE AN

23  OFFICER, TO CONDUCT THE AIRCRAFT TRANSACTION WITH

24  SAGAR.  AMONG THOSE AIRCRAFT DELIVERED BY SAGAR TO YOU,

25  AS PART OF THE AGREEMENT, WERE SIX CESSNA AIRCRAFT,

1   IDENTIFIED WITH THE FOLLOWING TAIL NUMBERS, N310CL,

2   N567D, N310LH, N310LT, N38LH, AND N210JM.

3        WHEN THOSE CESSNA AIRCRAFT WERE IMPORTED INTO

4   THE UNITED STATES, YOU AND YOUR CO-DEFENDANT,

5   MR. RICOTTA, NOTED THE AIRCRAFT LOGBOOKS WERE

6   INCOMPLETE, WERE MISSING PAGES AND IN SOME CASES WERE

7   MISSING WHOLE TIME PERIODS.

8        BEGINNING SOMETIME IN FEBRUARY OR EARLY MARCH

9   1997, AND CONTINUING UP TO AT LEAST AUGUST 11, 1997,

10  YOU AND YOUR CO-DEFENDANT, MR. RICOTTA, AND OTHERS

11  WORKING WITH YOU, OR AT YOUR DIRECTION, CREATED THE

12  MISSING PORTIONS OF THOSE SIX CESSNA LOGBOOKS.  YOU

13  ACCOMPLISHED THIS BY USING BLANK LOGBOOK PAGES AND

14  MAKING FALSE AND FRAUDULENT ENTRIES IN THOSE PAGES, AS

15  WELL AS USING STAMPS PURPORTED TO BE FROM THE MEXICAN

16  MINISTRY OF COMMUNICATIONS AND TRANSPORTATION AND A

17  CESSNA REPAIR STATION TO GIVE THE AIR OF AUTHENTICITY

18  TO THE LOGBOOKS.  YOU AND YOUR CO-DEFENDANT, KNOWING

19  THAT PORTIONS OF THE LOGS FOR THESE SIX CESSNA AIRCRAFT

20  CONTAINED FALSE AND FRAUDULENT ENTRIES, NEVERTHELESS

21  SOUGHT AND OBTAINED STANDARD AIRWORTHINESS CERTIFICATES

22  FROM FAA REPRESENTATIVES IN ORDER TO SELL THE AIRCRAFT

23  TO THE UNITED STATES CUSTOMERS.

24        YOU AND YOUR CO-DEFENDANT UNDERTOOK THE

25  CREATION OF FALSE AND FRAUDULENT PORTIONS OF THE

1   MISSING LOGBOOK ENTRIES BECAUSE YOU KNEW THAT THE VALUE

2   OF THESE SIX CESSNA AIRCRAFT WERE CONSIDERABLY

3   DIMINISHED BY PROVIDING MISSING OR INCOMPLETE LOGBOOKS.

4           THEREAFTER, YOU, WITH THE ASSISTANCE OF YOUR

5   CO-DEFENDANT, USING ARE THE ARGENTUM AIR CORPORATION,

6   SOLD THE SIX CESSNA AIRCRAFT, WITH THE TAIL NUMBERS

7   THAT I PREVIOUSLY MENTIONED, TO ALL US BUYERS. ALL OF

8   THESE AIRCRAFT HAD LOGBOOKS WHICH CONTAINED FALSE OR

9   FRAUDULENT ENTRIES.

10          IS THAT ALL TRUE, SIR?

11      A    YES, YOUR HONOR.

12          THE COURT:  IS THE GOVERNMENT SATISFIED?

13          MR. COUGHLIN:  YES, YOUR HONOR.

14          THE COURT:  THE COURT'S SATISFIED.

15          I FIND YOU IN FULL POSSESSION OF YOUR

16  FACULTIES, SIR.  THAT YOU UNDERSTAND THE NATURE OF

17  THESE PROCEEDINGS AND THE CONSEQUENCES OF YOUR PLEA.  I

18  FIND THAT YOU UNDERSTAND YOUR CONSTITUTIONAL RIGHTS AND

19  THAT YOU MADE A KNOWING, INTELLIGENT AND VOLUNTARY

20  WAIVER OF YOUR RIGHTS.  PERMISSION TO WITHDRAW YOUR NOT

21  GUILTY PLEA TO COUNT 1 OF THE SUPERSEDING INDICTMENT IS

22  GRANTED.

23          HOW DO YOU PLEA TO THE CHARGE THAT BEGINNING

24  ON A DATE UNKNOWN TO THE GRAND JURY AND CONTINUING UP

25  TO AND INCLUDING OCTOBER 2001, WITHIN THE SOUTHERN

1  DISTRICT OF CALIFORNIA, AND ELSEWHERE, IN A MATTER

2  WITHIN THE JURISDICTION OF THE FEDERAL AVIATION

3  ADMINISTRATION, AN AGENCY OF THE UNITED STATES, THE

4  DEFENDANT, CHRISTIAN E. ESQUINO AND HIS CO-DEFENDANT,

5  IN OR AFFECTING INTERSTATE AND FOREIGN COMMERCE DID

6  KNOWINGLY AND INTENTIONALLY CONSPIRE TOGETHER, AND WITH

7  EACH OTHER, AND OTHER PERSONS KNOWN AND UNKNOWN TO THE

8  GRAND JURY, TO COMMIT OFFENSES AGAINST THE UNITED

9  STATES. THAT IS, KNOWINGLY AND WITH THE INTENT TO

10  DEFRAUD, MAKE OR USE ANY MATERIAL, FALSE WRITING, FALSE

11  ENTRY, FALSE CERTIFICATION AND FALSE RECORDS CONCERNING

12  AIRCRAFT, ALL IN VIOLATION OF TITLE 18, UNITED STATES

13  CODE, SECTIONS 38(A)(3) AND 38(A)(1)(C), GUILTY OR NOT

14  GUILTY, SIR?

15      MR. TOPEL: YOUR HONOR, WITH THE LIMITATIONS

16  ON THE DATE AS SET OUT IN THE PLEA AGREEMENT, THAT IS

17  UNTIL AUGUST 1997.

18      THE COURT: I UNDERSTAND THAT.

19      MR. TOPEL: ALL RIGHT.

20      THE DEFENDANT: GUILTY.

21      THE COURT: ACCEPT YOUR GUILTY PLEA.

22  SENTENCING DATE, MADAM CLERK?

23      MADAM CLERK: NORMAL COURSE, JUDGE?

24      THE COURT: DO YOU WANT NORMAL COURSE OR DO

25  YOU WANT MORE TIME?

1             MR. TOPEL:  WE NEED A LITTLE MORE TIME HERE.

2   THERE IS INFORMATION IN MEXICO WE WILL WANT TO PRESENT.

3             THE COURT:  HOW MUCH TIME DO YOU WANT,

4   MR. TOPEL?

5             MR. TOPEL:  I WOULD LIKE 90-DAYS.  WHAT DO YOU

6   RUN NORMALLY?

7             THE COURT:  ELEVEN WEEKS.

8             MR. TOPEL:  LET'S MAKE IT 120.

9             THE COURT:  I ASSUME THE GOVERNMENT HAS NO

10  OBJECTION.

11            MR. COUGHLIN:  NO OBJECTION.

12            MADAM CLERK:  JULY 26TH AT 9:00 A.M.

13            THE COURT:  IS THAT DATE AGREEABLE, MR. TOPEL?

14            MR. TOPEL:  YES, IT IS.

15            THE COURT:  MR. COUGHLIN?

16            MR. COUGHLIN:  YES, IT IS, YOUR HONOR.

17            THE COURT:  MR. ESQUINO, IS THAT DATE

18  AGREEABLE WITH YOU, SIR?

19            THE DEFENDANT:  YES, YOUR HONOR.

20            THE COURT:  ALL RIGHT.  I WILL SEE YOU JULY

21  26TH AT 9:00.  MR. ESQUINO, BEFORE YOU LEAVE TODAY,

22  CHECK WITH --

23            MR. TOPEL:  YOUR HONOR, CAN WE BRING HIM IN ON

24  WEDNESDAY MORNING TO PROBATION INSTEAD OF THIS

25  AFTERNOON?

1          THE COURT: THAT'S FINE.  MR. ESQUINO, JUST

2   CHECK WITH MR. TOPEL.  WHAT I WAS GOING TO TELL YOU, I

3   WANT YOU TO MAKE AN APPOINTMENT FOR THE PRE-SENTENCE

4   REPORT INTERVIEW, BUT I WANT YOU TO DO IT AT A TIME

5   WHEN MR. TOPEL CAN BE THERE WITH YOU.  OKAY?

6          THE DEFENDANT:  YES, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  THANK YOU.

8          MR. TOPEL:  THANK YOU, SIR.

9          THE COURT:  YOU ARE WELCOME.

10         (WHICH WERE ALL THE PROCEEDINGS

11          HELD IN THE ABOVE-ENTITLED CAUSE.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF CALIFORNIA

2

3

4        I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER

5    FOR THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT

6    OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED IN

7    SHORTHAND AS SUCH OFFICIAL COURT REPORTER THE FOREGOING

8    PROCEEDINGS HAD BEFORE THE HONORABLE THOMAS J. WHELAN,

9    JUDGE OF SAID COURT IN THE ABOVE-ENTITLED CAUSE ON THE

10   22ND DAY OF MARCH 2004, AND THEREAFTER CAUSE TO BE

11   TRANSCRIBED INTO TYPEWRITING THE FOREGOING TRANSCRIPT

12   WHICH I HEREBY CERTIFY IS A TRUE AND CORRECT

13   TRANSCRIPTION OF MY SHORTHAND NOTES SO TAKEN OF THE

14   EVIDENCE OFFERED AND RECEIVED ON SAID DATE BEFORE SAID

15   JUDGE.

16

17

18

19

20

21   MELISSA A. PIERSON, CSR, RPR
     CALIFORNIA LICENSE NO. 12499
22   ILLINOIS LICENSE NO. 084-003138

23

24

25   DATED THIS 20TH DAY OF OCTOBER 2004.

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal Case No. 02cr0333-W |
| Plaintiff, ) | |
| ) | |
| v. ) | CERTIFICATE OF SERVICE |
| ) | BY MAIL |
| CHRISTIAN E. ESQUINO (1), ) | |
| Defendant. ) | |

IT IS HEREBY CERTIFIED THAT:

I, Melissa Johnson, am a citizen of the United States over the age of eighteen years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and

On November 1, 2004, I deposited in the United States mail at San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of Government's Sentencing Summary Chart

addressed to Joseph Milchen, Esq., 136 Redwood St., San Diego, CA 92103

the last known address at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of December, 2004.

MELISSA D. JOHNSON

# EXHIBIT 5

**THE OFFENSE**

**Charges and Convictions**

October 8, 2003, a forty-four count superseding indictment was filed in the Southern District of California, charging Christian E. ESQUINO and Lance Z. RICOTTA in  Count 1, with Conspiracy to Commit Fraud Involving an Aircraft, in violation of 18 U.S.C. § 38(a)(3) and 38(a)(1)(C); in Counts 2-22 & 25-32, with False Statement or Writing and Aiding and Abetting, in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2; in Counts 33-35, with False Statement or Writing and Aiding and Abetting, in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2; in  Counts 36-37, and 39-44, with Fraud Involving Aircraft and Aiding and Abetting, in violation of 18 U.S.C. § 38(a)(1)(C), and 18 U.S.C. § 2; and in Count 38, with Fraudulent Communications Involving Aircraft and Aiding and Abetting, in violation of 18 U.S.C. § Aiding and Abetting, in violation of 18 U.S.C. § 38(a)(1)(C), and 18 U.S.C. § 2.

On March 25, 2004, ESQUINO and RICOTTA each pled guilty to Count One of the superseding indictment. For ESQUINO, sentencing was scheduled for July 26, 2004, at 9:00 a.m., and for RICOTTA, sentencing was scheduled for July 6, 2004, at 9:00 a.m.

**The Offense Conduct**

The following information was obtained from material provided by the United States Attorney's Office and through discussions with the Assistant U.S. Attorney (AUSA) and case agent. Defense counsel representative was also contacted for comment and added no information.

*Background of Federal Aviation Logbooks*

According to the Federal Aviation Administration (FAA), federal aviation regulations require aircraft owners and operators to keep records of maintenance, preventive maintenance, alterations and inspections performed on each of their aircraft, aircraft engines, propellers and appliances. Maintenance records are usually assembled and maintained in a bound logbook format. However, these records may be kept in any format that provides record continuity, includes the required content, lends itself to the addition of new entries and is intelligible. Many owners and operators maintain individual logbooks for the "aircraft" (airframe, appliances and avionics) and "engine" (basic engine and accessories). Records kept by owners and operators must include descriptions of the work performed, the date the work was completed, and the signature and certification number of the person approving the aircraft or engine for return to service. This information is vital when the owner of an aircraft is seeking to obtain an annual airworthiness inspection or the standard airworthiness certificate as it verification that the aircraft is made ready to fly.

Maintenance records typically include entries describing the removal and replacement of tires, brakes, fuel pump, engine spark plugs, filters, annual inspections, and engine or propeller overhauls. Each of these maintenance actions would require an appropriately rated person or repair facility to perform or supervise the work and approve the aircraft or engine for return to service. Aircraft owners and operators are also required to track and record the total time in service of each airframe, engine, propeller and rotor. Several methods are employed to track total time, including manual calculation following each flight, discrete hours meters known as Hobbs meters, or engine tachometer readout (similar to an odometer on an automobile, but records hours and tenths of hours when the engine is operating). Total time in service is used to schedule required maintenance, determine the inspection status of items required to be inspected at specific intervals, determine the retirement date/time of life-limited parts, if installed, and gauge the resale value of the aircraft, engines and appliances.

The logbooks provide a history of the aircraft including its major repairs/maintenance, annual inspections and, disclose any major problems ( i.e., airframe damage caused by an accident, engine failure, engine overhauls, modification, etc.). The logbooks also tracked total time, which is the run time/flight time on the engine(s) and airframe from the date of manufacture and from the time since a major overhaul was completed. The total time, and time since a major overhaul, are important to any buyer/owner because engines and airframe parts have different life spans set by the manufacturer's specifications, which require inspection, repair, replacement or overhaul, depending on the part.

According to the FAA, if the total time and/or time since a major overhaul are fraudulently changed it has a direct impact on the condition and safety of the aircraft. A change of these times also has an economical impact on the aircraft, i.e., fraudulently showing the aircraft had an engine overhaul would increase the value of the plane because the perspective buyer is being told that the engine(s) have less hours than they actually do. An aircraft without logbooks and or incomplete logbooks could lose 30% to 40% of its value. Consequently, creating false logbooks for an aircraft could substantially increase the value of the aircraft.

*The Offenses*

According to investigative material, on March 17, 1994, ESQUINO, Mauricio Esquino, and Luis Evia formed Argentum Air Corporation, to buy and sell aircraft. ESQUINO, Mauricio Esquino and Evia were each 1/3 owners of the corporation. Evia was the president, ESQUINO was the vice president. Evia stated he was paid $2,000 a month by the corporation. Evia stated that ESQUINO ran the business and made the major decisions because ESQUINO had the aircraft connection. On a number of occasions, ESQUINO would have Evia take cash ($1,000 to $5,000) and deposit the money in ESQUINO's wife account in Tijuana. This continued until early 1996, when Evia started his own company (Evia Corporation). Evia continued to work with ESQUINO until early 1997 because they had accumulated a balance of approximately $60,000 on Evia's American Express card for various business expenses related to Argentum.

1   In late 1996, ESQUINO and Jorge Sanchez-Pedraza made a deal with the Ministry of
2   Agriculture in Mexico (hereinafter SAGAR), to trade thirteen of SAGAR's aircraft for a
3   newer Jet Star aircraft. SAGAR's aircraft included a King Air, two helicopters, a number of
4   Cesena 310 and 210 aircraft. Because Sanchez-Pedraza knew little about aircraft, he relied
5   on ESQUINO to conduct negotiations with SAGAR. Prior to executing the transaction with
6   SAGAR, ESQUINO directed Evia to ensure that Argentum Corporation was in good
7   standing with the State of California by paying any outstanding fees. ESQUINO used the
8   Argentum Corporation as the corporate entity in purchasing SAGAR's aircraft.
9

10  In early 1997, ESQUINO directed Evia to provide Sanchez-Pedraza with power of attorney
11  for Argentum. Thereafter, Sanchez-Pedraza signed the agreement between SAGAR and
12  Argentum, as Argentum's representative. Shortly after the contract was signed, the thirteen
13  Mexican aircraft were brought by ESQUINO to Brown Field in San Diego, where some
14  maintenance was preformed. Part of the work done on the aircraft involved getting them
15  ready for resale, which included creating bogus logbook entries for the aircraft. Evia stated
16  that once the Mexican aircraft were present in the United States, ESQUINO directed him
17  (Evia), Axel Ambrosius and RICOTTA to create the bogus logbook entries using a
18  counterfeit Mexican repair station stamp that RICOTTA had made.
19

20  Ambrosius stated he was good friends with Mauricio Esquino and Luis Evia in college. He
21  met Mauricio's father, Salvador Esquino, and ESQUINO, through this relationship. He also
22  knew that ESQUINO and Salvador Esquino were involved in the aircraft business. In early
23  1997, Ambrosius stated he received a call from Evia who asked him if he wanted to make
24  a couple thousand dollars for one week of work. Ambrosius asked if it was illegal and was
25  told it was not; however, later learned he was creating false logbooks. Ambrosius was told
26  that ESQUINO would pay him when the work was completed. Ambrosius agreed to met
27  with Evia, who explained that they wanted him to help create some logbooks for aircraft that
28  ESQUINO had purchased from the Mexican Government.
29

30  Evia and RICOTTA provided Ambrosius the needed materials to create bogus log books
31  including, blank logbooks, pages, stamps and seals, the Mexican tail numbers of the
32  purchased aircraft, a map of Mexico, Mexican airport codes, information on an aircraft's
33  flight range and fuel capacity, as well as the starting and ending time periods for which they
34  needed logbook entries. Ambrosius filled in blank pages with a pilot's name, license number,
35  aircraft model, registration number, date, flight time, including departure time, arrival time
36  and total time, as well as the total aircraft time. Ambrosius indicated that each logbook
37  contained approximately 50 to 75 pages.
38

39  Ambrosius knew that RICOTTA was a pilot and employee of ESQUINO. Ambrosius did
40  most of the work at his residence; however, on occasion he went to the Argentum office in
41  Bonita, California, where he saw ESQUINO, Evia and RICOTTA. He knew that Evia and
42  RICOTTA completed entries in the logbooks and recalled that RICOTTA used a stamp to
43  make entries. Ambrosius indicated he created logbooks for 10 to 12 aircraft with some

1  aircraft having two books. He estimated that it took approximately one week to two weeks
2  to complete the logbooks which he delivered to Evia and RICOTTA at the office in Bonita.
3  According to Evia and Ambrosius, RICOTTA obtained and used stamps and seals which he
4  placed into the logbooks regarding inspections and maintenance completed on the aircraft.
5  Evia helped fill in the stamps by making up information and names regarding inspections to
6  include information on the type of inspections, the date it occurred and the location, the name
7  of the authority conducting the inspection and the total time hours on the aircraft. Both Evia
8  and Ambrosius stated that RICOTTA took steps to make the log books look older as well as
9  authentic. One method used to age the books was to heat them, to induce an aged look.
10
11  According to Ambrosius, he was paid twice for working on the Mexican logbooks. The first
12  time, Ambrosius accompanied ESQUINO's wife, Bertha Cruz, to an ATM at a Bank in
13  Coronado, and was paid $500 in cash. The second time, Ambrosius was paid directly by a
14  check ($2,500) presented to him by ESQUINO, at Evia's office, where RICOTTA was also
15  present. Bank records for ESQUINO's account corroborate a check in the amount of $2,500,
16  was written to Ambrosius.
17
18  According to FAA records, between March 1997 and early 1998, all thirteen aircraft were
19  sold by ESQUINO and RICOTTA to United States buyers. Each aircraft was sold with the
20  forged logbooks and FAA records show that the new United States owners applied for FAA's
21  standard airworthiness certificate using the bogus logbooks as evidence of the aircraft's
22  maintenance and inspection record while in Mexico. The current United States owners of
23  six of the Mexican aircraft sold by ESQUINO and RICOTTA in the United States were given
24  the bogus Mexican log books where they purchased the aircraft.
25
26  On March 16, 1998, Craig Allen, the owner of the 1996 Piper Cherokee Aircraft PA-28,
27  sold the Piper Cherokee to RICOTTA for $16,500. Escrow and bank records revealed that
28  ESQUINO financed the purchase of the aircraft. Mr. Allen informed RICOTTA that the
29  engine on the Piper Cherokee had "run out," meaning that the flight hours on the engine
30  were near the maximum allowable and that the engine needed to be overhauled. Mr. Allen
31  believed the engine had a 2,000-hour maximum lifetime and recalled that when he purchased
32  it in 1996, it was at approximately 1,800 hours. Mr. Allen stated that RICOTTA was very
33  familiar with this fact and used it when negotiating the purchase price for the Piper Cherokee.
34  Mr. Allen also stated that personnel at the Faulkner Air Shop is Burnet, Texas, were familiar
35  with the Piper Cherokee aircraft and refused to issue Mr. Allen a ferry permit in March 1998,
36  based on the overall condition of the Piper Cherokee's engine.
37
38  On August 12, 1999, the Piper Cherokee was sold for $39,000, to Mr. Lightsey. Mr.
39  Lightsey stated he knew the owner of the aircraft was RICOTTA, but dealt mainly with the
40  broker. According to Mr. Lightsey, the Piper Cherokee was advertised as having 415 hours
41  on the engine with a total tech time of 3,525 hours. On December 31, 1999, a pilot flying the
42  Piper Cherokee experienced engine failure that necessitated an emergency landing short of
43  the airport, narrowly avoiding traffic and electrical lines. This emergency landing was

1   caused by catastrophic engine failure. Mr. Lightsey replaced the engine shortly thereafter.
2   Investigation into this matter revealed that the logbooks for the Piper Cherokee indicated
3   that an engine overhaul was performed on September 9, 1982, when in fact, it was only an
4   engine inspection and repair. The mechanic who performed this work was interviewed by
5   the agents and unequivocally stated the logbook had been forged.

7   On May 23, 2000, RICOTTA purchased a 1966 Jet Commander aircraft, U.S. serial number
8   N382AA, for $150,000. RICOTTA traveled to Bakersfield with ESQUINO to inspect the
9   aircraft. The previous owner, Mr. Hevele stated that RICOTTA spent little time inspecting
10  the plane and substantial time reviewing the logbooks. Mr. Hevele recalled that RICOTTA
11  told him he was the "leg man" and that ESQUINO was the "money man." When RICOTTA
12  purchased the aircraft, Mr. Hevele discussed with him the fact that the engines had high time
13  on them and one of the life-limited parts in the engine was near the end of it allowable cycles,
14  which required replacement.

16  On July 20, 2001, RICOTTA sold the Jet Commander for $250,000, to Mr. Howell, who took
17  delivery of the jet at Executive Aviation Logistics (EAL) at the Chino Airport, in Chino,
18  California. Mr. Howell stated that prior to purchasing the jet, he spoke with RICOTTA about
19  the advertisement for the jet which noted it had new life-limited components when it was
20  overhauled in 1978. The aircraft was also advertised as the right engine having
21  approximately 2,000 hours, and the left engine having 1,861 hours and 1,727 cycles. When
22  Mr. Howell purchased the aircraft he believed he was purchasing an older jet with newer
23  engines. The logbooks for the jet revealed that the right engine was overhauled on
24  May 16, 1978, the left engine had been overhauled and on May 18, 1978.

26  Shortly after the purchase of the jet, Mr. Howell learned from Mr. Hevele (the former owner
27  who sold the jet to RICOTTA) that when he (Mr. Hevele) sold the jet in 1999, to RICOTTA,
28  the engines had approximately 3,255 hours on them, and one of the engines had 5,975 cycles,
29  and it was only good for 6,000 cycles. Investigating agents discovered that the log books
30  had been changed, and that the entries on May 16 and 18, 1978, showing an engine overhaul,
31  had been forged. The mechanic who worked on the Jet Commander was interviewed and he
32  stated he had done a 150-hour inspection on the jet's engines, but not an overhaul.
33  Documentation kept by the mechanic's own company who performed the work corroborate
34  that it was a 150-hour inspection and not an engine overhaul.

36  Between 1997 and July 20, 2001, ESQUINO either purchased or arranged for the purchase
37  of four additional aircraft and they are as follows: Rowwell Commander 690B, U.S. tail
38  number N25CE; Cessna Conquest, U.S. tail number N441CE; Merlin IIIB, U.S. tail number
39  N100CE and Navajo Piper, U.S. tail number N82PP. Each of these aircraft had portions of
40  their log book entries created, altered or completely forged by RICOTTA or ESQUINO.

42  A company called Rubber Stamp and Button Champ, in San Marcos, California, provided
43  numerous documents and exemplars of rubber stamps requested and purchased by

1     RICOTTA. The owner of Rubber Stamp and Button Champ recalled that RICOTTA placed
2     orders for stamps with a number of U.S. airport names on them. The owner believed that
3     RICOTTA was in the business of buying and selling aircraft. The owner provided computer
4     archives showing the purchase of stamps valued at $474.22, for the period of January through
5     December 2000. Additionally, during the winter of 1999, through spring of 2000, RICOTTA
6     ordered 30 to 40 rubber stamps on three or four different occasions. The stamps were in the
7     Spanish language and the stamps mentioned airport names that were outside of the United
8     States.
9
10    ESQUINO met with government agents two times in May of 2001. During the first meeting,
11    the defendant told agents he wanted to meet with them because he heard he was under
12    investigation by the government for various crimes. He denied criminal wrongdoing at the
13    initial meeting, and never mentioned any activity relating to the logbooks as outlined in this
14    report.
15
16    Agents extensively reviewed his finances with him, noting that at time he had not filed tax
17    returns for tax years 1997, 1998, and 1999. ESQUINO said he had procrastinated in filing
18    because he did not believe he had the money to pay the taxes. During one of the interviews,
19    the defendant said that an attorney had told him that failure to file a return was not a crime.
20
21    The agents had copies of tax returns variously prepared by a certified public accountant and
22    an accountant, but ESQUINO never filed the returns. The returns showed the following. For
23    1997, adjusted gross income (AGI) of $413,282, taxable income (TI) of $319,958 and total
24    tax (TT) of $120,447. The 1998 return showed AGI of $447,234, TI of $376,734 and TT of
25    $144,323. The 1999 return shows an AGI of $447,025, TI of $347,819, and TT of $110,897.
26    The defendant said he believed the above returns contained truthful information.
27
28    The defendant was confronted by agents with various personal and corporate financial
29    statements dated from 1997 to 2000. The personal statements show net worth ranging from
30    approximately $4.66 million to $8.37 million. The corporate statements show net
31    worth/capitol ranging from approximately $1.92 million to $3.95 million. When asked why
32    he had not paid his taxes, the defendant did not answer the question.
33
34    Similarly, agents presented the defendant with statements from his various corporations,
35    showing millions of dollars in net profits from sales of aircraft and the defendant said he
36    believed the statements were accurate, but did not reflect his net income from the sales.
37
38    ESQUINO told agents he had been "black balled" by one bank, and as a result, he started
39    transacting his business in cash. He noted the reason this happened was that the bank had
40    made a large error, and he erroneously thought he had $250,000 in the account, which in fact
41    was not his. As a result, he spent the money. The bank later notified him that he was
42    overdrawn by the above amount. The defendant acknowledged that he was a poor record
43

keeper (he admitted this repeatedly in the interviews). The defendant disavowed wrongdoing relating to this incident.

Defendant ESQUINO admitted he conspired with a Mr. Langerveld, to perpetuate an insurance scam. In sum, a plane owned by one of the defendant's companies (Aircraft R Us) was damaged by employees of Mr. Langerveld, in approximately February of 2000. The aircraft was a total loss ($2 million) and Mr. Langerveld had inadequate insurance to pay for the aircraft. Mr.Langerveld proposed that they back-date documents to show the craft was sold to Langerveld on the day before the accident so the plane would be covered by insurance with a higher limit. The defendant signed documents and later reportedly had second thoughts about his actions and informed the insurance company. The insurance company sued Langerveld, ESQUINO and their companies alleging insurance fraud. The case was later settled and the defendant believes the whole incident cost him $1million.

On February 4, 2002, RICOTTA was interviewed by the investigating agents and stated he was being interviewed on his own volition. In summary, RICOTTA stated he had known ESQUINO for approximately six years during which time ESQUINO financed a great deal of RICOTTA's aviation/pilot training. RICOTTA indicated that his negotiating skills in pre-purchase inspection repairs saved ESQUINO a large amount of money. RICOTTA gave an example of the Jet Star, N112TR, purchased in Canada where the initial repairs estimate was $300,000 but RICOTTA was able to negotiate the repair bill down to $100,000.

RICOTTA reported that ESQUINO had log books of several aircraft that ESQUINO placed advertisements in the Plane Facts, an aviation publication, and some Mexican newspapers, using RICOTTA as the contact person for the purchase of these log books. According to RICOTTA, ESQUINO paid for the ads with RICOTTA's credit card. RICOTTA indicated he cancelled the credit card after this incident.

RICOTTA stated that ESQUINO had threatened his (RICOTTA's) life. He also accused him of wanting his father (Thomas Ricotta) killed. RICOTTA denied the allegations of plotting to harm or kill his own father. RICOTTA noted that his father caused RICOTTA's mother a lot of problems during their divorce and as a result his father is suing everybody involved in the divorce.

RICOTTA indicated he last saw ESQUINO one month prior and that this meeting revolved around RICOTTA trying to assist in an aircraft transaction. The aircraft was a Bell Jet Ranger Helicopter, tail number N207WJ. ESQUINO was brokering the transaction between the seller, Mr. Eberle, and the buyer, Mr. Garcia. ESQUINO took $125,000 from Mr. Garcia as a deposit and Mr. Garcia spent $40,000 in improvement on the helicopter; however, the deal fell through when ESQUINO's check for $90,000 to Mr. Garcia bounced.

RICOTTA also stated that ESQUINO was angry with his own brother Salvador Esquino over airplane deals and as a result ESQUINO was suing Salvador. RICOTTA also stated that he

and Salvador were doing business together. Investigating agents noticed that RICOTTA arrived for the interview driving a black 1997 Jaguar, bearing California license plates, registered to Salvador Esquino, in Coronado, California.

On February 27, 2002, ESQUINO and RICOTTA were arrested without incident pursuant to the federal warrants issued on February 11, 2002. ESQUINO and RICOTTA invoked their right to remain silent.

The AUSA was interviewed and noted that losses in this case are estimated at between $200,000 and $350,000. ESQUINO was viewed as the organizer of the offense. He recruited others through RICOTTA and arranged for the planes received from the Mexican government. He rewarded RICOTTA for his involvement by letting RICOTTA fly various planes and by flying ESQUINO to different places. This allowed RICOTTA to obtain enough hours for some pilot license certifications. As noted in this report, ESQUINO also paid RICOTTA for his involvement, as verified by bank records.

RICOTTA was viewed as being the person instrumental in creating the logbooks, with others involved as described in this report.

The case agent was interviewed. He identified ESQUINO as the person "in charge" during the conspiracy in this case, and said that ESQUINO could be likened to a "CEO." The case agent said ESQUINO had the connections in Mexico for the aircraft he acquired and had others do the "dirty work" of the logbooks. Both defendants recruited people to make the fraudulent logs.

RICOTTA was described as ESQUINO's "right hand man." RICOTTA performed errands and oversaw the operations of creating the log books. RICOTTA took sections out of logbooks and found a company to make fraudulent stamps which were used to make the false log books. Later in the conspiracy (1999 to 2001), the logs became even more sophisticated. This was done by using more stamps and recreating whole pages for logs.

Most of the planes had some logs, though some may not have had any. In sum, gaps were recreated or whole logs were made. Mr. Ambrosius made several logs in 1997. He was given a map, plane flight-ranges, and told to fabricate pilot names and license numbers.

ESQUINO is criminally wanted by the Mexican Government for not providing a promised jet as part of the aforementioned aircraft deal.

Lastly, the agent noted that losses for some victims may be high as they had to obtain expensive inspections for their aircraft.

this date). He had purchased a plane from RICOTTA and at the time of purchase, he knew the plane would need an engine replacement soon as the logs showed a high amount of hours. Nevertheless, the engine was in a condition which was worse than that reflected in the logs, and Mr. Rowell said it would be difficult to determine what the difference in value was. He had repairs completed on the plane and recently sold the plane. He opined that his losses may have amounted to $10,000 on the sale of the plane, due to the fraudulent log books. He said the whole experience was very frustrating for him. Mr. Rowell said he is not sure if he will attend the sentencing in this matter.

Victim Jack Van Blarcom was contacted and he said he desires restitution. He purchased his aircraft from a dealer, and the dealers had acquired the plane in an estate sale. Mr. Van Blarcom is an airframe and power plant (aircraft) mechanic and holds a related degree. He was first informed about the fraudulent logbooks about one year ago and has since noticed additional things wrong with the plane (non-standard rivets in places, etc.). He purchased the plane for about $155,000 (documentation provided) and believes the offense caused the plane to lose 30% to 50% of its value (this is in almost the same range as noted by the FAA in the "Offense Conduct" section of this report). Thus, he is asking for $70,000 in restitution. He has not made any repairs on the plane to date. Mr. Van Blarcom is not sure if he will attend sentencing.

Mr. Van Blarcom also submitted a written victim impact statement. In his statement he reiterates the information above. Additionally, this victim said that his plane "may not be resellable in the future and if it is, its value is greatly reduced." He also stated, "I'm angry that these individuals would jeopardize the lives of the operators & passengers that have flown in this airplane." Lastly, Mr. Van Blarcom said, "These people not only committed fraud for the sake of a few dollars but endangered the lives of many people in the process." In the victim impact statement, Mr. Van Blarcom noted that since the crime in this case he has experienced anger and anxiety.

The probation officer contacted Victim Johnny Morgan. Mr. Morgan said he purchased an aircraft from a person who purportedly bought it from RICOTTA. Mr. Morgan believes this third party is also a criminal. Mr. Morgan said he probably spent $100,000 to $150,000 to repair the aircraft. He had paid premium price for the aircraft because the logs showed low hours and no damage, but he later discovered that this was false. Mr. Morgan has since sold the aircraft. Mr. Morgan will not attend sentencing and he is not sure if he will pursue restitution.

The total restitution claimed by victims (those that desire restitution) as noted above is currently $185,000, and may grow larger if other victims respond.

**Pretrial Supervision Adjustment**

The defendant's pretrial services officer was contacted and he noted the defendant is in compliance with his bond conditions and no problems are noted.

**Defendant's Statement of the Offense**

The defendant was interviewed on May 27, 2004, at the U.S. Probation Office, in San Diego, California. ESQUINO was interviewed in the English language and in the presence of defense counsel representative Lyn R. Agre, Esq.

Upon advice of counsel, the defendant limited his comments to affirming the factual basis of the plea agreement. The probation officer provided the defendant with a copy of the factual basis, which the defendant read to himself (silently), and then affirmed as true. A summary of the factual basis follows below.

In early 1997, ESQUINO arranged for the exchange of aircraft with the Mexican Department of Agriculture (hereinafter "SAGAR"). ESQUINO used the Argentum Air Corporation, a corporation in which he was an officer, to conduct the aircraft transaction with SAGAR. Among those aircraft delivered by SAGAR to ESQUINO as part of this agreement, were six Cessna aircraft identified with the following U.S. tail numbers: N310CL, N567D, N310LH, N310LP, N38LH, and N210JM.

When the above aircraft were imported into the United States, it was noted by both defendants ESQUINO and RICOTTA that the logbooks for the above aircraft were incomplete, missing pages and in some cases missing whole time periods.

Beginning sometime in February or early March 1997, and continuing up to at least August 1997, defendants ESQUINO and RICOTTA, and others working with them at their direction, created missing portions of the six Cessna logbooks. They accomplished this by using blank logbook pages and making false and fraudulent entries therein, as well as using stamps purporting to be from the Mexican Ministry of Communications and Transportation, and a Cessna Repair Station, to give an air of authenticity to the logbooks.

Defendants ESQUINO and RICOTTA, knowing that portions of the logbooks for the above aircraft contained false and fraudulent entries, nonetheless sought and obtained standard airworthiness certifications from FAA representatives, in order to sell the aircraft to United States customers.

ESQUINO and RICOTTA undertook the creation of false and fraudulent portions of the missing logbook entries because they knew that the value of the aircraft was considerably diminished by missing or incomplete logbooks.

1  Subsequent to the above, ESQUINO, with the assistance of RICOTTA, using Argentum Air
2  Corporation, sold the above aircraft to United States buyers.  All of the above aircraft had
3  logbooks which contained false or fraudulent entries.

# EXHIBIT 6

Joseph Milchen
Frank & Milchen
Attorneys at Law
136 Redwood Street
San Diego, CA 92103
(619) 574-1888
California State Bar No. 38093

Attorneys for Defendant
Christian E. Esquino

FILED

04 DEC -9 PM 12: 45

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                        DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT O F CALIFORNIA
(Honorable Thomas J. Whelan))

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 02-CR-0333-W |
| Plaintiff, | ) | |
| v. | ) | Sentencing Memorandum |
| CHRISTIAN E. ESQUINO, | ) | |
| Defendant. | ) | Date: December 16, 2004 |
| | ) | Time: 9:00 a.m. |

## STATEMENT OF FACTS AND PROCEEDINGS

On March 22, 2004 defendant Christian Esquino entered a plea of guilty to

Count One of the Superseding Indictment in the above matter. After Esquino was

sworn, the court inquired as to the factual basis for the plea of guilty pursuant to

Rule 11(b)(3) of the Federal Rules of Criminal Procedure. The inquiry as to the

factual basis tracked the language of the Plea Agreement in this matter, Paragraph

B (ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS) of Section II.

Those facts admitted by defendant were as follows:

FRANK & MILCHEN
ATTORNEYS AT LAW
136 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

Case No. 02-CR-0333-W

" . . . (I)n early 1997, you [Esquino] arranged for the exchange of aircraft with the Mexico Department of Agriculture, hereinafter in this Plea Agreement referred to as Sagar, S-A-G-A-R.

"You (Esquino) used the Argentum, A-R-G-E-N-T-U-M, Air Corporation, a corporation of which you (Esquino) were an officer, to conduct the aircraft transaction with Sagar. Among those aircraft delivered by Sagar to you (Esquino), as part of the agreement, were six Cessna aircraft, identified with the following tail numbers, N310CL, N567D, N310LH, N310LT, N38LH, and N210JM.

"When those Cessna aircraft were imported into the United States, you (Esquino) and your co-defendant Mr. Ricotta, noted the aircraft logbooks were incomplete, were missing pages and in some cases were missing whole time periods.

"Beginning sometime in February or early March 1997, and continuing up to at least August 11, 1997, you (Esquino) and your co-defendant, Mr. Ricotta, and others working with you (Esquino) or at your (Esquino's) direction, created the missing portions of those six Cessna logbooks. You (Esquino) accomplished this by using blank logbooks pages and making false and fraudulent entries in those pages, as well as using stamps purported to be from the Mexican Ministry of Communications and Transportation and a Cessna repair station to give the air of authenticity to the logbooks. You (Esquino) and your co-defendant, knowing that portions of the logs for these six Cessna aircraft contained false and fraudulent

RANK & MILCHEN
TTORNEYS AT LAW
8 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

Case No. 02-CR-0333-W

entries, nonetheless, sought and obtained standard Airworthiness Certificates from FAA representatives in order to sell the aircraft to the United States customers.

"You (Esquino) and your co-defendant undertook the creation of false and fraudulent portions of the missing logbook entries because you knew that the value of these six Cessna aircraft were considerably diminished by providing missing or incomplete logbooks.

"Thereafter, you (Esquino), with the assistance of your co-defendant, using are (sic) the Argentum Air Corporation, sold the six Cessna aircraft, with the tail numbers that I (the Court) previously mentioned, to all U.S. buyers. All of these aircraft had logbooks which contained false of fraudulent entries." Transcript of Disposition, on March 22, 2004, pages 6-8.

To the court's inquiry whether all of the above facts were true, defendant answered in the affirmative. Id. at page 8.

The court then inquired whether the government was satisfied with the factual basis, and received another affirmative answer. Ibid.

The court accepted the plea of guilty. Id. at 9.

There was no mention at all during the plea colloquy of any facts underlying the enhancements that were recommended by the parties in Paragraph X of the Plea Agreement, entitled PARTIES' SENTENCING RECOMMENDATIONS.

### PERTINENT PARTS OF THE PLEA AGREEMENT

Paragraph X contains joint recommendations of the parties regarding the Base Offense Level and Adjustments under the Guidelines. Subparagraph (A)(2)(1)

IANK & MILCHEN
TORNEYS AT LAW
I REDWOOD STREET
SAN DIEGO
ALIFORNIA 92103
(619) 574-1888

includes a suggestion that defendant's Base Offense Level be increased eight levels pursuant to U.S.S.G. Section 2F1.1(b)(1)(I), because the loss exceeded $200,000, although there is no upper monetary figure on that recommended loss.

Subparagraph (A)(2)(2) recommends an increase of two levels pursuant to Section 2F1.1(b)(2), because there was more than minimal planning and the scheme involved more than one victim.

Subparagraph (A)(2)(c) recommends an increase of two levels pursuant to Section 2F1.1(b)(7) because "the offense involved the conscious or reckless risk of serious bodily injury." It is interesting to note at this junction that there are no headings under (A)(2), such as (a) and (b), that precede subsection (c).

The last increase is for an additional two levels in Subparagraph (A)(2)(3), pursuant to Section 3B1.1(c), because of an "aggravating role."

Paragraph IX establishes that the sentencing judge has the sole discretion to determine the sentence defendant receives. It also provides that " . . . the recommendation made by the United States is not binding on the court, and it is uncertain at this time what defendant's sentence will be."

Paragraph IX also provides that " . . . if the judge does not follow any of the parties' sentencing recommendations, Defendant nevertheless has no right to withdraw the plea."

RANK & MILCHEN
TTORNEYS AT LAW
6 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

## POINTS AND AUTHORITIES

A. Imposition of the Paragraph X(A)(2) Enhancements will Violate

Defendant's Fifth and Sixth Amendment Constitutional Rights

To Proof Beyond a Reasonable Doubt and a Jury Trial

On June 24, 2004, the Supreme Court of the United States decided *Blakely v. Washington,* supra, 524 U.S. ___, 124 S.Ct. 2531. The Court's decision in *Blakely* expanded on *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000).

In *Apprendi,* the United States Supreme Court held that the defendant had a constitutional right to a jury trial on the factual findings underlying the New Jersey hate-crime enhancement applied to his sentence. That enhancement raised the maximum possible sentence from 10 years to 20 years upon a finding that the offense was committed with the intent to intimidate because of the victim's race, color, gender, handicap, and various other statuses. *Apprendi v. New Jersey,* supra, 530 U.S. 466 at 468-469. Two years later, in *Ring v. Arizona,* 536 U.S. 584, 592-593 and n.1 (2002), the Court "applied *Apprendi* to an Arizona law that authorized the death penalty if the judge found one of ten aggravating factors." *Blakely.* 524 U.S. ___, 124 S. Ct. at 2537. Thus, in *Apprendi* and in *Ring,* the Court "concluded that the defendant's constitutional rights have been violated because the judge had imposed a sentence greater that the maximum he could have imposed under state law without the challenged factual finding." *Blakely,* 524 U.S. ___, 124 S.Ct. at 2537 [citing *Apprendi,* 530 U.S. at 491-497; *Ring,* 536 U.S. at 603-609].

RANK & MILCHEN
TTORNEYS AT LAW
REDWOOD STREET
SAN DIEGO
:ALIFORNIA 92103
(619) 874-1888

5

Case No. 02-CR-0333-W

In applying these precedents to the state sentencing guidelines at issue in *Blakely*, the Court clarified that "the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely *on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 524 U.S. ___, 124 S.Ct. at 2537 [emphasis in original]. Stated another way, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (*Ibid.*) [emphasis in original].

Under the Sixth Amendment's guarantee of trial by jury, judges cannot be permitted to make factual findings that increase a defendant's sentence beyond the maximums suggested by the statutory guidelines. Rather, juries must find such facts "beyond a reasonable doubt" in accordance with the Fifth Amendment right to due process. Writing for the majority, Justice Scalia stated: "When a judge inflicts a punishment that the jury's verdict does not allow . . ., the judge exceeds his proper authority." *Blakely*, 524 U.S. ___, 124 S.Ct. at 2537.

While the *Blakely* Court did not specifically address the Federal Sentencing Guidelines, several of the dissenting Justices argued that the scope of the ruling is so broad that it casts significant doubt on the constitutionality of some of the essential provisions of the Federal Guidelines. For example, Justice O'Connor wrote: "Over 20 years of sentencing reform are all but lost; and tens of thousands of criminal judgments are in jeopardy." *Blakely*, 524 U.S. ___, 124 S.Ct. at 2550 [J.O'Connor dissenting]. "All Criminal sentences imposed under the federal and

ANK & MILCHEN
TORNEYS AT LAW
REDWOOD STREET
SAN DIEGO
ALIFORNIA 92103
(619) 574-1888

state guidelines since *Apprendi* was decided in 2000 arguably remain open to collateral attack." Id. At 2549.

*Blakely* holds that all facts necessary as a matter of law to increase a criminal sentence must be found by a jury (or a judge if the parties waive the right to a jury trial) beyond a reasonable doubt.

B. The Enhancements Recommended in Paragraph X(A)(2) Cannot

Constitutionally Be Imposed

In *United States* v. *Ameline*, 376 F.3d 967, 974 (9th Cir. 2004), the Ninth Circuit held that the *Blakely* reasoning applied to the Sentencing Guidelines. This court is bound by the *Ameline* decision.

Thus, federal judges may not increase an offender's sentence on the basis of an enhancement specified in the United States Sentencing Guidelines without a trier of fact finding the facts to justify that enhancement beyond a reasonable doubt. Alternatively, of course, an offender can admit to the factual basis for the enhancements, and waive the offender's right to have the factual basis determined beyond a reasonable doubt.

The Ninth Circuit in *Ameline* further held that the unconstitutional portions of the Guidelines are severable from the remainder of the Guidelines. Id. At 981.

By analogy, the unconstitutional portions of Paragraph X(A)(2) recommending the increases in punishment are severable from the remainder of defendant's plea agreement and must be stricken. See e.g., United States v. Kelly,

RANK & MILCHEN
TTORNEYS AT LAW
5 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

Case No. 02-CR-0333-W

314 F.3d 908, 912 (7th Cir. 2003) [holding unconstitutional portions of Child Pornography Protection Act severable from remainder of statute].

The absence of a severability clause in defendant's plea agreement does not raise a presumption against severability. *Matter of Reyes*, 910 F.2d 611 (9th Cir. 1990).

In fact, in the context of plea agreements, many federal courts have held waiver provisions severable from the remainder of the plea agreement and proceeded to adjudicate the merits of sentencing issues on appeal. See *United States v. Buchanan*, 59 F.3d 662 (2nd Cir. 1998); *United States v. Chen*, 127 F.3d 286,290-92(2nd Cir. 1997); *United States v. Bushert*, 997 F2d. 1343, 1353 (11th Cir. 1993); *United States v. Baty*, 980 F.2d 977, 979 (5th Cir. 1992); *United States v. Wessells*, 936 F. 2d 165, 168 (4th Cir. 1991).

C. Scope of Defendant's Challenge by This Pleading

Defendant does not seek to withdraw his plea of guilty. Defendant does not seek to set aside the Plea Agreement. Defendant continues in his recommendations to the court regarding the applicable adjustments to the base offense level.

However, defendant contends that the court cannot constitutionally impose the upward adjustments.

RANK & MILCHEN
ITTORNEYS AT LAW
6 REDWOOD STREET
SAN DIEGO
:ALIFORNIA 92103
(619) 574-1888

D. There was No Waiver by Defendant of his Right to Challenge

The Unconstitutional Enhancements

Defendant never admitted the facts that constituted the enhancements in this case. The paragraph dealing with the Factual Basis for the plea of guilty makes no mention of the facts that underlie the enhancements.

Even if it could be argued that his agreement to recommend the enhancement was somehow an agreement on his part to the factual basis, he did not waive his right to challenge the constitutionality of the enhancement. At the time of the entry of the plea in this case, he did not know that he had the right that *Blakely* bestowed on him.

To constitute a waiver, a defendant must intentionally relinquish a known right. That did not happen in this case.

In addition, as noted above, in Paragraph IX of the Plea Agreement, the recommendations of the parties are not binding on the court. As "recommendations" they do not rise to the level as "agreements about the factual basis" for the upward adjustments.

E. The Proof is in the Practice

One almost immediate impact of the *Blakely* decision was that the government started to insert a standard "*Blakely* waiver" in all plea agreements. This practice has been instituted here in the Southern District of California. However, since defendant and the government entered the plea agreement in this

RANK & MILCHEN
ITORNEYS AT LAW
REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

case prior to the issuance of the *Blakely* decision, no such waiver was included in the plea.

In addition, the charging pleadings now contain Special Allegations of facts underlying upward adjustments. As such, they must be specifically addressed when a defendant seeks to change his plea from "not guilty" to "guilty." A defendant now is called upon to "admit" or "deny" the factual allegations that would permit a greater punishment.

Post-*Blakely* the Rule 11 plea colloquies now include advising a defendant of a defendant's *Blakely* rights. Furthermore, it is common feature of the Plea Agreements drafted by the government now to explicitly include *Blakely* waivers if applicable.

The requirements of Rule 11(b) (Considering and Accepting a Guilty or Nolo Contendere Plea) contain 14 specific items that the court "must inform the defendant of, and determine that the defendant understands . . . ." *Blakely* and *Ameline* have now created a 15th requirement to Rule 11(b).

F. Summary

Here, defendant has complied with his obligation under the plea agreement by entering his guilty plea and admitting the factual basis beyond a reasonable doubt. The upward adjustments suggested in Paragraph X(A)(2) were not included in the factual basis and have not been proved beyond a reasonable doubt nor admitted by defendant. Therefore, imposition of those enhancements to bring

RANK & MILCHEN
.TTORNEYS AT LAW
I6 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92I03
(6I9) 574-I888

defendant beyond the Base Offense Level of 6 will violate defendant's rights to a jury trial and due process and is constitutionally impermissible.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests this Court to reject the recommendation for the upward adjustments and submits that defendant's base offense level can be no greater than 6.

Dated: December 9, 2004                    Respectfully Submitted


_____
Joseph Milchen
Frank & Milchen
Attorneys for Defendant
Christian E. Esquino

RANK & MILCHEN
TTORNEYS AT LAW
REDWOOD STREET
SAN DIEGO
ALIFORNIA 92103
(619) 574-1888

Case No. 02-CR-0333-W

# EXHIBIT 7

Joseph Milchen
Frank & Milchen
Attorneys at Law
136 Redwood Street
San Diego, CA 92103
(619) 574-1888
California State Bar No. 38098

RECEIVED
SAN DIEGO, CA

Attorneys for Defendant
Christian E. Esquino

FILED

05 JAN 12 AM 9:19

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
(Honorable Thomas J. Whelan)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal Case No. 02-CR-333-W |
| ) | |
| Plaintiff, ) | Objections to the Presentence |
| ) | Report |
| v. ) | |
| ) | |
| CHRISTIAN E. ESQUINO, ) | |
| ) | |
| Defendant. ) | Date:  January 24, 2005 |
| ) | Time:  9:00 a.m. |

## **The Sole Objection**

In reporting to the court on "The Defendant's Criminal History,"

commencing on page 12, at line 5, and continuing through page 15, at line 12,

the Probation Officer calculates that Defendant has six criminal history points,

and falls into Category III in his criminal history.

Consistent with Paragraph X (E) of the Plea Agreement in the above

matter, defendant has the right to claim that his criminal history category over-

represents the serious of his criminal history and the likelihood that he will

commit further crimes.

RANK & MILCHEN
ATTORNEYS AT LAW
16 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1688

There are four prongs to this argument, as follows:

(1) The misdemeanor conviction in state court in Texas resulted in a deferred prosecution involving six (6) months of summary probation, with the conviction later being set aside.

(2) The date of the conduct underlying the conviction in the Middle District of Florida at Orlando occurred in 1986, and would not have been counted except for the over four-year delay in the bringing of the charges, and the three-year delay in the resolution of the case.

(3) The conviction in this District, on a Rule 20 from the Southern District of Texas, resulted in a probationary sentence, with an early termination of the probation.

(4) The Plea Agreement submitted by the government to the defense one week prior to the disposition hearing in this matter would have eliminated that two-point increase in defendant's criminal history category (Presentence Report, page·15, lines 5-7).

### The Misdemeanor Conviction in Texas

Although technically countable, the offense involved a handgun that was left in a vehicle and forgotten. The manner in which the case proceeded through the Texas criminal justice system is indicative of the minor nature of the offense. First, the case was not processed from its filing in 1989 until early 1993. There was over a 3 year delay from the filing of the case until its resolution. If the matter would more serious, the State of Texas would have

RANK & MILCHEN
TTORNEYS AT LAW
16 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1688

2

Case No. CR-02-333-W

insisted upon a speedier track for the case. Second, the plea was "nolo contendere" instead of an insistence upon a full acceptance of responsibility with a "guilty" plea. Third, the process was a "deferred prosecution" with the conviction to be set aside at a later date upon the successful completion of a probationary period. Fourth, the unsupervised probationary period was a mere six months. Fifth, the conviction was indeed set aside on July 26, 1993.

## The Federal Case in Florida

In this matter, an "historical" case involving the smuggling of cocaine was developed in the Middle District of Florida. Defendant was ultimately exonerated of knowingly assisting in the cocaine venture, but pleaded guilty to the crimes which he had committed, failure to file a currency transaction reporting form.

First, the act giving rise to the offense occurred in 1986, almost 19 years ago. If the charges had been filed shortly after the time of the offense, and the same sentence imposed in a timely fashion, this conviction would not have been counted at all. However, because the case was an "historical" investigation, the charges were not filed until 1990. And because the case involved many defendants and many documents, it was not resolved as to Esquino until 1993.

The Sentencing Guidelines contemplated that most arrests occur just prior to the filing of charges. The time frame for not counting certain convictions becomes artificially inflated when there are delays such as occurred

RANK & MILCHEN
TTORNEYS AT LAW
5 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

Case No. CR-02-333-W

in the Orlando case. Simply put, the conduct that occurred 19 years ago (when the defendant was 23 years old) does not justify the counting of 2 criminal history points.

Second, the sentence imposed (6 months of custody) reflects the lack of seriousness in the conduct.

### The McAllen Bank Fraud Case

Ultimately, the sentence imposed in this case for the offense to which defendant pleaded guilty was a probationary sentence, with an early termination of that probation.

When this fact is viewed in light of a prior misdemeanor conviction (no time in custody), a federal felony in Florida (6 months in custody), and the federal case sentenced in San Diego (no time in custody), it is clear that the convictions as they are counted overly represent his seriousness of his prior criminal conduct and the likelihood that he will commit further crimes.

### The Two-Level Increase

A Plea Agreement was faxed from the government to defendant's then attorney on March 15, 2004. That agreement proposed that defendant plea to Counts 33-44 of the Indictment in this matter. All of these counts involved conduct that occurred after March 16, 1998.

This case was on calendar for disposition on March 22, 2004.

As the court recalls there was a delay in the entry of the plea in this matter. The delay resulted from the fact that defendant could not plead guilty

RANK & MILCHEN
TTORNEYS AT LAW
M REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1888

Case No. CR-02-333-W

to the proposed Plea Agreement because he could not truthfully provide under oath a factual basis for the pleas. Thus, an adjustment was made to the resolution of the case in which the conduct alleged to be unlawful resulted in the conduct being at a time while he was on probation in the McAllen Bank Fraud Case.

The important aspect of this situation was that the proposal pending would have precluded the two-level increase, and the government was willing to accept the fact of the lessening of two criminal history points in order to resolve the case. However, instead of perjuring himself to obtain that benefit, defendant is now suffering the increase in the criminal history points. That is unfair.

### Relief Requested

Based upon the foregoing analysis of defendant's criminal history, and the situation that evolved on the date of the resolution of the case, it is respectfully requested that the court find that defendant's criminal history category should be II, and not III. This adjustment would result in a guideline range of 21-27 months, instead of 24-30 months. The defense would requested that the court imposed the low end of that guideline level, namely 21 months.

Dated: January 12, 2005

Respectfully submitted,

Joseph Milchen
Attorney for Defendant
Christian E. Esquino

RANK & MILCHEN
TTORNEYS AT LAW
16 REDWOOD STREET
SAN DIEGO
CALIFORNIA 92103
(619) 574-1688

Case No. CR-02-333-W

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )
                                     )NO. 02CR0333-W
          PLAINTIFF,                 )
     VS.                             )SAN DIEGO, CALIFORNIA
                                     )JANUARY 24, 2005
CHRISTIAN E. ESQUINO,                )9:00 A.M.
                                     )
          DEFENDANT.                 )
*  *  *  *  *  *  *  *  *  *  *  *

ORIGINAL

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE THOMAS J. WHELAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        CAROL LAM, U.S. ATTORNEY
                           BY:  MR. TIMOTHY D. COUGHLIN,
                           ESQ.
                           880 FRONT STREET
                           5TH FLOOR
                           SAN DIEGO, CALIFORNIA 92101
                           (619) 557-5610

FOR THE DEFENDANT:         FRANK & MILCHEN
                           BY:  MR. JOSEPH A. MILCHEN,
                           ESQ.
                           136 REDWOOD STREET
                           SAN DIEGO, CALIFORNIA 92103
                           (619) 574-1888




OFFICIAL REPORTER:         MELISSA A. PIERSON, CSR, RPR
                           940 FRONT STREET, BOX 18
                           SAN DIEGO, CALIFORNIA 92101
                           (619) 702-7508
                           IL CSR NO. 084-003138
                           CA CSR NO. 12499

1

MADAM CLERK: CASE NO. 02CR0333, UNITED STATES OF AMERICA VERSUS CHRISTIAN E. ESQUINO.

MR. MILCHEN: JOE MILCHEN FOR CHRISTIAN ESQUINO. HE IS PERSONALLY PRESENT.

THE COURT: GOOD MORNING, SIR.

MR. COUGHLIN: TIMOTHY COUGHLIN FOR THE UNITED STATES. GOOD MORNING, YOUR HONOR.

THE COURT: GOOD MORNING. THIS MATTER IS ON CALENDAR FOR SENTENCING. MR. MILCHEN, DO YOU WAIVE ARRAIGNMENT FOR JUDGMENT AND SENTENCE?

MR. MILCHEN: I DO.

THE COURT: IS THERE ANY LEGAL CAUSE NOT TO PROCEED?

MR. MILCHEN: WELL, YOU KNOW, YOUR HONOR, I HAVE BEEN THINKING SINCE JANUARY THE 12TH, ABOUT THE BOOKER DECISION, AND TRYING TO FIGURE OUT HOW IT IMPACTS WHAT WE DO IN THE FEDERAL COURT. THE AGREEMENT SAID SOMETHING ABOUT THAT THE SENTENCE WOULD BE GOVERNED BY THE GUIDELINES, AND NOW, THEY ARE ADVISORY, AND NOT MANDATORY. IT OCCURRED TO ME THAT MAYBE THE AGREEMENTS ARE NOW VOID?

THE COURT: THAT WOULD ASSUME THAT I WASN'T GOING TO GO WITH WHAT THE GUIDELINES OF WHAT THE AGREEMENT WERE, WOULDN'T IT?

MR. MILCHEN: IT COULD BE, YOUR HONOR. WE ARE

```
 1   READY.  WE WAIVE.  THERE IS NO LEGAL CAUSE.

 2           THE COURT:  ALL RIGHT.  FOR THE RECORD, I HAVE

 3   READ AND CONSIDERED THE PRE-SENTENCE REPORT; THE PLEA

 4   AGREEMENT; THE DEFENDANT'S OBJECTION TO THE

 5   PRE-SENTENCE REPORT; THE ADDENDUM TO THE PRE-SENTENCE

 6   REPORT; THE SECOND ADDENDUM TO THE PRE-SENTENCE REPORT;

 7   THE DEFENDANT'S SENTENCING MEMORANDUM; THE DEFENDANT'S

 8   SENTENCING CHART; THE GOVERNMENT'S SENTENCING CHART;

 9   THE GOVERNMENT'S SENTENCING MEMORANDUM; THE

10   GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM ALONG

11   WITH THE ATTACHMENTS; THE GOVERNMENT'S RESPONSE TO THE

12   DEFENDANT'S REQUEST THAT I FIND HIS CRIMINAL HISTORY

13   CATEGORY TO BE OVER REPRESENTED.

14           STARTING WITH THE -- AS MR. MILCHEN JUST

15   INDICATED, THE GUIDELINES AFTER THE BOOKER DECISION ARE

16   NOW ADVISORY, BUT WITH REGARD TO THE GUIDELINES, IT

17   WOULD BE MY INTENTION TO FOLLOW THE PARTIES' JOINT

18   RECOMMENDATION TO THE PLEA AGREEMENT FOR A TWO-LEVEL

19   DEPARTURE PURSUANT TO GUIDELINE SECTION

20   5(K)2.0.

21           WITH REGARD TO THE DEFENDANT'S OBJECTION TO

22   UPWARD GUIDELINE ADJUSTMENTS THAT WERE AGREED TO IN THE

23   PLEA AGREEMENT AS NOT BEING IMPOSED, THAT'S DENIED AS

24   MOOT, UNDER BOOKER.

25           WITH REGARD TO THE CRIMINAL HISTORY CATEGORY
```

BEING OVER REPRESENTED, I TENTATIVELY AGREE WITH THE
GOVERNMENT AND THE PROBATION DEPARTMENT THAT IT IS NOT
OVER REPRESENTED. HE HAS THREE CONVICTIONS. TWO OF
THOSE ARE FELONIES. QUITE HONESTLY, MR. MILCHEN, IF I
WAS TO AGREE WITH YOU, THAT IS, THE DELAY IN FILING THE
FIRST ONE SHOULD MAKE IT NOT SCORE, HE WOULD STILL BE A
CRIMINAL HISTORY SCORE OF FOUR, AND HE WOULD STILL BE
IN A CRIMINAL HISTORY CATEGORY OF THREE. THAT DOESN'T
MAKE THAT MUCH OF A DIFFERENCE. I DON'T AGREE WITH
YOU. BUT EVEN IF I DID, I AM JUST STATING THAT FOR THE
RECORD. STILL HIS CRIMINAL HISTORY SCORE WOULD STILL
PUT HIM IN THE CRIMINAL HISTORY CATEGORY THREE.

I WOULD GO TO THE LOW END OF THE RANGE AS
CONTEMPLATED BY THE PLEA AGREEMENT, THE LOW END OF THE
GUIDELINE RANGE, EVEN THOUGH IT IS ADVISORY. FOR THE
RECORD, THE STATUTORY MAXIMUM IN THIS CASE IS TEN
YEARS. I WILL LISTEN TO EVERYBODY.

MR. MILCHEN: YOUR HONOR, THE ONLY THING, ON
THE OVERLY REPRESENTATION, WHICH IS THE ONE ISSUE WHICH
WAS RESERVED TO BE ARGUED, IT JUST IS KIND OF QUIRKY
THAT HE GETS THAT TWO-LEVEL INCREASE BECAUSE OF THE WAY
THAT THE CASE WENT DOWN.

HOWEVER, EVEN THOUGH YOU MAY NOT AGREE, BUT IF
YOU DID, THEN, THAT MEANS THE GUIDELINES SCORING, THE
CRIMINAL HISTORY POINTS, YOU HAVE THAT EVENT THAT TOOK

1    PLACE IN THE MIDDLE DISTRICT OF FLORIDA THAT STARTED

2    LIKE 19 YEARS AGO.  AND THEN, THAT MINOR MATTER WHICH

3    SCORED AS ONE POINT IN DALLAS, WHICH IS VERY OLD AS

4    WELL, 15 YEARS AGO -- 14 YEARS AGO NOW, AND THE WAY

5    THAT IT WAS TREATED, IT'S LIKE DEFERRED -- IT WAS A

6    DEFERRED PROSECUTION, IN ESSENCE.

7            IT SEEMS TO ME THAT NOW THAT WE -- WHEN WE ARE

8    NOT -- DON'T HAVE TO BE SO TECHNICAL ABOUT SCORING

9    CRIMINAL HISTORY POINTS, ALTHOUGH, THEY ADVISED, IT

10   SEEMS TO ME, THAT HE REALLY SHOULD GO TO THE CRIMINAL

11   HISTORY CATEGORY TWO.  AND I WOULD ASK THE COURT TO --

12   I SPELLED IT OUT IN MY PLEADING, AND I THINK THAT WOULD

13   BE APPROPRIATE IN THIS CASE.  WITH THAT, I WOULD

14   SUBMIT.

15           THE COURT:  THANK YOU.  MR. COUGHLIN?

16           MR. COUGHLIN:  YOUR HONOR, I HAVE NOTHING TO

17   ADD.  I THINK I ARGUED AS BEST I COULD WHY IT IS

18   REASONABLE FOR HIM TO BE IN A CRIMINAL HISTORY CATEGORY

19   THREE.  I AGREE WITH PROBATION, AND FOLLOWING THE

20   COURT'S ANALYSIS IS THE SAME AND SUBMIT THAT TO THE

21   COURT.

22           I AGREE WITH THE COURT IN TERMS OF THE

23   ADDITIONAL TWO-POINT LEVEL DEPARTURE UNDER 5(K)2.0, AND

24   THIS RESULTS IN THE GUIDELINE RANGE OF 24 TO 30 MONTHS.

25   PER THE PLEA AGREEMENT, WE RECOMMEND THE LOW END OF 24

MONTHS IN CUSTODY.

THE COURT: MR. ESQUINO, IS THERE ANYTHING YOU WANT TO SAY, SIR? YOU DON'T HAVE TO SAY ANYTHING, BUT YOU CAN IF YOU WANT TO.

THE DEFENDANT: THANK YOU, YOUR HONOR. I HAVE NOTHING TO SAY.

THE COURT: I HAVE ONE QUESTION FOR EITHER COUNSEL OR BOTH COUNSEL: WITH REGARD TO THE RESTITUTION, I HAVE TO SET A MONTHLY PAYMENT. IT SEEMS THAT A MONTHLY PAYMENT OF $12,000 IS JUST NOT REASONABLE.

MR. COUGHLIN: YOUR HONOR, I WOULD SUGGEST TO THE COURT, AND THIS IS CONSISTENT WITH WHAT WE ARE GOING TO ASK, WE WERE GOING TO ASK FOR A MAY REPORT DATE, WHICH IS FINE WITH THE GOVERNMENT, IN THE INTERIM, PERHAPS IN THE NEXT SIX WEEKS, I CAN MEET WITH MR. MILCHEN AND MR. ESQUINO, WE CAN MAKE A RECOMMENDATION TO THE COURT PURSUANT TO SOME TYPE OF PAYMENT SCHEDULE. WE CAN ALSO BE IN CONTACT WITH THE PROBATION DEPARTMENT AND ALLOW MR. MILCHEN TO KIND OF PERHAPS SUGGEST, WITH MR. ESQUINO'S ASSISTANCE, WHAT WOULD BE APPROPRIATE AND SOMETHING HE COULD UNDERTAKE.

MR. MILCHEN: THAT'S AGREEABLE WITH ME, YOUR HONOR.

THE COURT: FOR PURPOSES OF TODAY, I THINK I

```
 1    HAVE TO SET A NUMBER.  SO, I WILL SET A NUMBER WITH THE

 2    UNDERSTANDING THAT I WILL MODIFY IT PURSUANT TO YOUR

 3    GENTLEMEN'S AGREEMENT.

 4            MR. MILCHEN:  THAT'S FINE.

 5            MR. COUGHLIN:  THAT'S FINE WITH THE

 6    GOVERNMENT, YOUR HONOR.

 7            THE COURT:  LET ME JUST BRIEFLY COMMENT ON HIS

 8    CRIMINAL HISTORY CATEGORY.  MR. MILCHEN, AS YOU ARE

 9    AWARE, THE PROBATION DEPARTMENT CORRECTLY POINTS OUT

10    THAT, ALTHOUGH THE CONDUCT IN THAT FIRST OFFENSE WAS 19

11    YEARS AGO FROM TODAY, THE CONDUCT IN THAT OFFENSE WAS

12    11 YEARS AGO FROM THE TIME OF THE CONDUCT IN THE

13    CURRENT OFFENSE FOR WHICH HE STANDS BEFORE ME.  SO, FOR

14    THAT REASON, I THINK THE CRIMINAL HISTORY CATEGORY IS

15    APPROPRIATE.

16            THE COURT FINDS THE PLEA AGREEMENT DOES COMPLY

17    WITH THE PROVISIONS OF SECTION 6(B)1.2 OF THE

18    SENTENCING GUIDELINES.  IT DOES ADEQUATELY REFLECT THE

19    SERIOUSNESS OF THE OFFENSE, AND WILL NOT UNDERMINE THE

20    STATUTORY PURPOSE OF SENTENCING.

21            THE BASE OFFENSE LEVEL IN THIS MATTER IS SIX.

22    BECAUSE THE AMOUNT OF THE LOSS EXCEEDED $200,000, THE

23    BASE OFFENSE LEVEL IS INCREASED BY EIGHT.

24    BECAUSE THERE WAS MORE THAN MINIMAL PLANNING, THE BASE

25    OFFENSE LEVEL WOULD BE INCREASED AN ADDITIONAL TWO
```

LEVELS. BECAUSE OF THE RISK OF SERIOUS BODILY INJURY,
THERE IS AN ADDITIONAL TWO-LEVEL INCREASE. BECAUSE OF
HIS ROLE IN THE OFFENSE, THERE IS AN ADDITIONAL
TWO-LEVEL INCREASE. I WILL ADJUST ALL OF THAT
DOWNWARDS THREE LEVELS FOR HIS ACCEPTANCE OF
RESPONSIBILITY PURSUANT TO GUIDELINE SECTION 3(E)1.1.
SPECIFICALLY, I WILL GRANT THE GOVERNMENT'S MOTION FOR
A THIRD LEVEL OFF. I WILL GRANT A TWO-LEVEL DEPARTURE
PURSUANT TO SECTION 5(K)2.0, PURSUANT TO THE PLEA
AGREEMENT BETWEEN THE PARTIES.

THAT GIVES ME AN ADJUSTED OFFENSE LEVEL OF 15,
A CRIMINAL HISTORY SCORE OF SIX, A CRIMINAL HISTORY
CATEGORY OF THREE. THE RESULTING GUIDELINE RANGE IS
FROM 24 TO 30 MONTHS. AS I INDICATED, BECAUSE OF THE
BOOKER CASE, WE ARE NO LONGER BOUND BY THE GUIDELINE.
THE STATUTORY MAXIMUM FOR THIS OFFENSE WOULD BE TEN
YEARS IN CUSTODY.

PURSUANT TO THE PLEA AGREEMENT BETWEEN THE
PARTIES, I WILL FOLLOW THE ADVISORY RANGE OF THE
GUIDELINES AND COMMIT HIM TO THE CUSTODY OF THE BUREAU
OF PRISONS FOR A TERM OF IMPRISONMENT OF 24 MONTHS.

A STATUTORY FINE WILL NOT BE IMPOSED. DUE TO
THE AMOUNT OF THE RESTITUTION THAT I AM ABOUT TO
IMPOSE, A SPECIAL ASSESSMENT OF $100 WILL BE IMPOSED.
I WILL ORDER HE PAY RESTITUTION, AS CONTAINED IN THE

1    SECOND ADDENDUM TO THE PRE-SENTENCE REPORT, IN THE

2    AMOUNT OF $435,000.  THAT WOULD BE SUBJECT TO

3    MODIFICATION ON OR BEFORE MAY OF THIS YEAR, PURSUANT TO

4    THE AGREEMENT OF THE PARTIES.  MAKE PAYMENTS TO THE

5    CLERK OF THE US DISTRICT COURT TO THE VICTIMS ON FILE

6    AT THE US ATTORNEY'S OFFICE.  FOR NOW, I WILL SET A

7    MINIMUM PAYMENT OF $5,000 PER MONTH, AND BE JOINTLY AND

8    SEVERALLY LIABLE FOR THAT AMOUNT, ALONG WITH HIS

9    CO-DEFENDANT, MR. RICOTTA.

10           FOLLOWING YOUR RELEASE FROM CUSTODY,    .

11   MR. ESQUINO, YOU WILL BE ON SUPERVISED RELEASE FOR A

12   PERIOD OF THREE YEARS.  I WILL IMPOSE ALL THE STANDARD

13   TERMS AND CONDITIONS OF SUPERVISION AND THE FOLLOWING

14   SPECIAL CONDITIONS:

15           FIRST, I DON'T WANT YOU TO POSSESS ANY

16   FIREARMS, EXPLOSIVE DEVICES OR DANGEROUS WEAPONS WHILE

17   YOU ARE ON SUPERVISED RELEASE.

18           YOU ARE PROHIBITED FROM OPENING CHECKING

19   ACCOUNTS OR INCURRING NEW CREDIT CHARGES OR OPENING

20   ADDITIONAL LINES OF CREDIT WITHOUT THE APPROVAL OF YOUR

21   SUPERVISING PROBATION OFFICER.

22           YOU ARE TO PROVIDE A COMPLETE DISCLOSURE OF

23   YOUR PERSONAL, BUSINESS AND FINANCIAL RECORDS TO YOUR

24   PROBATION OFFICER, IF HE OR SHE REQUESTS THEM.

25           DON'T ENGAGE IN THE EMPLOYMENT OR PROFESSION

OF AIRCRAFT SALES OR ANY OTHER OCCUPATION INVOLVING THE
FIDUCIARY RESPONSIBILITIES OR SOLICITATION OF FUNDS.

FILE ALL YOUR FEDERAL AND STATE TAX RETURNS,
INCLUDING ANY CORRECTED RETURNS THAT MAY BE REQUIRED BY
LAW.

NOTIFY THE COLLECTION'S UNIT OF THE US
ATTORNEY'S OFFICE AND THE US PROBATION DEPARTMENT OF
ANY INTEREST IN ANY PROPERTY OBTAINED DIRECTLY OR
INDIRECTLY, INCLUDING ANY INTEREST CONTAINED UNDER ANY
OTHER NAME OR ENTITY, INCLUDING A TRUST, PARTNERSHIP,
OR CORPORATION UNTIL THE FINE OR RESTITUTION ORDER IS
PAID IN FULL.

ALSO, NOTIFY THE COLLECTION'S UNIT AND THE US
ATTORNEY'S OFFICE, THE US PROBATION OFFICE BEFORE YOU
TRANSFER ANY INTEREST IN REAL PROPERTY OWNED DIRECTLY
OR INDIRECTLY.

SUBMIT TO A SEARCH OF YOUR PERSON, PROPERTY,
PLACE OF RESIDENCE, VEHICLE AND PERSONAL EFFECTS
WHENEVER REQUESTED TO DO SO BY YOUR PROBATION OFFICER
OR LAW ENFORCEMENT OFFICER.

REPORT ALL VEHICLES OWNED OR OPERATED IN WHICH
YOU HAVE, TO YOUR PROBATION OFFICER.

IF YOU ARE REMOVED, DEPORTED OR ALLOWED TO
VOLUNTARILY RETURN TO MEXICO, DO NOT RE-ENTER THE
UNITED STATES ILLEGALLY.  IF YOU DO RE-ENTER THE UNITED

1  STATES, YOU ARE TO REPORT TO YOUR SUPERVISING PROBATION

2  OFFICER WITHIN 24 HOURS OF RE-ENTRY.  SUPERVISION OF

3  THESE CONDITIONS WILL BE WAIVED UPON YOUR REMOVAL,

4  DEPORTATION OR VOLUNTARY DEPARTURE FROM THE UNITED

5  STATES.

6       I WILL RECOMMEND THAT THE DRUG PROGRAM, DRUG

7  TESTING WILL BE SUSPENDED.

8       STAY OF EXECUTION OF CUSTODY UNTIL?

9       MR. MILCHEN:  MAY 16TH, YOUR HONOR, AT SAY

10  11:00 O'CLOCK IN THE MORNING, AND PUT IT ON THE

11  CALENDAR AT 2:00.

12       THE COURT:  WHY DON'T WE GO TO FRIDAY, THE

13  20TH.  THE 16TH IS PRETTY BUSY DOWNSTAIRS.  FRIDAY IS A

14  BETTER DAY FOR THE MARSHAL SERVICE.  MR. COUGHLIN, I

15  ASSUME YOU HAVE NO OBJECTION?

16       MR. COUGHLIN:  NO OBJECTION.

17       THE COURT:  MR. ESQUINO, IS THAT ALL RIGHT

18  WITH YOU?

19       THE DEFENDANT:  YES, SIR.

20       THE COURT:  STAY OF EXECUTION OF CUSTODY UNTIL

21  FRIDAY, MAY 20TH, BY 12:00 NOON.  BY THAT DATE AND

22  TIME, SIR, YOU ARE TO REPORT TO THE US MARSHAL'S

23  OFFICE, WHICH IS LOCATED IN THE BASEMENT OF THIS

24  COURTHOUSE.  MR. MILCHEN WILL TAKE YOU DOWN THERE THIS

25  MORNING JUST SO YOU KNOW WHERE TO GO.

```
 1                  THE DEFENDANT:  YES.

 2                  MR. MILCHEN:  ON THAT STAY, YOUR HONOR, CAN HE

 3      ALSO REPORT DIRECTLY TO THE INSTITUTION?

 4                  THE COURT:  YES.  IF HE IS DESIGNATED BY THAT

 5      TIME, HE CAN REPORT DIRECTLY TO THE INSTITUTION, IF HE

 6      SO DESIRES.

 7                  MR. MILCHEN:  ONE FINAL THING, WILL THE COURT

 8      CONSIDER INCLUDING IN THE JUDGMENT AND SENTENCE THE

 9      RECOMMENDATION THAT HE BE HOUSED AT A PRISON CAMP IN

10      THE WESTERN REGION?

11                  THE COURT:  I WILL RECOMMEND HE BE HOUSED IN

12      THE WESTERN REGION, YES, SIR.

13                  MR. MILCHEN:  IN A CAMP?

14                  THE COURT:  I DON'T KNOW IF THEY HAVE ANY

15      CAMPS LEFT.  THEY HAVE DONE AWAY WITH THE INTENSIVE

16      CONFINEMENT CENTER PROGRAM.  I AM NOT SURE WHAT THEY

17      ARE DOING, MR. MILCHEN.

18                  MR. MILCHEN:  I THINK THEY HAVE LOTS OF CAMPS

19      STILL.

20                  THE COURT:  I WILL MAKE THAT RECOMMENDATION.

21      THAT'S ALL I CAN DO.

22                  MR. MILCHEN:  THANK YOU VERY MUCH, YOUR HONOR.

23                  MR. COUGHLIN:  THANK YOU.

24                  THE COURT:  YOU ARE WELCOME.

25                  (WHICH WERE ALL THE PROCEEDINGS HAD.)
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

1

2

3

4          I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER

5     FOR THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT

6     OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED IN

7     SHORTHAND AS SUCH OFFICIAL COURT REPORTER THE FOREGOING

8     PROCEEDINGS HAD BEFORE THE HONORABLE THOMAS J. WHELAN,

9     JUDGE OF SAID COURT IN THE ABOVE-ENTITLED CAUSE ON THE

10    24TH DAY OF JANUARY 2005, AND THEREAFTER CAUSE TO BE

11    TRANSCRIBED INTO TYPEWRITING THE FOREGOING TRANSCRIPT

12    WHICH I HEREBY CERTIFY IS A TRUE AND CORRECT

13    TRANSCRIPTION OF MY SHORTHAND NOTES SO TAKEN OF THE

14    EVIDENCE OFFERED AND RECEIVED ON SAID DATE BEFORE SAID

15    JUDGE.

16

17

18

19

20                    *Melissa A. Pierson*

21                    MELISSA A. PIERSON, CSR, RPR
                      CALIFORNIA LICENSE NO. 12499
22                    ILLINOIS LICENSE NO. 084-003138

23

24     DATED THIS 12TH DAY OF JULY 2006.

25

# EXHIBIT 9

AO 245B (Rev. 9/00) Judgment in a Criminal Case
Sheet 1

FILED
05 JAN 24 PM 3:12
U.S. DISTRICT COURT
DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
v.
CHRISTIAN E. ESQUINO (01)

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: 02CR0333-W

JOSEPH MILCHEN
Defendant's Attorney

**REGISTRATION NO.** 28170198

**THE DEFENDANT:**

X pleaded guilty to count(s) one of the superseding indictment

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 38(a)(3) and 38(a)(1)(C) | CONSPIRACY TO COMMIT FRAUD INVOLVING AN AIRCRAFT | S1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X Count(s) Remaining superseding counts and the underlying indictment are dismissed on the motion of the United States.

X Assessment : $ 100.00 payable forthwith.

X Fine ordered waived.

IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

January 24, 2005
Date of Imposition of Sentence

THOMAS J. WHELAN
UNITED STATES DISTRICT JUDGE

122

Entered Date: 1-25-05

DEFENDANT:      CHRISTIAN E. ESQUINO (01)
CASE NUMBER:    02CR0333-W

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 24 months.

X    The court makes the following recommendations to the Bureau of Prisons:
     The Court recommends placement in the western region.
     The Court recommends a camp facility

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

     ☐    at _____ ☐ a.m.  ☐ p.m.   on _____ .

     ☐    as notified by the United States Marshal.

X    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     X    or USM by noon    on 5/20/05_____ .

     ☐    as notified by the United States Marshal.

     ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT:    CHRISTIAN E. ESQUINO (01)
CASE NUMBER:  02CR0333-W

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 3 years.

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

X   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court . The defendant shall also comply with *any special conditions imposed.*

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any *controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;*

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:    CHRISTIAN E. ESQUINO (01)
CASE NUMBER:  02CR0333-W

## SPECIAL CONDITIONS OF SUPERVISION

__X__   The defendant shall not possess firearms, explosive devices, or other dangerous weapons.

__X__   The defendant shall submit to search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer or other law enforcement officer.

__X__   The defendant shall report all vehicles owned, operated, or in which the defendant has an interest to the probation officer.

__X__   If deported, excluded, or allowed to voluntarily return to Mexico, not reenter the United States illegally and report to the probation officer within 24 hours of any reentry to the United States; supervision waived upon deportation, exclusion or voluntary departure.

__X__   The defendant shall provide complete disclosure of personal and business financial records to the probation officer as requested.

__X__   The defendant shall be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the probation officer.

__X__   The defendant shall file all federal and state tax returns, including any corrected returns, as required by law.

__X__   The defendant shall notify the collections unit of the U.S. Attorney's office, and the U.S. Probation office, of any interest in property obtained, directly, or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation, until any fine or restitution ordered is paid in full.

__X__   The defendant shall notify the collections unit of the U.S. Attorney's office and the U.S. Probation office, before the defendant transfers any interest in property owned directly or indirectly by the defendant.

__X__   The defendant shall not engage in the employment or profession of aircraft sales or any other occupation involving fiduciary responsibilities or the solicitation of funds.

__X__   The defendant shall pay restitution in the amount of $435,000.00 (subject to modification), through the Clerk, U.S. District Court, to the victims listed below, payable forthwith or through the Inmate Financial Responsibility Program during the period of incarceration, with the payment of any remaining balance to be made following the defendant's release from prison, at the rate of $5,000.00 per month. Distribution of restitution is to be on a pro rata basis. This restitution liability is jointly and severally with the codefendant.

| | |
|---|---|
| Marcia Horn<br>130 Cessan Drive<br>Erie, CO 80516 | $15,000.00 |
| Dr. John Williams<br>1519 Syrup Mill Road<br>Blythewood, SC 29016 | $100,000.00 |
| Jack C. Van Blarcom<br>2883 Overland Court<br>Highland, CA 92346 | $70,000.00 |
| Don Horowitz<br>C/O SSC<br>660 NW 125th Street<br>North Miami, FL 33168 | $250,000.00 |

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT FOR THE FILED

SOUTHERN DISTRICT OF CALIFORNIA 06 MAY -8 AM 9: 48

(SAN DIEGO DIVISION)

CLERK, U.S. DISTRICT ...
SOUTHERN DISTRICT OF CALIF...

BY: ___

DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| RESPONDENT, | ) |
| | ) |
| | ) |
| -VS- | ) |
| | ) |
| | ) |
| CHRISTIAN E. ESQUINO, | ) |
| DEFENDANT. | ) |

CASE NO:02-CR-0333-W

## THE DEFENDANT'S

## MEMORANDUM OF LAW WITH ADDITIONAL FACTS AND AUTHORITY IN

## SUPPORT OF HIS REQUEST TO AMEND HIS PENDING § 2255

**COMES NOW,** Christian E. Esquino, The Defendant/Petitioner in **PRO SE,** and hereby respectfully submits his Memorandum Of Law with additional facts and authority in support of his request to amend/ supplement his pending Section 2255 Motion. The Defendant makes his instant request pursuant to the Federal Rules Of Civil Procedure, Rule 15(a)(c). In support of The Defendant's present request, he states the following:

# GROUND ONE

The Defense Counsel in the case at bar, was Constitutionally ineffective where he failed to object to the fatally defective in-dictment. The Indictment failed, totally, to allege a federal of-fense in Count One of the indictment that encomapsses the beginning date of the offense of conviction, Count One.

Based upon the Government's allegations, as set out in the "OVERT ACTS", in support of the conspiracy charged in Count One, it assumed that the conspiracy charged in Count One began in mid-February 1997. (See Overt Acts Of Count One, Page 6, Attached As Exhibit One).

In mid-February 1997, the date of commission of the alleged conspiracy in Count One, there was no such statutory charge under Title 18 U.S.C. §§ 38(a)(3) and/or 38(a)(1)(C). As such, counsel was, in fact, Constitutionally ineffective where he ill-advised The Defendant to plead guilty to Count One conspiracy as charged in the indictment where it failed to invoke subject-matter juris-diction upon the District Court pursuant to Title 18 U.S.C. §§ 38 (a)(3) and 38(a)(1)(C).

To the contrary, the statutory charge on Count One of the in-dictment serves to effectively, divest, the District of subject-matter jurisdiction to either try, convict or to sentence The De-fendant under Title 18 U.S.C. §§ 38(a)(3) and/or 38(a)(1)(C), and therefore, the indictment should be dismissed, "With Prejudice".

"Habeas corpus has long been available to attack convictions and sentences entered by a court without jurisdiction". Keel v. United States, 585 F.2d 110 at 114 (5th Cir. 1978)(en banc). See

also, <u>United States v. Ruelas</u>, 106 F.3d 1416 at 1418-19 (9th Cir. 1997). It is clear that the District Court is without jurisdiction to accept a guilty plea to a non-offense.

The violation of The Defendant's right to be free of prosecution for a non-offense, would bar his conviction, even if, factual guilt was established on overwhelming evidence. The Defendant's instant claim can be effectively resolved via the Court's examination of the face of the indictment without requiring any further proceedings.

Failure of the District Court to grant The Defendant's motion will result in a complete and a fundamental miscarriage of justice.

## GROUND TWO

The indictment failed to place the conspiracy within an oper-ative time-frame. Count One of the indictment charged, in part, that: "Beginning at a date unknown to the grand jury and continu-ing up to and including July 20, 2001...."

The indictment is open-ended, in that, it failed to allege a beginning date of the conspiracy on Count One, as such, it also fails to inform The Defendant of the charge that he must defend against.

The indictment is fatally defective because it merely alleg-ed an unknown <u>start date</u> for the term of the conspiracy, and the-refore, it prevents The Defendant from pleading double jeopardy in future prosecutions. Counsel was certainly, Constitutionally in-effective where he failed to raise or challenge, pre-trial, during or after trial, the open-ended conspiracy charge. Counsel had pos-session of the record and he was aware of the vague and the fatal defect in the indictment with regards to the <u>start date</u> of the conspiracy, which resulted in the indictment's failure to allege an offense on Count One.

An indictment is sufficient if it alleges, (1) a conspiracy to commit a crime; (2) the time during when the conspiracy was oper-ative, and (3) the statute allegedly violated. See <u>United States v. Shabani</u>, 993 F.2d 1419 at 1420-(9th Cir. 1993).

The manner in which the indictment was drafted in Count One, hampered The Defendant's ability to prepare a defense. Had The De-fendant known that the indictment failed to state a federal offense

-4-

on Count One, he would have never pleaded guilty, but instead, he would have insisted that his counsel take corrective measures to determine whether a true federal charge could be made against The Defendant in the case at bar.

In the case at bar, the District Court never made any specific findings or any findings beyond a reasonable doubt that the conspiracy extended into the effective date of, Title 18 U.S.C. § 38(a)(3) or § 38(a)(1)(C), as required by controlling caselaw. See United States v. Torres, 901 F.2d 205 at 224-226 (2nd Cir. 1990).

As stated by the Ninth Circuit Court Of Appeals in, United States v. Cecil, 608 F.2d 1294 (9th Cir. 1979);:"More importantly, the indictment fails to place the conspiracies within any time frame. The language "beginning on or before July, 1975, and continuing thereafter until on or after October, 1975," is opened-ended in both directions." Id., at 1297.

It is clear that, the manner in which the indictment is drafted, it fails the Appellate Court's instructions in, United States v. Shabani, where the Court held that to be sufficient, the indictment must allege; the time during when the conspiracy was operative. Id., at 1420. Counsl's failure to raise the instant issues constitutes ineffective assistance of counsel.

The Sixth Amendment to the United States Constitution guaranteed that The Defendant is entitled to assistance of counsel in the presentation of his defense. Also, the Supreme Court stated: "The right to counsel is a fundamental right of criminal defendants; it

assures the fairness and thus the legitimacy of our adversary process." Kimmelman v. Morrison, 477 U.S. 365 at 374 (1986).

Furthermore, the High Court has recognized that: "the right to counsel is the right to Effective assistance of counsel." See McMann v. Richerson, 397 U.S. 759 at 771 (1970).

In the case at bar, Counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied upon as having produced a just result. See Strickland V. Washington, 466 U.S. 668 at 686 (1984).

The representation that The Defendant received from his counsel, fell well below an objective standard of reasonableness and there is a reasonable probability that, but for Counsel's unprofessional errors, and his otherwise, deficient performance, the results of the proceedings would have been different. Strickland at 694, supra.

Based upon Counsel's inadequate representation, including his failure to object to the Court's adjudication of the claims in this case, resulted in a conviction/sentence that is in violations of the laws of the United States and the U.S. Constitution, which constitutes a fundamental and a complete miscarriage of justice.

Had The Defendant been aware of the fatally defective indictment in the case at bar, he would not have pleaded guilty, but instead, he would have insisted upon going to trial.

The Defendant's waiver of his right to appeal did not include claims of ineffective assistance of counsel brought under motion to vacate pursuant to Title 28 U.S. § 2255, where The Defendant has established ineffective assistance of Counsel, and, where, in

absence of Counsel's erroneous advice, The Defendant would have insisted on going to trial. See **United States v. Baramdyka**, 95 F.3d 840 at 844 (9th Cir. 1996).

**WHEREFORE,** in the interest of justice and due process of law, The Defendant prays that this Honorable Court give liberal and generous constructions to his pleadings and grant his motion in full, or in the alternative, grant whatever other relief that the Court deems proper and just.

<u>DATED: MAY</u> ष्ठ 2006:

Respectfully submitted,

Christian A. Esquino, #28170-198
F.C.I. Lompoc Low
3600 Guard Road
Lompoc, California-93436

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 02cr0333-W |
| | ) | Civil Case No. 06cv0966-W |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | BY MAIL |
| CHRISTIAN ESQUINO, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Melissa D. Johnson, am a citizen of the United States over the age of eighteen years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and

On July 17, 2006, I deposited in the United States mail at San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of Government's Response and Opposition to Petitioner's Brief Filed In Support of His 28 U.S.C. 2255 Motion to Vacate, Set Aside, or Correct Sentence

addressed to Christian E. Esquino, Reg. No. 28170-198, Federal Correctional Institution Lompoc Low, 3600 Guard Road, Lompoc, CA 93436

the last known address at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __17th__ day of July, 2006.

MELISSA D. JOHNSON